UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>MONTAGE TECHNOLOGY GROUP<br><br>LIMITED SECURITIES LITIGATION | Case No. 14-cv-00722-SI<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 42 |

Defendants Montage Technology Group Limited ("Montage"), Howard C. Yang, Stephen Tai, and Mark Voll move to dismiss the consolidated amended complaint ("CAC") filed by plaintiffs Martin Graham, et al. The motion, which seeks dismissal for failure to state a claim upon which relief can be granted and on grounds of *forum non conveniens*, is scheduled for hearing on January 30, 2015. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument and **VACATES** the hearing. For the reasons set forth below, the Court **DENIES** defendants' motion to dismiss.

**BACKGROUND**

Defendant Montage is a Cayman Islands corporation, headquartered and primarily conducting business in China. CAC ¶ 3. Through its subsidiaries, Montage also conducts business in Hong Kong, Taiwan, and the United States. CAC ¶ 15. During all relevant times, its shares traded in the United States on NASDAQ.[1] CAC ¶ 3. Individual defendants Howard C. Yang, Stephen Tai, and Mark Voll are, respectively, the Chief Executive Officer ("CEO"),

---

[1] Montage stock (ticker: MONT) ceased trading on November 19, 2014, when all of its outstanding shares were purchased by two Chinese corporations, one them state-owned.

President, and Chief Financial Officer ("CFO") of Montage. CAC ¶¶ 16-19.

Plaintiffs are a class of persons and entities who purchased securities of Montage from September 25, 2013, to February 6, 2014, and did not sell the securities before February 6, 2014. CAC ¶ 2. Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. CAC ¶ 2.

In August 2013, the Securities and Exchange Commission (SEC) declared effective a Form S-1 (the "2013 Registration Statement") that Montage filed in connection with its initial public offering. CAC ¶ 21. The Registration Statement represented that 82 percent of Montage's net revenue came through independent distributors. CAC ¶ 23. The largest of these distributors, LQW, accounted for 50 percent of Montage's revenue for fiscal year 2012 and 67 percent of its revenue for the first six months of fiscal year 2013. *Id.* Each of the individual defendants signed the 2013 Registration Statement. CAC ¶ 28.

Montage subsequently filed with the SEC a Form 10-Q for the third quarter of fiscal year 2013, as well as 2014 Registration Statement. CAC ¶¶ 29, 32. Each of these filings stated that revenue from LQW constituted 71 percent of Montage's revenue for the nine months ended September 30, 2013. CAC ¶¶ 29, 24.

On February 6, 2014, analyst firm Gravity Research issued a report alleging that LQW is owned and controlled by an undisclosed affiliate of Montage, Shanghai Montage Microelectronics Co. Ltd. ("SMMT"). CAC ¶ 38. Montage stock prices fell over 25 percent in the two days following publication of the Gravity report. CAC ¶ 39.

Plaintiffs filed suit shortly thereafter. Dkt. No. 1. On the basis of their own investigation corroborating the Gravity report, *see* CAC ¶ 1, they allege that Montage committed fraud by failing to disclose in its SEC filings, as required by generally accepted accounting principles ("GAAP"), that its dealings with LQW were related party transactions. CAC ¶ 5. A litany of financial, familial, managerial, and spatial connections forms the basis of plaintiffs' allegation that LQW is a related party to Montage. *See* CAC ¶¶ 41-66. The Court will provide only a brief summary.

LQW was founded in 2011 by a former employee of Defendant Yang, and acquired by

SMMT four months later. CAC ¶¶ 41-42. SMMT, in turn, was founded in 2008 as a joint venture between Montage officer/Director of Engineering Lei (Larry) Wu and a wholly owned subsidiary of Montage. CAC ¶ 43. As of July 2009, the subsidiary no longer owned any portion of SMMT, but Wu maintained majority ownership until around July 2012. CAC ¶¶ 50-51. By that time, individuals named Yan Zhu ("Yan") and Chen Yueci owned 60 percent and 40 percent respectively. CAC ¶ 51. Yan, the majority owner of SMMT, is the legal representative of a company controlled by the parents of defendant Stephen Tai. CAC ¶ 52.

Plaintiffs allege further ties between Montage and SMMT. For instance, SMMT and Montage have a common phone number on certain websites. CAC ¶ 54. Montage allegedly posts job listings referring to SMMT as a subsidiary. CAC ¶ 55. Plaintiffs' June 2013 inquiry into the office addresses of LQW and SMMT brought plaintiffs' investigator to a padlocked warehouse door, and to an office building that SMMT did not occupy, but which Montage previously had. CAC ¶¶ 56-59. At the office address Montage reports for itself on its website, front desk staff told plaintiffs' investigator that SMMT occupied the same floors as Montage, and was "part of Montage." CAC ¶ 60.

Several former employees of Montage spoke with plaintiffs' investigator. *See* CAC ¶¶ 63-66. One employee who worked for Montage during the relevant period described SMMT as a "shell company established for tax evasion," operated by the same people who operate Montage. CAC ¶ 65. Another described LQW as "a Hong Kong company to pass through." CAC ¶ 66.

On the basis of the foregoing information, plaintiffs' allege that LQW is a related party to Montage, and that Montage's failure to disclose its dealings with LQW as related party transactions made its SEC filings false and misleading. CAC ¶ 5.

On September 22, 2014, defendants filed a motion to dismiss the CAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and on grounds of *forum non conveniens*. Docket No. 42. Defendants claim that plaintiffs have not properly pleaded a material omission, *scienter*, or loss causation to support a Rule 10b-5 claim. Def.'s Mot. Dismiss 6-13. Defendants also request dismissal of plaintiffs' Section 20(a) claims against the individual defendants on the grounds that plaintiffs have not properly pleaded a 10b-5 claim, and because plaintiffs have adduced no facts to

support the allegation that individual defendants had control over the allegedly misleading disclosures. *Id.* at 13. Finally, defendants request dismissal of this action in favor of an alternative forum in the People's Republic of China ("PRC"). *Id.* at 13-19.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). However, a district court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001). However, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as prior court proceedings, without thereby transforming the motion into a motion for summary judgment. *Id.* at 688-89.

If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

1  request to amend the pleading was made, unless it determines that the pleading could not possibly

2  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)

3  (citations and internal quotation marks omitted).

**DISCUSSION**

**I.  Forum Non Conveniens**

*Forum non conveniens* is a common law doctrine allowing a court to decline to exercise its jurisdiction in cases where litigation in the forum would place an undue burden upon one of the parties. The *forum non conveniens* determination ultimately lies in the court's discretion. *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001). However, it is an "exceptional tool to be used sparingly[.]" *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000). The burden is on the moving party to make "a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Ravelo* 211 F.3d at 514; *see also Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1549 (5th Cir. 1991).

"A party moving to dismiss based on *forum non conveniens* bears the burden of showing (1) that there is an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104 (9th Cir. 2002).

Defendants must show "that an alternative forum exists, and that it is adequate." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163 (citing *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 n.22 (9th Cir. 2000). "[A]n alternative forum ordinarily exists when the defendant is amenable to service of process in the foreign forum." *Lueck*, 236 F.3d at 1137 (citing *Piper Aircraft*, 454 U.S. at 254 n.22). "The foreign forum must provide the plaintiff with some remedy for his wrong in order for the alternative forum to be adequate." *Id.*

Defendants are amenable to service of process in the PRC. *See* Decl. of Randall Peerenboom ("Peerenboom Decl.") ¶ 19-22 (stating that Montage is subject to the jurisdiction of PRC courts); Declaration of Howard C. Yang ¶ 3; Declaration of Mark Voll ¶ 3; Declaration of Stephen Tai ¶ 3. However, the parties dispute whether the forum provides an adequate remedy for

5

plaintiffs' alleged injuries. *See* Peerenboom Decl. ¶ 18; Decl. of Gang Song ("Song Decl.") ¶ 3.

According to defendants' expert, PRC law provides a cause of action for securities fraud, arising from Article 63 of the PRC Securities Law and regulations issued by the Supreme People's Court in 2002 and 2003 (collectively "the PRC Regulations"). Peerenboom Decl. ¶ 31. He asserts that plaintiffs have "the right to bring suit in Shanghai for the injury claimed in the CAC, and that were the Shanghai court to hear the case, it would provide an adequate forum for this dispute." *Id.* at ¶ 10.

Plaintiffs' expert, however, claims that PRC laws do not apply to the securities at issue here, and that PRC courts would not hear this case. Song Decl. ¶ 13. As to the first issue, plaintiffs' expert claims that the PRC Securities Law governs only issuances and transactions of securities occurring within the territory of the PRC. *Id.* at ¶ 20. He further states that the PRC Regulations "[do] not apply to the civil disputes arising from transactions conducted outside the securities market established with [PRC] State approval." *Id.* Because plaintiffs purchased the securities at issue on a United States Exchange, PRC law would not apply to the dispute. *Id*.

As to the second issue, plaintiffs' expert lists a number of prerequisites that stand in the way of plaintiffs' obtaining a remedy in the PRC. *Id.* at ¶ 6-7. Most relevant is the requirement of a penalty ruling or criminal judgment made against Montage by the China Securities Regulatory Commission ("CSRC") or a People's Court, respectively, before a court will hear a private securities fraud suit. *See id.* Not only has no ruling been made as to the misrepresentations at issue in this case, he states, but the CSRC and People's Court have jurisdiction only over domestic securities markets, and thus cannot issue a ruling against Montage for its alleged misrepresentations related to securities traded on United States exchanges. *Id* at 11-13. Because the Chinese enforcment entities lack the ability to issue a penalty ruling against Montage, plaintiffs' expert concludes that no PRC court would entertain plaintiffs' lawsuit. *Id.*

In his reply declaration, defendants' expert acknowledges that the PRC Regulations do not mention suits against companies listed on foreign exchanges, but claims that this fact does not preclude such suits. Reply Decl. of Randall Peerenboom ("Peerenboom Reply Decl.") ¶ 3. He explains:

6

> A PRC court could find that the [PRC Regulations] do apply to suits against companies abroad, or it could apply the provisions to such suits indirectly by reference. Alternatively, it could apply some of the provisions, but not others, to securities suits involving companies listed abroad. Or it could find that the provisions do not apply to such suits but that another set of rules does.

*Id.* at ¶ 3.

The expert likewise acknowledges that the CSRC lacks jurisdiction to issue a penalty ruling against Montage. *Id.* at ¶ 5. Rather than concluding, as plaintiffs' expert does, that the inability to issue a penalty ruling precludes a remedy by operation of the courts' prerequisites, defendants' expert claims that "it would not make sense" in this case for PRC courts to insist upon the customary requirements for taking up private securities fraud suits. *Id.*

The questions of Chinese law raised by the parties' experts need not be resolved by this Court. It is enough to note that the rebuttal of defendants' expert to the issues raised by the plaintiffs' expert rests on speculation as to what PRC courts *could* do. They *could* interpret the PRC Regulations to include jurisdiction over foreign securities transaction (or take some other course), and *could* waive the typical prerequisites to bring securities fraud suits. *See* Peerenboom Reply Decl. ¶¶ 3, 5. However, the defendants cite no case in which a PRC court has either interpreted PRC law in the way their expert suggests, or waived the prerequisites for hearing a private securities fraud case involving foreign-listed securities. Nor have defendants offered any evidence indicating the courts are likely to do so. While the remedy available in the alternative forum need not be judicial, *see Lueck,* 236 F.3d 1137, 1145, defendants have not established that PRC offers any remedy whatsoever for the plaintiffs' alleged harm.

Defendants cite no example, and the Court could find none, of a United States court transferring to the PRC a securities fraud case involving securities purchased on a United States market.[2] Defendants' speculation has not convinced this Court to become the first to do so. Defendants have not established that the PRC will provide the plaintiffs with a remedy — judicial

---

[2] The one example provided by defendants, *Yung v. Lee*, No. 00 Civ. 3965, 2002 WL 31008970, at *2 (S.D.N.Y. 2002),.actually dismissed a case in favor of a forum in Hong Kong, not PRC. While the court in that case appears to conflate the two jurisdictions, *see id.* at *3, another case defendants cite makes clear that the two jurisdictions have different legal systems. *See King.com Ltd. v. 6 Waves LLC*, No. C-13-2977, 2014 WL 1340574 at *7 (N.D. Cal. 2014).

or otherwise — and have therefore failed to carry their burden of establishing an adequate alternative forum. Accordingly, the Court DENIES defendants' motion to dismiss on grounds of *forum non conveniens*.[3]

## II. Failure to State a Claim

### A. The Securities Exchange Act of 1934, Section 10(b)

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary. . . ." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) by making it unlawful to make any untrue statement of material fact necessary in order to make the statements made not misleading. 17 C.F.R. § 240.10b-5.

A plaintiff asserting a claim under Section 10(b) or Rule 10b-5 must adequately allege six elements: (1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citation omitted); *In re NVIDIA Corp. Sec. Litig.*, No. 11-17708, ___ F.3d ___, 2014 WL 4922264, at *4 (9th Cir. Oct. 2, 2014).

Federal Rule of Civil Procedure 9(b) requires a plaintiff who alleges fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requirement extends to securities fraud complaints. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 735-35 (9th Cir. 1985)).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a Section

---

[3] Because defendants have not satisfied the first prong of the *forum non conveniens* analysis, the Court need not address whether the private and public interest factors militate in favor of transferring the case.

1  10(b) complaint plead with particularity both falsity and *scienter*. *Zucco*, 552 F.3d at 990-91. As to falsity, the complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1); *In re Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). As to *scienter*, the complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. § 78u-4(b)(2); *In re Daou Sys.*, 411 F.3d at 1015.

Defendants attack plaintiffs' 10b-5 claim as failing to properly plead three elements: (1) materiality, (2) *scienter*, and (3) loss causation. Def.'s Mot. Dismiss at 1-2. For the reasons stated below, the Court finds that the plaintiffs have alleged sufficient facts to support each element and accordingly denies defendants' motion to dismiss plaintiffs' 10b-5 claim.

### 1. Material Omission or Misrepresentation

Plaintiffs allege that LQW is a related party to Montage under GAAP, and that Montage's failure to disclose its dealings with LQW as related party transactions in SEC filings made those filings false and misleading. CAC ¶¶ 27-36. Defendants claim, first, that plaintiffs have pleaded no facts to support the contention that LQW and Montage are related parties under GAAP and, second, that plaintiffs have not shown the omissions were material even if the disclosures were required. Def.'s Mot. Dismiss at 6, 9.

The SEC relies on the Financial Accounting Standards Board ("FASB") to adopt the principles that govern accounting standards for SEC filings. *See* Thomas Lee Hazen, 2 The Law of Securities Regulations § 9.6 (6th ed. 2009). The FASB's Statement of Financial Accounting Standards ("FAS") No. 57 requires disclosure of all material related party transactions. FAS No. 57(2). The glossary of FAS No. 57 includes in its definition of related parties the "affiliates of the enterprise." FAS No. 57(24). "Affiliate" is defined as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise." *Id.* The glossary defines "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an enterprise through

ownership, by contract, or otherwise." *Id.* These definitions accord with those found in SEC Regulation S-X. *See* 17 C.F.R. § 210.1-02(b), (g). Financial statements filed with the SEC which are not consistent with GAAP are presumed misleading. 17 C.F.R. § 210.4-01(a)(1).

Plaintiffs have pleaded sufficient facts, taken as a whole, to support an inference that Montage and LQW were related parties under GAAP and, accordingly, that Montage's failure to so disclose made its SEC filings misleading. First, defendants essentially concede that LQW was a related party prior to July of 2012, when Lei Wu – an officer of Montage – was a majority owner of SMMT.[4] See Def. Mot. at 6-7. This alone establishes the falsity of Montage's financial disclosures because the 2013 Registration Statement reported financial data going back to 2010, but never disclosed LQW as a related party. CAC ¶¶ 21-27.

Though Montage's relationship to SMMT ownership was somewhat more attenuated after July 2012, plaintiffs allege other facts giving rise to the plausibility of a continued close relationship. For instance, SMMT was at all relevant times owned by an officer of Montage, or by an employee of a Montage officer's family member. *See* CAC ¶¶ 43, 50-52. Plaintiffs also allege that SMMT's phone number on several websites is identical to the one Montage listed on its SEC filings. CAC ¶ 54. Montage allegedly listed SMMT as a subsidiary in recent job advertisements. CAC ¶ 55. Plaintiffs' investigator visited LQW's address and found only a padlocked warehouse door. CAC ¶¶ 56-57. The investigator's visit to SMMT's listed addresses found either that the address did not exist, or that a company named "Lanqi," Chinese for Montage, had occupied the space. CAC ¶¶ 58-59. Front desk staff at Montage's Shanghai office confirmed that SMMT occupied the same floors as Montage and was "part of Montage." CAC ¶¶ 60-61. According to the CAC, one employee told plaintiffs' investigator that SMMT was a "shell company for tax evasion," and another characterized LQW as "a Hong Kong company to pass through." CAC ¶¶ 65-66.

---

[4] Defendants argue that failure to disclose this fact in its financial statements was not a material omission because it preceded the beginning of the class period. This argument is without merit. Plaintiffs allege that LQW was a related party at the time it entered into transactions with Montage, and that plaintiffs relied on financial statements which failed to disclose this fact. Whether LQW's related party status coincides with the class period is of no moment.

Drawing all reasonable inferences from the above facts in favor of plaintiffs, the Court is satisfied that plaintiffs have adequately pleaded an omission or misrepresentation. While the twice-removed ownership of SMMT after July 2012 might not itself be enough to support related-party status, Montage's continued holding out of SMMT as a subsidiary, made more plausible by SMMT's lack of physical presence independent of Montage, is sufficient to support an inference that Montage continued to possess, directly or indirectly, "the power to direct or cause the direction of the management and policies of [SMMT] through ownership, by contract, or otherwise." FAS No. 57(24). Montage's failure to disclose its dealings with LQW as a related party would therefore violate its disclosure obligations under GAAP.

The materiality of the omission is also sufficiently pleaded. Materiality is established when there is "a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered 'the total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano,* __ U.S. __ (2011); 131 S.Ct. 1309, 1318. Plaintiffs have alleged that Montage's transactions with LQW accounted for between 50 and 71 percent of its revenues, and that Montage's 2012 revenue growth is attributable entirely to its transactions with LQW. CAC ¶¶ 23-25. Other courts in this circuit have found undisclosed related party transactions to be material, even where the transactions constitute a smaller portion of the defendants' business. *See, e.g.*, *Cheung v. Keyuan Petrochemicals, Inc.*, No. CV 11-9495 PSG (JCGx), 2012 WL 5834894, at *8-9 (C.D. Cal. Nov. 1, 2012) (finding undisclosed related party transactions constituting between 20 and 31 percent of defendant's sales to be material); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1118-19 (C.D. Cal. 2012) (finding allegations of undisclosed related party transactions sufficient to plead falsity and noting that other courts have done the same). Where, as here, the related party transactions generate most of a defendants' revenue, it is substantially likely that a reasonable investor would find that disclosure of the omitted fact would significantly alter the "total mix of information." *See Matrixx Initiatives*, 131 S.Ct. at 1318. The Court thus finds that plaintiffs have sufficiently pleaded materiality.

### 2. *Scienter*

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.§ 78u-4(b)(2)(A) (2012). The Supreme Court has provided three instructions to guide courts in determining whether a complaint meets this heightened standard. *See Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-324 (2007). First, as with any motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true. *Id.* at 322. Second, the court must consider holistically the complaint, and other sources courts ordinarily consider when ruling on a Rule 12(b)(6) motion. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-323. Finally, courts must consider opposing inferences, that is, "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324 (2007). A complaint will withstand a motion to dismiss "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Defendants' criticize plaintiffs' "attempt to plead *scienter* based on management or board positions[.]" Def.'s Mot. Dismiss at 10. However, in this circuit, such allegations based on management's role "may be relevant and help to satisfy the PSLRA *scienter* requirement in three circumstances." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). In fact, "such allegations may independently satisfy the PSLRA when they are particular and suggest that defendants had access to the disputed information." *Id.* at 786. The "core operations inference" allows even generalized allegations about management's role to suffice "in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that that management was without knowledge of the matter." *Id.* (citing *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 988 (9th Cir. 2008).

The CAC alleges that transactions with LQW accounted for up to 71 percent of Montage's revenues during the relevant period. CAC ¶ 26. Defendants suggest that LQW's status as a major distributor does not establish *scienter* standing alone. Def.'s Motion Dismiss 5-6. However, the

1    Court need not decide that question because plaintiffs make additional allegations supporting a
2    finding of *scienter*. Plaintiffs have alleged that each individual defendant worked for Montage
3    when a Montage director still formally owned SMMT. *See* CAC 16-18, 43, 56, 51. As of August
4    2013, SMMT and Montage continued to share a phone number. CAC ¶ 54. As of July 2014,
5    SMMT had no independent office, and instead occupied the same space as Montage, and current
6    and former employees understood SMMT to be "part of Montage." CAC ¶¶ 56-66. Furthermore,
7    Montage has previously flagged related party transactions in its financial statements, which shows
8    that it was well aware of its duty to comply with this disclosure requirement. CAC ¶ 46.

9    While this Court is required to consider the inference that senior Montage officers simply
10   did not know that LQW was a related party, *see Tellabs* 551 U.S. at 324, that inference is not as
11   cogent or compelling as the inference that defendants knew, or were deliberately reckless in not
12   knowing, that their largest distributor, with which they shared an office, was in fact a related party
13   subject to disclosure under GAAP. Moreover, if the relationship between SMMT and Montage
14   was obvious to Montage employees, then a reasonable person could infer that Montage officers
15   were also aware of it. *See Zucco*, 552 F.3d at 1000-01.

16   These facts, taken together, raise a "strong inference" that the defendants were aware of
17   facts that made their SEC filings false or misleading. Indeed, under these circumstances, "it would
18   be 'absurd' to suggest that that management was without knowledge of the matter." *South Ferry*,
19   542 F.3d. at 786.

### 3. Loss Causation

Finally, defendants move to dismiss the CAC on the ground that plaintiffs have not sufficiently pleaded loss causation. Def.'s Mot. Dismiss at 12.

Loss causation is the "causal connection between the material misrepresentation and the [plaintiffs'] loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). At the pleading stage, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (2008) (quoting *Dura*, 544 U.S. at 347). Stated another way, "a plaintiff must allege (1) the fraudulent

statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known." *In re Immersion Corp. Sec. Litig.*, No. C 09-4073 MMC., 2011 WL 6303389 at *10 (N.D. Cal. Dec. 16, 2011). Plaintiffs need not prove loss causation to survive a motion to dismiss, but they must properly allege it. *Metzler*, 540 F.3d at 1062.

First, as noted above, the plaintiffs have properly alleged an omission they claim led to inflated stock prices, specifically, that Montage failed to disclose material related party transactions. *See* CAC ¶¶ 5, 92-93, 96-97. Second, the plaintiffs have alleged that the fraud became known to the market following the release of the Gravity Report. CAC ¶¶ 7, 38-39. Finally, plaintiffs alleged that the Gravity Report "shocked the market" when released, causing share prices to fall more than 25 percent over the two subsequent days. CAC ¶¶ 38-39. Taken together, these allegations properly plead loss causation.

Defendants rely on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), to support the proposition that the Gravity Report revealed only a risk of fraud, and therefore did not constitute the predicate "corrective disclosure" necessary to show loss causation. *Id.* at 12; *Loos,* 762 F.3d 880 (2014). *Loos* addressed the question of whether an announcement of an investigation into *potentially* fraudulent conduct, without more, is sufficient to allege loss causation. *See Loos*, 762 F.3d at 888-90; *see also Metzler*, 540 F.3d 1049, 1063-64 (holding that a newspaper article *announcing an investigation* was not a corrective disclosure because it raised only a risk of fraud). Here, by contrast, the Gravity Report, upon which plaintiffs rely, did not announce an investigation; rather, it announced the *findings* of its investigation: fraudulent conduct. *See generally* Def.'s Mot. Dismiss, Ex. B. While the Report may have phrased its accusation in less than certain terms, absolute certainty is not required to adequately plead loss causation. *See Loos*, 762 F.3d at 888-89 ("[W]e have stated that a securities fraud plaintiff is not required to allege an outright admission of fraud on a motion to dismiss.").

In "the Ninth Circuit . . . a plaintiff properly pleads loss causation by alleging that the market learned of and reacted to the allegedly fraudulent practices and by alleging that this reaction caused the plaintiff's loss." *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451-

14

1 LHK, 2011 WL 566814, at *5 (N.D. Cal. Feb. 15, 2011). The Court is satisfied that plaintiffs
2 have met this burden.

### B. Securities and Exchange Act Section 20(a)

Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "control persons." 15 U.S.C. § 78t(a). To establish liability under Section 20(a), a plaintiff must (1) prove a primary violation of federal securities law, and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002). Whether an individual defendant is a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (internal citations omitted). "The plaintiff need not show the controlling person's *scienter* or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

"Although a person's being an officer or director does not create any *presumption* of control, it is a sort of red light." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) (internal citations omitted, emphasis in original). However, at the motion to dismiss stage, "[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (internal citations omitted). Additionally, "numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status." *Id.* at 1208; *see also In re Amgen Inc. Sec. Litig.,* 544 F.Supp.2d 1009, 1037 (C.D.Cal.2008).

Here, plaintiffs have alleged that the three individual defendants are officers of the defendant corporation – the CEO, CFO, and President, respectively. CAC ¶¶ 16-19. Plaintiffs have further alleged that the individual defendants signed the allegedly fraudulent SEC filings which form the basis of this action. CAC ¶¶ 28, 37. These allegations suffice to state a claim for violation

of Section 20(a).

## CONCLUSION

For the foregoing reasons, the Court **DENIES** defendants' motion to dismiss. This order resolves Docket No. 42.

**IT IS SO ORDERED**.

Dated: January 29, 2015

_____
SUSAN ILLSTON
United States District Judge