# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASE NO. 14-CV-00722-SI

- - - - - - - - - - - - - - - - - - - - - x

In re

MONTAGE TECHNOLOGY GROUP LIMITED

SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF

PAUL A. GOMPERS, PH.D.


January 20, 2016

9:45 a.m.


Cornerstone Research

699 Boylston Street

Boston, Massachusetts

Reporter:   Rosemary F. Grogan, RPR, CSR No. 112993



Page 2

```
 1                     APPEARANCES
 2   On Behalf of the Plaintiffs:
 3            By:  Jonathan Stern, Esquire
 4            THE ROSEN LAW FIRM, P.A.
 5            275 Madison Avenue, 34th Floor
 6            New York, NY  10016
 7            212-686-1060
 8            jstern@rosenlegal.com
 9
10   On Behalf of the Defendants:
11            By: Edward Moss, Esquire
12            O'MELVENY & MYERS LLP
13            Times Square Tower
14            7 Times Square
15            New York, NY 10036
16            212-728-5671
17            emoss@omm.com
18
19   Also present:
20            Gary Zimmermann
21
22
23
24
25
```



Page 3

1                         INDEX OF EXAMINATION

2    WITNESS: PAUL A. GOMPERS, PH.D.

3    EXAMINATION                              PAGE NO.

4    By Mr. Stern                             4/135

5    By Mr. Moss                                132

6

7                         INDEX TO EXHIBITS

8    NUMBER                DESCRIPTION              PAGE NO.

9    Exhibit 1      Exhibit L and Attachments        44

10                  including Expert Report of

11                  Paul A. Gompers, Ph.D. 12/18/15

12   Exhibit 2      Exhibit 1 and Attachments        48

13                  including Expert Report of

14                  Howard J. Mulcahey

15   Exhibit 3      The "Less Than" Efficient Capital   83

16                  Markets Hypothesis: Requiring

17                  More Proof From Plaintiffs In

18                  Fraud-On-The-Market Cases by

19                  Ferrillo, et al.

20   Exhibit 4      Exhibit B and Attachments        93

21                  including Expert Report of

22                  Paul A. Gompers, Ph.D. 10/24/11

23   Exhibit 5      Gravity Research Document 2/6/14   123

24   (Original documents attached to original transcript and

25                  retained by Attorney Stern)



Page 4

1                    PAUL A. GOMPERS, PH.D, having been

2      satisfactorily identified by the production of a

3      driver's license, and duly sworn by the Notary Public,

4      was examined and testified as follows:

5

6                         EXAMINATION

7      BY MR. STERN:

8           Q.   Dr. Gompers, my name is a Jonathan Stern.  I'm

9      at The Rosen Law Firm, and we represent the plaintiffs

10     in this litigation.

11                    Have you been deposed before?

12          A.   Yes.

13          Q.   How many times?

14          A.   A couple dozen, probably.  I don't know the

15     exact number, but, yeah, I've been deposed a number of

16     times.

17          Q.   So you're familiar with the ground rules?

18          A.   I am.

19          Q.   But just to go over it, if you don't

20     understand a question, please ask me to clarify.

21          A.   Yes.

22          Q.   And for the record, do you understand you're

23     testifying under oath?

24          A.   I do.

25          Q.   Is there any reason you cannot testify



Page 5

1    truthfully and accurately?

2         A.   No.

3         Q.   Are you taking any medications that would

4    impair your ability to testify?

5         A.   No.

6         Q.   Is there any other reason that would impair

7    your ability to testify?

8         A.   No.

9         Q.   Okay.  So you received a Ph.D. in economics,

10   correct?

11        A.   I received a Ph.D. in business economics,

12   which is the joint program at Harvard, where you do the

13   full Ph.D. in economics plus the MBA.  So it's a

14   combined program.

15             But yeah, I did all the course work and

16   met all the requirements for the Ph.D. in economics, as

17   well as the MBA.

18        Q.   And what was your research focused for that

19   Ph.D.?

20        A.   For my -- my thesis, all of the three chapters

21   of my thesis looked at aspects of the venture capital

22   industry.

23        Q.   And what sort of analysis did you perform in

24   analyzing the venture capital industry?

25        A.   It was a variety of things.  My job market



Page 6

1   paper was a paper which looked at investments.  And

2   there was both a theoretical modeling aspect of it,

3   where I built a -- from first principles and economic

4   model, and then I collected data and did an empirical

5   estimation of that model.

6                    So it combined both theory and empirical

7   research.

8        Q.   Okay.  And did this involve any research into

9   public securities markets?

10       A.   My job market paper, no.  It was looking

11  exclusively at private investments in venture capital.

12       Q.   Okay.  And what's the new research focus, as a

13  professor of -- as a professor?

14       A.   Well, there's a number of buckets.  The first

15  bucket would be a continuation of that research that I

16  started more than 20 years ago on venture capital and

17  private equity; have done research on organization of

18  venture capital and private equity funds; investment

19  performance, looking at the actions that private equity

20  investors and venture capitalists take to enhance firm

21  value; looking at the ways that venture capitalists exit

22  securities.

23                   The second broad area that I've done

24  research on would be the -- what I might call

25  pathologies in the public market.  This would include



1    looking at the behavior of institutional investors;

2    written a number of papers on initial public offerings

3    and pathologies that affect the initial public offering

4    market.  So that would be the second bucket of things.

5                  And then a third bucket would be

6    corporate governance.  I have written research, in fact,

7    with colleagues, Joy Ishii and Andrew Metrick, were the

8    first to develop, in 2001, a corporate governance index,

9    and to demonstrate that a broad-based corporate

10   governance index is related to firm valuation and public

11   stock market performance.

12       Q.   Okay.  So let's take these one at a time.  So

13   the first area of venture capital and private equity, I

14   guess that's focused primarily on nonpublic markets, but

15   exit would involve looking at, often, securities?

16                  MR. MOSS:  Objection to form.

17       A.   So the most profitable type of exit for

18   venture capitalists and private equity investors is

19   taking firms public.  And I have a number of papers

20   which look at the type of actions that venture

21   capitalists and private equity investors take, both pre

22   and post IPO, looking at how -- for example, one paper

23   looks at when -- what happens when private equity

24   investors distribute their shares.

25                  So if you think about a private company,



Page 8

1    which goes public.  It's typical for the pre-public

2    venture capitalists or private equity investors to own a

3    lot of the stock.  Typically, those investors don't sell

4    those shares in the open market.  They distribute them

5    to their limited partners.

6              So if you're if you're if you're CalPERS,

7    and you've invested in my venture capital fund.  I have

8    a firm that goes public.  At some point after the lockup

9    expires, I decide that I'm going to distribute the

10   shares to you, I chop them up, and will divide them up

11   among all my investors.  And I have several papers which

12   look at both what affects the decision of when I do

13   that, and shows that the private equity investors are

14   very good at timing peaks in the public market, but also

15   show that there's a discernible significant stock price

16   decline when those private equity investors choose to

17   distribute the securities.  So there's an immediate 3 to

18   5 percent stock price decline when they distribute those

19   shares.

20             So there are a number of papers that

21   include -- like that as an example that include elements

22   of public market activity in which venture capitalists

23   and private equity investors are involved.

24   Q.   Is it your position that any of that has a

25   bearing on market efficiency?



1          MR. MOSS:  Objection to the form.

2      A.   So absolutely.  So the paper that we have on

3  distributions certainly shows that -- that when venture

4  capitalists and private equity investors distribute,

5  they are able to time the market.  And, in fact, firms

6  subsequent to distribution have negative long-run

7  risk-adjusted return.  So, in some sense, they're

8  overvalued, and certainly indicates inefficiency.

9          Similarly, the significant stock price

10  decline on the execution of the distribution would be

11  evidence of insufficiency.  So there are a number of

12  elements of the paper that -- the papers I've written

13  on, on distribution policy, that would go to indicate

14  the markets aren't efficient relative to those aspects.

15      Q.   That those are aspects of inefficiency -- when

16  you said they're inefficient relative to those aspects,

17  what do you mean by "relative to those aspects"?

18      A.   So the notion of market efficiency is that it

19  affects certain companies at certain times and with

20  respect to certain types of information.  So the test of

21  market efficiency is -- looks at whether or not markets

22  efficiently incorporate new value relevant information,

23  both rapidly and fully respond to that information.

24          Now, it's possible some types of

25  information could be efficiently incorporated, and other



Page 10

1  types of information would be inefficiently

2  incorporated.  And so when one talks about inefficiency,

3  it's about a particular aspect, i.e., you don't make a

4  blanket statement about, this firm is inefficient for

5  all times, for all types of information.  It's a very

6  specific test for either specific events, specific types

7  of information, at specific points in time.

8          Q.   Okay.  That makes sense.

9               And then the second area you were saying,

10 pathologies in public market behavior.  What are some

11 examples of pathology in public market behavior?

12         A.   Well, the -- you know, over the last 10 or 15

13 years the academic financial economics literature has

14 been full of examples.  Things like the market reacting

15 to repetition of old news.

16              So the definition of market efficiency is

17 that new unexpected material value relevant information

18 should read rapidly and fully incorporated into the

19 stock price.  If -- if information is just repeated, if

20 it's already out in the public market, the repetition of

21 that -- the repetition of that information should not

22 affect the stock price because it's already been -- been

23 released.

24              But there's -- there are a number of

25 papers that have taken this and shown that repetition of



1   information does affect the stock price.  I highlight

2   one example in my report.  That's the example of

3   Bristol-Myers and EntreMed; a paper by Huberman and

4   Regev, from 2002, when there was repetition of trial

5   results that had been published months before in both

6   nature and in the popular media including The New York

7   Times.

8              But when the front-page article that had

9   the exact same information was published several months

10  later, there was significant stock price increase in

11  both Bristol-Myers and EntreMed.  And Huberman and Regev

12  conclude in their paper that this is strong evidence of

13  inefficiency.

14             More recently, Professor Tetlock, who

15  does a lot of content analysis, has written several

16  papers, where, what he does is -- he has all the

17  information, all news stories, and all public stocks.

18  And what he does is, he uses computer algorithms and

19  natural language analysis to determine whether or not

20  news stories, which are published, contain the same

21  information as a news story, which was published at some

22  date earlier on that company.

23             And he does this by matching, sort of,

24  words and phrases and the way things -- and strings of

25  words.  And he does this for thousands of companies and



Page 12

1    millions of articles.  And the conclusion to his 2012

2    paper is that there does seem to be a systematic

3    reaction to old news.

4              And so that's just one example of

5    pathology, where stocks seem to react to the

6    republication of past information.

7              Some of the work I've worked on relates

8    to initial public offerings.  So you have the end of the

9    quiet period.  I talk about that.  How there's a

10   systematic predictable stock price increase at the end

11   of the quiet period, when first analyst reports are

12   issued.  You have the systematic stock price decline at

13   the end of the underwriter lockup; typically, 180 days.

14             You have the work going back to

15   Jay Ritter, in 1981, which showed that risk adjusted

16   return on initial public offerings were substantially

17   negative, indicating that they're systematically

18   overvalued.

19             So there's a very -- very large

20   literature.  And then there's a set of papers, which

21   look at the investor behavior in the public market, and

22   try to look at what institutions do versus individuals,

23   and I have a couple of papers on this; one of the papers

24   with Randy Cohen and Tuomo Vuolteenaho looks at how --

25   how institutions are able to exploit uninformed



Page 13

1    individual investors.  And that when information comes

2    to the market, and institution investors are net buyers

3    from individuals, that that predicts very strong returns

4    for the stock.  And when they're net sellers, when

5    information comes to the market, that that's a predicter

6    of negative returns.  And our conclusion is that

7    institutions seem to be able to exploit relatively

8    uninformed individual investors.

9                    And there's a whole series of papers on

10   individual and individual investor behavior.  So I'm

11   going to stop there because the literature is quite

12   large that's gone to document these kind of -- of

13   pathologies, kinds of issues, in public -- in public

14   security markets.

15       Q.   Do you identify any specific pathology that

16   Montage stock was subject to during the class period?

17       A.   So I did not investigate whether or not the

18   particular pathologies, say, at the end of the quiet

19   period or the end of the lockup affected Montage, but

20   I'm sure we'll have a chance to talk about this.

21   Certainly, the literature on initial public offerings

22   would indicate that you should be very concerned about

23   the market for Montage stock.  Certainly, the control

24   period one might use, you'd have to take that into

25   consideration.



Page 14

1              But given that Montage is an initial

2    public offering, over the relevant time period, you,

3    certainly, would be concerned that the systematic

4    patterns that have been found in the literature by IPOs

5    could be present.

6        Q.   So that's not a per se inefficient.  It's a

7    matter of it raises a red flag for you that would lead

8    to heightened scrutiny?

9              MR. MOSS:  Objection to form.

10       A.   Certainly, when I -- when I look within the

11   tests that Mr. Mulcahey has done, and you probably

12   consider them, there's certainly evidence of

13   inefficiency.  I have not done my own affirmative tests.

14   I haven't gone out and done -- I haven't sought to

15   establish, for my own affirmative perspective, that the

16   market is inefficient for Montage stock.

17              But what I've certainly done is to -- to

18   look at the analysis that proffered by Mr. Mulcahey, and

19   properly considered the evidence that Mr. Mulcahey

20   provides does give indications that Montage stock was

21   trading inefficiently.

22       Q.   Okay.  But I guess to be clear, you're not

23   suggesting, though, that an IPO stock is always -- that

24   a posed IPO stock is always going to be inefficient, are

25   you?


MAGNA
LEGAL SERVICES

1      A.   No, you would have to test that stock

2   individually.  This relates to what I said earlier,

3   which is that it's an individual question.  While --

4   while there are systemic patterns of inefficiency for

5   newly public stocks, you -- and, certainly, that should

6   inform the way you approach both creating your event

7   study regression model and the type of tests you do.

8   It's an individual question about the stock at that

9   point in time.

10      Q.   And even based on what you said earlier, my

11   understanding is, it can be a different answer, with

12   respect to different, sort of, information.  So some

13   information could be incorporated efficiently and other

14   information not; is that correct?

15           MR. MOSS:  Objection to form.

16      A.   That's correct.  Some information may be

17   rapidly and fully incorporated into the stock price when

18   its released and other information might not be, which

19   is why you need to -- which is why you need to test as

20   many different types of corporate events as possible, to

21   see whether or not the market reaction to that

22   unexpected new value relevant information is efficient.

23      Q.   Okay.  So -- thanks.

24           And you said the third bucket is

25   corporate governance, and you developed a government



1    govern index.

2              Could you maybe explain in more detail

3    what you mean by that?

4        A.   So if you think about firm charter and bylaws,

5    they're essentially like the constitution of a firm.

6    They govern the relationship between outside

7    shareholders and managers, and they govern the

8    decision-making rights that outside shareholders have.

9              What Andrew Metrick and Joy Ishii did,

10   was to look at the 1500 largest public companies.  And

11   we looked at the -- we looked at 24 charter and bylaw

12   provisions that govern the power-sharing relationship

13   between managers and shareholders, and we created

14   something called the G-index.  And it was a very simple

15   idea, which is if you look at the charter and bylaws,

16   any provision which ceded power firms, shareholders and

17   gave it to managers, would be a positive one.  Anything

18   which -- which gave power to the shareholder -- to the

19   shareholders over the managers would be a negative one.

20   And if those -- if the issues were silent on it, it was

21   a zero.  And then we created indexes for the

22   1500 companies.

23              We were able to show, and other

24   researchers have confirmed quite -- quite extensively,

25   that this index is a strong -- has a strong relation to



Page 17

1  firm valuation, and is strongly related to future

2  returns on a stock.  Lots of other people have done

3  other things to show that it seems to be related to

4  excessive investment; a whole bunch of other things.

5  But it was, really, the first paper to show that a

6  broad-based measure of corporate governance could --

7  could predict, in a quite powerful way, performance of

8  public companies.

9       Q.   And so in which direction is --

10       A.   If you want to pause for a second, I'm being

11  blinded?

12       Q.   Yes, sure.

13                 (Off Record Discussion)

14            MR. STERN:  We can go back on.

15       A.   Back on the record.

16                 So this paper actually spawned a huge

17  number of activists hedge-fund investors.  I've spoken

18  at a bunch of activists hedge-fund meetings because

19  they're interested in these results.  It is, in fact,

20  the most highly cited academic finance paper over the

21  last 15 years, and has certainly had a major impact on

22  practice in the way investors think about evaluating

23  corporate managers.

24       Q.   And to be clear, it shows that for matters --

25  so it's --



Page 18

1        A.    Better governance is defined as --

2              MR. MOSS:  Just let him finish the question.

3              THE WITNESS:  Okay.

4    BY MR. STERN:

5        Q.    Actually, go ahead.  "Better governance is

6    defined as"?

7        A.    Better governance is defined as power-sharing

8    rules that cede more rights to the outside shareholders

9    versus the managers.  So think about if managers are

10   given control and are protected from intervention by

11   outside investors and the market for corporate and

12   control and the like, managers can take actions that may

13   not be in the best interest of shareholders.

14                 And so better-governed firms, meaning

15   firms that operate more like a democracy for

16   shareholders, perform substantially better than firms

17   that are what we call managerial dictatorships.

18       Q.    So would it be fair to say then that firms

19   that have a greater opportunity for self-dealing, the

20   market is going to have a negative assessment of a

21   future cash flow?

22       A.    No.  What it is, it's -- it has to do with --

23   with the power-sharing rules that shareholders have.  So

24   when you look at, I'm an outside shareholder.  Do I have

25   the ability to -- is it one share, one vote?  Is it --


MAGNA ▶
LEGAL SERVICES

Page 19

1   what's the slate of directors?  How are they elected?

2   Is it staggered board?  Do they have poison pills that

3   can dilute the effect of an outside, uninvited

4   acquisition?

5           So it's -- none of it has anything to do

6   with -- so it doesn't -- the way to think about it is,

7   what are the power-sharing rules that would relate

8   between managers and shareholders.

9   Q.   But why would power-sharing rules have an

10  affect on the future cash flows of a security?

11  A.   Well, it's sort of an interesting question

12  about which way the causality runs; whether or not

13  having poor corporate governance is indicative of the

14  type of managers who are at the firm; whether poor

15  corporate governance allows managers to -- again, the

16  primary mechanism by which the effect operates is that

17  managers, who are shielded from -- from governance of

18  shareholders or the market of corporate control,

19  typically, engage in -- in wasteful investment; both

20  wasteful investment from a cap. app. perspective, as

21  well as wasteful investment from an acquisition

22  perspective.

23          And so, in fact, Allen Ferrell and

24  Martijn Cremers have actually written a paper where they

25  show that the vast majority of the negative performance



Page 20

1    is around just such events.  That if you look at the

2    stock price reaction of poorly-governed firms, when they

3    announce acquisitions, that that's significant negative

4    reaction to their acquisitions, in a large part,

5    explains the majority of the negative performance of

6    poorly-governed firms.

7              So the mechanism by which poor governance

8    seems to engender future negative cash flows is that --

9    that by being insulated from shareholders and the

10   disciplining of the corporate control market, that

11   managers' predisposition is primarily to engage in

12   wasteful investment.

13       Q.   Why would managers be predisposed to engage in

14   wasteful investment in the absence of control?

15       A.   So this dates back to, sort of, the work of

16   Mike Jensen and free cash flow agency costs, in the late

17   1980s, where he argued that the incentive of managers,

18   who typically own relatively small percentages of the

19   companies they manage, is to manage larger firms.  And

20   so the idea is that if they're thinking about capital

21   budgeting, they're likely to invest in projects that

22   don't have positive NPV, just to build the size of the

23   company.

24             They're likely to engage in wasteful

25   acquisitions, because they want to build the size of the



Page 21

1   company.  And so given the -- given the difference in

2   incentives of managers versus shareholders, you get this

3   disproportion investment in growing the size of the

4   firm, even if that does lead to greater share value.

5       Q.   Okay.  Have you published any -- so I think,

6   actually, you answered that.  Sorry.

7            Do you have a background in econometrics?

8       A.   Certainly, I've taken a large number of

9   courses in econometrics.  I'm an empirical financial

10  economist.  So all of the papers that I've published

11  have -- are empirical papers.  Even if there's a model

12  section, there's always an empirical section that goes

13  with it.

14           I teach a Ph.D. course called Empirical

15  Methods in Corporate Finance, where I teach econometric

16  and other empirical methods to econ. and business Ph.D.

17  students at Harvard.  So my specialization is not

18  econometrics, but, certainly, have trained, and that's

19  what I do.  I do empirical research which requires the

20  use of econometrics.

21      Q.   Okay.  In what areas are you an expert?

22           MR. MOSS:  Objection --

23      A.   I'm a financial --

24           MR. MOSS:  -- to form.  You mean in this case

25  or in general?



Page 22

1          MR. STERN:  In general.

2     A.   I'm a financial economist, and, as I've said,

3 I'm sort of an empirical financial economist, and the

4 areas of research, sort of, outlined, you know, this

5 morning.

6          So that would -- that would cover the

7 areas of, sort of, my research and my expertise.

8     Q.   Okay.  So those areas are the ones in which

9 you're an expert in.  You don't claim to be an expert in

10 any other areas, other than the ones in which you've

11 done economic research?

12    A.   You know, I'm a financial economist who does

13 empirical research.  And, certainly, empirical issues in

14 financial economics is -- you know, that's my area of

15 expertise.  That's -- that's what I teach.  It's what I

16 research.

17    Q.   Okay.

18         MR. MOSS:  Sorry.  I just had an objection to

19    form on the last question.  I don't know if you got

20    it.  I might have mumbled it.

21 BY MR. STERN:

22    Q.   How many times have you testified or submitted

23 a -- scratch that question.

24         How many times have you submitted a

25 report, declaration or affidavit, in any case, as an



Page  23

1    expert?

2         A.   I've been working as an expert the last 14

3    years.  I don't know how to hazard a guess.  Over 14

4    years, maybe close to 80, 90.  I mean, I can't guess

5    but, you know, I've been active, over the last 14 years,

6    as an expert.

7         Q.   Were those all in securities cases?

8         A.   No.

9         Q.   What percentage would you estimate were in

10   security cases?

11        A.   Probably half.  I don't know how -- I don't

12   know how you would count, sort of, valuation work in the

13   Delaware Chancery, whether you would call that

14   securities work or not.  But if you're talking about

15   typical, 10b-5 class action securities litigation, it's

16   probably a little less than half; but, I don't know,

17   40 percent.

18        Q.   And in, approximately, what portion would you

19   say were, where you had to value market efficiency?

20             MR. MOSS:  You mean what portion of the

21        40 percent?

22             MR. STERN:  Yeah.  I guess what portion of the

23        total, let's say.

24        A.   So 100 percent is all the engagements I've

25   worked on.  Fifteen percent maybe.  I mean, that sort of



Page 24

1    sounds about right, just given the overall scope of

2    things.  But, primarily, as a rebuttal expert at the

3    class certification stage, probably 10, 15 percent.

4         Q.   So you said there were about 80.  So you would

5    say -- I guess it sounds like you would say at least

6    eight or nine cases in which you've done --

7         A.   Yeah.

8         Q.   -- work in market efficiency analysis?

9         A.   Eight, 10, 15.  I mean --

10        Q.   Somewhere --

11        A.   -- somewhere in that range.

12        Q.   Sure.

13              Have you ever been hired by a plaintiff

14   in a case to opine on market efficiency?

15        A.   I've never been asked, so no.

16        Q.   So then when you've done market efficiency

17   analysis, it's been for the defense side in every case?

18        A.   It's hard to work for the plaintiff if you've

19   not been asked for the plaintiff --

20        Q.   Fair enough.

21        A.   -- I mean, so that is sort of by exclusion,

22   yes.  At the class certification stage, I've only worked

23   with plaintiffs -- excuse me, with defendants in 10b-5

24   matters.

25        Q.   Okay.  And in how many of those cases were you



Page 25

1    actually asked to evaluate whether the market was

2    efficient versus the conclusions reached by the

3    plaintiffs' experts?

4        A.   It's been a -- there have only been a very

5    small number, one or two, in which I've been asked to

6    affirmatively opine on market efficiency.  As I

7    mentioned, almost every time I've been retained as a

8    rebuttal expert to -- to plaintiffs' class cert. expert,

9    and in that regard have been a rebuttal expert to offer

10   an opinion about whether or not the plaintiff expert has

11   offered evidence which would demonstrate that the market

12   for the given security was efficient.

13       Q.   And in the cases where you were asked to opine

14   as efficiency, do you recall the names of those cases?

15       A.   So one of the first ones I've worked on in

16   2001, 2002, was MicroStrategy.  I've worked in the -- on

17   the Sycamore IPO securities matter.  Again, that was

18   back in the 2002, 2003 time frame.

19            There are cases in which I've been a

20   rebuttal expert, and I said there's evidence of

21   inefficiency, without coming to an affirmative opinion

22   of inefficiency.  So, for example, the Luman V. Anderson

23   case.  I don't think I came to an affirmative opinion on

24   inefficiency, but showed that there was evidence that

25   the market for FCStone was operating inefficiently.



Page 26

```
 1                    So maybe that's a subtle distinction.  So
 2   in a number of cases provided evidence which would
 3   which -- would support a conclusion of inefficiency, but
 4   haven't been asked to offer that opinion.
 5        Q.   Okay.  And when you drew a conclusion of
 6   inefficiency or opined there was evidence of
 7   inefficiency, was that based on a single test or did you
 8   look at a number of different tests to draw that
 9   conclusion?
10             MR. MOSS:  Objection to form.  Are you talking
11        about a specific opinion or are you talking about,
12        in general, whenever he's done --
13   BY MR. STERN:
14        Q.   In general, when you've actually opined as to
15   efficiency or whether there's evidence of inefficiency.
16        A.   So there were -- there were always direct
17   tests.  So, for example, in the Luman V. Anderson case,
18   there was evidence of stocks moving statistically
19   significantly in the opposite direction of news.  So
20   that's inconsistent with market efficiency; as well as
21   statistically significant autocorrelation, which is,
22   again, a direct test.
23             So any -- any time that I've looked to --
24   looked to whether or not a market was efficient, it's
25   only been direct tests of inefficiency.  I certainly
```



Page 27

1    have never utilized things like that volume or a number

2    of market-makers or a number of analysts.  Those things

3    are not indicative of market efficiency.

4                    The only other factor which -- outside of

5    the direct tests that I've used, is a fundamental basis

6    for efficiency.  So looking at the function of

7    arbitrage, to looking at things called a put-call parity

8    test, and the cost of shorting.  So there's data that --

9    and significant academic evidence which shows that

10   stocks, which are expensive to short, are inefficiency

11   traded.

12                   And so in a number of cases have looked

13   at the cost to actually shorting a stock.  So the level

14   of short interest is not -- the academic literature has

15   not looked at the level of short interest as being an

16   indicator of market efficiency or inefficiency.

17   Sometimes very high short interest can be associated

18   with stocks which are inefficiently priced, and

19   sometimes very low levels of short interest.  But the

20   consistent result in academic literature is to look at

21   something which is called the rebate rate, and to see

22   how much it costs, when you want to short a given stock.

23                   And so those stocks, which are very

24   expensive to short, the academic literature have shown

25   that those stocks are inefficient.  And, similarly, with



Page 28

1    put-call parity violation.  So there's a number of

2    papers that look at the relationship between the price

3    of put-calls and the underlying stock.  Essentially, you

4    can create the synthetic long position by trading in

5    puts and calls, and you can compare that synthetic long

6    position to the stock price, and you can show that if

7    those things disagree, the market for that stock is

8    efficient.

9              So those would be two additional tests

10   that look at arbitrage that the academic literature has

11   shown demonstrate market inefficiency.

12   Q.   Okay.  If you were asked by a plaintiff to

13   opine as to efficiency of a stock, how would you go

14   about doing that?

15   A.   First and foremost is the gold standard.  The

16   advanced study, which goes back to late 1960s.  Farmer,

17   Fisher, Jensen, and Roll did the first event study at

18   the University of Chicago in 1969, where they looked at

19   market reaction to stock splits.  What you need to do in

20   an event study -- and I think I've talked about it a

21   little bit in my report -- but you need to create a

22   regression model, which isolates the firm-specific

23   component of the stock return; so taking out the market

24   and the industry effects.

25              And then you need to, ex-ante, look for



Page 29

1    new value relevant information which comes to the
2    market, which is material you would expect cause
3    statistically significant stock price reactions because
4    of the type of unexpected information that it is.  And
5    then you test whether or not the market reactions to
6    that information is consistent with that information.
7                    So when good news comes to the market,
8    the stock prices go up.  When negative information comes
9    to the market, the stock prices go down.  So you create
10   an ex-ante hypothesis about the direction in which you
11   expect to see the stock price move, and then you test in
12   the data whether or not those stock price reactions are
13   consistent.
14       Q.   So then you're concerned not only with whether
15   there is a reaction, but whether that reaction is in the
16   correct direction?
17       A.   The academic literature is absolutely clear.
18   If you look at Fama's 1991 paper, where he talks about
19   market efficiency.  He talks about good news causing
20   stock prices to go up.  Bad news causing the stock
21   prices to go down.  The seminal paper on Event Study
22   Methodology by Craig MacKinley, in 1997, talks about
23   creating hypotheses about whether or not the information
24   is good or bad relative to expectation.
25                    So all tests of market efficiency entail



Page 30

1    creating a hypothesis about where this information is

2    relative to the expectation about that particular event.

3    So good news moves stock prices in a positive direction,

4    if the market is efficient, and bad news moves stock

5    prices in negative directions.

6         Q.   Can you tell on the face of a piece of news

7    whether it's good news or bad news?

8         A.   Well, the academic literature is pretty clear.

9    So you want to pick events that you can assign ex-ante.

10   So you don't want to sit back and read the news with a

11   glass of wine and decide, this is good or bad.  There's

12   academic literature on things like earning surprises.

13              So you can create a measure of

14   expectation for earnings.  Typically, what the

15   literature does is to look at the consensus analysts

16   forecasts for analysts who have made forecasts in the

17   last month, and you can measure where the earnings

18   announced are relative to the expectations.  So you have

19   analytical numbers.  You have quantitate numbers.  So if

20   it was expected to be 10 cents, but it's 15, that's a

21   positive earnings surprise, and you would expect the

22   stock price to go up.  Similarly, if it was 2 cents,

23   that would be a negative earnings surprise.

24              There are other types of corporate events

25   as well that the academic literature shows



Page 31

1    systematically have particular types of stock price

2    reactions; things like changes in earnings guidance,

3    changes in analysts' forecasts for revenue and earnings;

4    security issuance, whether you issue equity, whether you

5    issue debt.  All of these things the academic literature

6    has shown have systematic relationship to stock price

7    movements.

8              And so what you need to do is, you need

9    to be informed by the academic literature about the type

10   of corporate events that engender particular types of

11   stock price reactions, and then utilize those events for

12   the firm in question to make your hypothesis ex-ante.

13        Q.   Okay.  So then, this is really your analysis

14   of not just informational efficiency, but fundamental

15   efficiency?

16        A.   Not at all.  The important thing to note is

17   that from the perspective of financial economics, that's

18   an artificial distinction.  The definition of market

19   efficiency are stocks which rapidly and fully

20   incorporate new value relevant information.  The seminal

21   Fama 1971 paper, as well as Fama '91 and '98, all say

22   that markets are efficient if they correctly incorporate

23   the information.

24             But even though some courts have tried to

25   define a notion of informational efficiency as only



Page 32

1    being stock price reaction, there's nothing in what I've

2    just stated which requires that the stock price reaction

3    be the correct size.  It just requires the notion that

4    when good news comes to the market, stock prices go up,

5    and when bad news comes to the market, stock prices go

6    down.

7                So even the way some courts have tried to

8    define fundamental efficiency, what I've just described

9    as a test of market efficiency doesn't require measuring

10   the size and saying the size has to right.  It just says

11   that you have an ex-ante prediction about good news

12   causing stock price increases, and bad news causing

13   stock price declines.

14       Q.   What's been your compensation in this matter?

15       A.   I haven't yet submitted a bill, so I haven't

16   been paid.  And I don't have a secretary to do this for

17   me.  So, typically, if the deposition happens close to

18   when I file the report, I just file one bill at the --

19   after I submit the -- after I give my deposition.

20       Q.   Okay.  And that payment goes from O'Melveny to

21   Cornerstone, and then you get your compensation or are

22   you paid directly by O'Melveny?

23       A.   I'm, typically, compensated directly by either

24   O'Melveny or the end client.  I would say that the

25   majority of the time the payment comes directly from the



Page 33

1    end client, although there are certainly circumstances

2    in which the payment comes from the law firm.

3         Q.   Okay.  What's been your total compensation for

4    cases that you've done with O'Melveny?

5              MR. MOSS:  Objection to form.

6         A.   I have -- I have no way to -- I have no way to

7    even guess.  I probably worked with O'Melveny only two

8    or three times over 14 years.  So it's -- again, I mean,

9    it's not -- it's not going to be enormous.

10                  I have no way to estimate it, but it's

11   not as if I've worked with O'Melveny, you know, 10 or 15

12   times.  So it's a relatively small -- less than a single

13   hand's worth of times.

14        Q.   Okay.  So more than $100,000?

15        A.   Again, I have no way -- I have no way to

16   estimate.  It could be.  It probably is.  But, again, I

17   have no way to guess.

18        Q.   Okay.  Have you ever been the subject of a

19   motion to exclude your testimony?

20        A.   Yes.

21        Q.   Has any court ever excluded your testimony?

22        A.   So there have been two courts which have

23   excluded pieces of my testimony.  The first was in the

24   Martoma trial in which the judge allowed me to testify,

25   but not as to my own affirmative valuation of Élan



Page  34

1    Pharmaceuticals, because he said my own affirmative

2    valuation of Élan did not go to the state of mind of

3    Matthew Martoma, when he sold SAC stake in Élan

4    Pharmaceuticals.  So I was allowed to testify, but what

5    I was able to testify about was limited to other aspects

6    of my testimony.

7              The one time in which I've been excluded

8    completely was, actually, for a good reason.  This was

9    in the Pfizer security litigation.  In that matter, Dan

10   Fascell was the plaintiff expert.  There was a -- I was

11   brought in as a rebuttal expert at the merits and

12   damages phase to Professor Fascell.  There were numerous

13   issues and problems with his opinion in his report.  He

14   submitted a number of revised reports in response to

15   problems and issues, none of which actually solved the

16   problems.

17             Ultimately, at a Daubert hearing, he was

18   thrown out as an expert.  And because it ended up that

19   there was no plaintiff expert, there could be no

20   rebuttal expert.  So I was excluded because there was no

21   affirmative expert.  But Professor Fascell was,

22   essentially, excluded -- was thrown out as an expert,

23   based on the work that I had done to show that his

24   merits and damages work was just flawed.

25        Q.   So you've never been excluded because of



Page 35

1    Daubert?

2         A.    That's correct, no.

3         Q.    Have you ever been subject to a Daubert Bert

4    motion?

5         A.    I think so, but I've never been excluded.  So

6    I don't recall -- I think if you've been -- if you've

7    been doing expert work for 14 years, you're likely to

8    have been challenged on Daubert.  I don't recall where

9    that have happened, but certainly have not been excluded

10   for Daubert reasons.

11        Q.    Have you ever been accused of perjury in a

12   litigation?

13        A.    No.

14        Q.    How many hours have you spent preparing your

15   report?

16        A.    I haven't -- I mean, I haven't added that up.

17   I would probably say somewhere between 50 and 60, but

18   again, I haven't added that up.  So, again, I don't -- I

19   don't know.

20               I just haven't gone to the spreadsheet to

21   add that up.

22        Q.    Are all the opinions that you're offering in

23   the class certification phase of this case contained in

24   your report and the attached exhibits?

25        A.    As I was preparing for this deposition and



1    going over the backup of Mr. Mulcahey, I became aware of

2    how he had actually created his model.  So there's a

3    spreadsheet which shows that he tried a number of

4    different things.  So I was really curious why

5    Mr. Mulcahey didn't include an industry index in his

6    regression model.

7                     Typically, what one does when one creates

8    a regression model, is one tries a variety of market and

9    industry indexes and uses the model that has the best

10   goodness of hit; the highest adjusted R-squared or some

11   measure like that.  And I was sort of a little puzzled

12   and shocked that there was no discussion of this backup

13   in Mr. Mulcahey's report.

14                    And I found in the backup, as I was -- as

15   I was going through and comparing, that Mr. Mulcahey

16   actually tried a variety of industry indexes, and

17   presented a model which didn't include the industry

18   index.  He uses the S&P small firm index, small cap

19   index.

20                    When he had regression models that had

21   higher adjusted R-squares, but included a variety of

22   semiconductor industry indexes, and it's sort of clear

23   why he didn't, which is because all of those

24   semiconductor indexes have a negative beta, negative

25   factor loading, meaning that Montage's return, after



Page 37

1    adjusting to the market, is negatively related to the

2    semiconductor industry.  It's just odd.

3              So it's clear he didn't do it because,

4    you know, the fact that a semiconductor company moves in

5    the opposite direction of a semiconductor industry, that

6    would be strong evidence of inefficiency.  So he didn't

7    include it in his report.

8              I didn't notice this prior to doing my

9    report.  So if I were to offer the report today, I would

10   offer the additional opinion that in his backup,

11   Mr. Mulcahey's industry indexes, which show a negative

12   correlation between Montage and semiconductor companies,

13   would indicate, potentially, that Montage is -- is

14   trading inefficiently.

15        Q.   Have you read the Amended Complaint in this

16   action?

17        A.   I have.

18        Q.   All right.  Did you read all the analysts

19   reports that were cited in Mr. Mulcahey's event study?

20        A.   So I read everything which was produced.  And

21   so to the extent, I didn't go and tabulate, did he

22   produce every one that he cited; but, certainly, all the

23   analysts report, which were produced, I have read.  And

24   those would be indicated in -- should be indicated in my

25   materials considered, although I may just cite to the



Page 38

1    production that Mr. Mulcahey has.

2        Q.   Okay.   What was your exact assignment in

3    preparing this report?

4        A.   So I was asked to -- I was asked to evaluate

5    whether or not Mr. Mulcahey did three things:   The first

6    was to evaluate whether or not the evidence provided in

7    Mr. Mulcahey's report, and the evidence provided at his

8    deposition in his testimony were sufficient to

9    demonstrate that Montage traded in an efficient market

10   over the proposed class period.

11              The second thing I was asked to do, is to

12   ask whether or not Mr. Mulcahey had provided evidence of

13   a price impact to the alleged misstatements in the

14   complaint.   And then the third is whether or not

15   Mr. Mulcahey had met the burden of showing that a

16   class-wide damages model, consistent with the

17   allegations in this matter, whether he demonstrated that

18   that could be constructed.

19        MR. STERN:   I'm sorry, I just had a little

20        trouble hearing the first one, because of the

21        noise.   Could you read back what he said?

22              (Record Read)

23        MR. STERN:   Okay, thanks.

24   BY MR. STERN:

25        Q.   Given your earlier testimony that


MAGNA ▶
LEGAL SERVICES

Page 39

1    efficiency -- you know, that there could be efficiency

2    with respect to some information and not other

3    information, when you say you were evaluating whether

4    Montage stock traded in an efficient market during the

5    class period, does that mean perfectly efficient?

6              MR. MOSS:  Objection to form.

7         A.   It's whether -- so it's whether or not the

8    evidence provided by Mr. Mulcahey is consistent with --

9    that the market rapidly and fully incorporated new value

10   relevant information.  Now, I understand this notion of,

11   again, that some courts have, that's talked about in a

12   number of court decisions about perfectly efficient

13   market.

14              And, certainly, models are imperfect.  We

15   never have the true representation of the world.  So you

16   never would expect whatever you find to be 100 percent.

17   But the question is, is the evidence provided consistent

18   with the market for Montage stock rapidly and fully

19   incorporating unexpected new value relevant information?

20   That's -- that's the test.

21        Q.   But not necessarily all unexpected new and

22   value relevant information?

23              MR. MOSS:  Object to form.

24        A.   It would have to be the vast majority of

25   times.  If we had perfect models, both perfect models of



Page 40

1    expected returns, so we can get that right residual, and

2    if we had perfect models for predicting what is true

3    news, we would expect it to be 100 percent of the time.

4                    But the problem is, and the reason we use

5    statistical inferences, is the fact that our empirical

6    information is imperfect.  And there's a certain error

7    rate in our estimation, which is why, when we have a

8    model for expected returns, so we can get our residuals,

9    and when we have a model for identifying unexpected new

10   value relevant information, we would expect that the

11   vast majority of times that we identified such news,

12   that we would expect to see an appropriate stock price

13   reaction.

14        Q.   Okay.  I think I'm asking this in a slightly

15   different way.  It's not a statistical inference.  You

16   testified earlier that a market can be efficient with

17   respect to some types of information, but not with

18   respect to others?

19        A.   That's correct.

20        Q.   So that's not really a statistical limitation,

21   right, or is it?  Am I misunderstanding?

22        A.   So you want to test as many types of corporate

23   events that are gleaned from the literature that would

24   allow you to create a hypothesis.  So it's possible that

25   a stock might react efficiently to an earnings surprise,



Page 41

1    but might react inefficiently to the repetition of an

2    old news story, for example.

3                    So this is why one needs to look at a

4    wide variety of corporate events that allows you to

5    test, you know, across all these corporate events, are

6    we finding that the market is appropriately reacting to

7    this unexpected new information.

8        Q.   But if you find that the market is not

9    reacting appropriately to one form of information, but

10   is reacting appropriately to others, what conclusion

11   would you draw?

12                  MR. MOSS:  Objection to form; incomplete

13       hypothetical.

14       A.   The market for that type of information is

15   inefficient.

16       Q.   If it's not reacting efficiently to any one

17   type of information?

18       A.   So Fama 1970 says that a market is efficient

19   if it always fully and rapidly incorporates new value

20   relevant information.  To the extent that within a given

21   period of time certain type of information is not

22   efficiently incorporated, that would say that that

23   market for that period of time is not efficient.

24                  So the test is specific types of

25   information.  And if the market isn't efficiently



Page 42

1   incorporating analysts earnings revisions, that would

2   say that over that period of time the market is not

3   efficient.  And it's not efficient relative to a

4   particular piece of information, but you couldn't call

5   that period of efficient.  To the extent you have

6   demonstrated inefficiency, you can't call it efficient.

7       Q.   Okay.  I think you testified to this, but just

8   to be clear:  Were you asked to opine as to the whether

9   the market for Montage's stock is efficient?

10      A.   No.  What I was asked to do was to opine on

11  whether or not Mr. Mulcahey had provided sufficient

12  evidence to demonstrate that the market for Montage's

13  stock traded in an efficient market over the proposed

14  class period.

15      Q.   And did you make any determination as to

16  whether the market for Montage's stock is efficient?

17      A.   So I didn't do my own affirmative -- I didn't

18  do my own affirmative tests, but what I did do is to

19  properly reconsider a number of the tests that

20  Mr. Mulcahey puts forward.  And there are certainly

21  evidence of inefficiency in that work.

22              And we can talk about the individual

23  elements, but, certainly, when one looks at things like

24  his FDT test, and excluding the alleged corrected

25  disclosures, and having no difference between his two


MAGNA
LEGAL SERVICES

Page 43

1    groups of dates, you can look at the serial correlation,

2    which I'm sure we'll have a chance to talk about.  I'm

3    sure we'll have a chance to talk about September 27th.

4              So I'm sure we'll have an opportunity,

5    but, certainly, properly considered, there is evidence

6    within what Mr. Mulcahey has done that he ignores that

7    points to inefficiency.

8        Q.   And you did not conduct your own event study

9    in the course of this report, correct?

10       A.   That's correct.  For the purposes of my

11   report, without -- without offering the opinion that it

12   is an appropriate regression model, I just used the

13   residuals from Mr. Mulcahey's regression model in my

14   analysis.

15       Q.   Okay.

16                   (Off Record Discussion)

17                   (Short Recess)

18   BY MR. STERN:

19       Q.   So earlier, when I asked you how you would go

20   about evaluating market efficiency, if you were asked to

21   do so by a plaintiff, you said the first thing you would

22   do is an event study.

23              Is there anything else you would do?

24       A.   I might do a put-call parity test.  I might

25   look at the cost of shorting.  But because the



Page 44

1    definition of market efficiency is to look at the way

2    markets incorporate new value relevant information, the

3    direct test has to be done, in which you do an event

4    study that looks at unexpected corporate events, and are

5    the announcement of those rapidly and fully incorporated

6    into the stock price.

7             So looking at the fundamental working of

8    arbitrage, as put-call parity and short interest, I

9    think that would be informative, but the -- the most

10   direct and necessary evidence is that event study that

11   you have to do.

12       Q.   Okay.

13            MR. STERN:  I'm going to introduce Plaintiff's

14   Exhibit 1.

15            (Exhibit 1 marked for identification)

16   BY MR. STERN:

17       Q.   Do you recognize this?

18                 (Witness reviewing)

19       A.   Yes.

20       Q.   What is it?

21       A.   It's the expert report -- or a copy of the

22   expert report that I filed in this matter.

23       Q.   Okay.  So throughout the report you refer to

24   the price of the stock fully reflecting all

25   publicly-available information.  And, for instance, you



Page 45

1    do it in paragraph 21; would be one example.  If you

2    want to just take a look at that, which is on page 13.

3                    (Witness reviewing)

4    BY MR. STERN:

5        Q.    And I should say when I'm identifying pages

6    here, I'm identifying pages of your report and not the

7    pages on the top that refer to the document number

8    paging.

9        A.    Did you say paragraph 21 or page 21?

10       Q.    So I said paragraph 21 on page 13, I believe.

11       A.    Okay.

12       Q.    Yes.  You say, "Rather, when assessing market

13   efficiency, it is imperative to conduct a properly

14   designed study to test whether prices fully and rapidly

15   reflect all publicly available information."

16                    What do you mean by "fully" in that

17   context?

18       A.    So I could have put quotations around this.

19   This is directly from Fama 1970, the definition of

20   market efficiency.  So the way Fama puts it is that Fama

21   states that quickly means that it happens so fast as to

22   not create profit opportunities.  And fully means that

23   it's an unbiased assessment of what the collective

24   market views that information.

25                    So it's an unbiased assessment of that



Page 46

1    information.

2         Q.    What do you mean by it's "unbiased"?

3         A.    So what Fama means is that -- and what the

4    academic research has shown is that markets can both

5    overreact and underreact to information.  And so,

6    implicit in the definition -- well, explicit in the

7    definition that Fama promulgates about market

8    efficiency, is that the stock price reaction to new,

9    unexpected value relevant information is an unbiased

10   assessment of the implications of that information for

11   the firm's value.

12        Q.    In practical terms, though, you said you

13   wouldn't look at the magnitude when you were studying

14   the efficiency of the stock.  You wouldn't look at the

15   magnitude of the reaction.

16              So how would you be able to detect an

17   under or overreaction?

18        A.    So for the purposes of what I would do in a

19   securities litigation matter, I would look at whether or

20   not stocks incorporate good news positively; bad news

21   negatively.  The academic literature is replete with

22   examples of the way academics have demonstrated that

23   markets can over and underreact.

24              You know, one of the earlier examples is

25   the post-earnings announcement drift, in which stocks,



Page 47

1    in general, after large positive earning surprises or

2    large negative earnings surprises continue to move in

3    that direction over the subsequent months on a

4    risk-adjusted basis.  The literature on that has said

5    that the incorporation of those earnings surprises is

6    incomplete and the markets underreact.

7              There are other examples in which markets

8    overreact to information.  There's some Hong and Stein

9    paper that showed that negative information, typically,

10   engenders an overreaction on the negative side, where as

11   positive information doesn't.  And there's a reason for

12   this, in terms of pent-up -- pent-up trading demand in

13   markets.

14             So, certainly, the academic literature

15   has demonstrated that certain types of information may

16   not be fully incorporated into the stock price.  As I

17   propose the way it would be examined for a firm like

18   Montage, in this matter, is to look at -- to look at

19   positive and negative events, and whether or not the

20   stock prices react positively and negatively to those.

21   I would likely also do, probably, some measures; so

22   things we can quantitatively measure like an earnings

23   surprise.

24             I would expect that large earnings

25   surprise would engender larger stock price reactions



Page 48

```
 1   than small earnings surprises.  So I might do some
 2   correlations between the size of the earnings surprise
 3   and the size of the stock price reaction, but I
 4   certainly wouldn't require a particular stock price
 5   reaction, in terms of size, to demonstrate market
 6   efficiency in a matter like this.
 7        Q.   Okay.
 8             MR. STERN:  Could I have this marked as
 9        Exhibit 2?
10             (Exhibit 2 marked for identification)
11                       (Witness reviewing)
12   BY MR. STERN:
13        Q.   I'll have you turn to page 13 and, again,
14   going on the --
15        A.   Of the Mulcahey report?
16        Q.   Sorry, yes.  Do you recognize this document?
17        A.   I do.
18        Q.   And what is it?
19        A.   It's the report of Mr. Mulcahey in this
20   matter.
21        Q.   Thank you.  And can you turn to page 13?
22        A.   Yes.
23        Q.   Do you see the second sentence that begins
24   with, "There is," in paragraph 23?
25                       (Witness reviewing)
```



Page 49

1       A.    I see the paragraph -- I see the sentence,

2   yes.

3       Q.    Could you just read that for the record?

4       A.    Yes.  So this is what Mr. Mulcahey writes, in

5   paragraph 23.  "There is an important distinction

6   between informational efficiency (i.e. whether public

7   information is quickly impounded in the stock price),

8   and fundamental efficiency (i.e. whether the information

9   is impounded correctly or accurately in the stock

10  price."

11      Q.    So I think I know the answer to this question,

12  based on your earlier characterization, but just to be

13  clear for the record:  Do you agree with that statement?

14      A.    So Mr. Mulcahey is making a distinction that

15  some courts have made.  It's not a distinction which

16  exists in the academic literature.  The definition of

17  efficiency is, as I -- as we just discussed a second

18  ago, from Fama, that it is a market which rapidly and

19  fully incorporates all new available public --

20  unexpected public value relevant information.

21                There have been some courts which have

22  tried to draw a distinction between stocks just moving

23  in reaction to information, which those courts call

24  informational efficiency, versus prices being right,

25  which those courts call fundamental efficiency.



Page 50

1      Q.   And you don't think that's a distinction that

2  is relevant?

3           MR. MOSS:  Objection to form; calls for a

4      legal conclusion.

5      A.   From a matter of financial economics that

6  distinction doesn't exist.  The definition of

7  efficiency, in terms of -- is based on stocks reacting

8  to new information, but, you know, if you go back to

9  Fama 1970, two sentences after he says a market is

10  efficient if it rapidly and fully incorporates new value

11  relevant information, two sentence later is a sentence

12  which says prices are right, meaning that prices reflect

13  an unbiased assessment of the information.

14           Now, nothing that I have stated, in terms

15  of how I would test for market efficiency in this matter

16  or any 10b-5 matter, nor do my criticisms of

17  Mr. Mulcahey require a test that the price reactions be

18  the right size.  So everything I've said is totally

19  consistent with the way some courts have defined

20  informational efficiency, which is that markets are

21  going to react to new information.  And markets are

22  going to react positively to good information and

23  negatively to bad information or bad news.

24      Q.   So then, I guess, do you think that

25  informational efficiency is a meaningful concept from



MAGNA

LEGAL SERVICES

Page 51

1    the perspective of financial economics?

2              MR. MOSS:  Objection.

3        A.    So testing market efficiency test (sic) is

4    testing whether or not information is rapidly and fully

5    incorporated into the stock price.  So from a matter of,

6    when you look at the academic financial economics

7    literature, they're not drawing this distinction between

8    fundamental efficiency and informational efficiency.

9    But certainly nothing I've proposed, in terms of what

10   needs to be shown from Montage to demonstrate that it's

11   efficient, requires any particular size of a stock price

12   reaction or any particular price for a given piece of

13   information.

14              So it is everything that we've talked

15   about this morning, in terms of what needs to be

16   demonstrated is consistent with the definition of

17   finding what some courts have called informationally

18   efficient markets.

19       Q.    Right, but I guess what I'm asking is, so do

20   you think there is a difference between -- so are you

21   saying, then, that what you've done isn't a test of

22   fundamental efficiency?

23              MR. MOSS:  Objection to the form.  He never

24         said it was a test --

25              MR. STERN:  Let me rephrase.



Page 52

1    BY MR. STERN:

2         Q.   The analysis you performed doesn't look at

3    magnitude?

4         A.   That's correct.  Everything I talk about in my

5    report, which is -- which is both a critique of what

6    Mr. Mulcahey has done, as well as the evidence within

7    his own analysis that shows market inefficiency, is all

8    confined to what some courts have called informationally

9    efficient.  There's nothing in my report which holds his

10   analysis to a standard of what some courts have called

11   fundamental efficiency.

12                 That's not the standard that's being

13   applied.

14        Q.   Is there any single test which would be

15   sufficient to establish market efficiency?

16        A.   A properly specified event study, that in and

17   of itself could demonstrate market efficiency by itself,

18   and, in fact, is required to show market efficiency.

19   Without a direct test, without a properly structured

20   event study you cannot demonstrate market efficiency.

21        Q.   I think you just answered given if an event

22   study was necessary.  What I asked is if any test was

23   sufficient?

24        A.   A properly specified event study would be

25   sufficient.



Page 53

1      Q.   So would you say if you performed an event

2  study, and it showed efficiency, you wouldn't need to

3  look at any other information where you could say this

4  is an efficient stock or I'm very confident --

5           MR. MOSS:  Object --

6  BY MR. STERN:

7      Q.   -- not 100 percent confident, but confident

8  that I don't have to look at anything else?

9           MR. MOSS:  Objection, mischaracterizes the

10          testimony.

11     A.   It would depend upon how many corporate events

12 I could find.  Certainly, the more different types of

13 corporate events over a purported class period, the

14 stronger the evidence would be.  So think about each

15 corporate event being a piece of evidence which would

16 weigh in favor of efficiency.

17               So if I have lots of evidence I could

18 look at, from earnings announcement to dividend

19 initiation to analyst forecast changes, whatever.  If I

20 had a lot of different events, and the vast majority of

21 those had consistent price reactions with the ex-ante

22 hypothesis, in my mind, that would be sufficient.  Now,

23 if I had a very small number of days, I couldn't be very

24 confident.

25               Again, I may look at things like the



Page 54

1    put-call parity and the short interest rebate rate to

2    look at how the arbitrage market was functioning.  But

3    you certainly need affirmative supportive evidence from

4    an event study.  That's necessary.

5                    A comprehensive enough event study could

6    be sufficient, but it just depends upon the number of

7    events throughout the time period that you can identify.

8        Q.   Okay.  Have you ever performed such an event

9    study in the context of litigation?

10           MR. MOSS:  Objection to form.

11       A.   Yes.

12       Q.   In which cases?

13       A.   So I've certainly done affirmative event

14   studies in Goldman Sachs; the securities Goldman Sachs

15   litigation.

16       Q.   And this is regarding efficiency?

17       A.   Well, in Goldman Sachs, it was for price

18   impact.

19       Q.   Okay.

20       A.   I did a price impact event study.  I'm just

21   going to look at...

22                    (Witness reviewing)

23           MR. MOSS:  Just for the record, the witness is

24       looking at Exhibit 2 of his report to refresh his

25       recollection.


MAGNA
LEGAL SERVICES

Page 55

1              MR. STERN:  Okay.

2        A.    I'm trying to remember in MiMedx, if I did in

3   that.  I certainly did in the FCStone matter.  I can't

4   remember in NII, if I did or not.  But, again, without

5   going back to a lot of the reports, I would say that in

6   a significant minority of the cases, I will do my own

7   event study.

8              There are some times in which I'll do an

9   event study and not create my own regression model, but

10  I'll certainly do an event study analysis.  And similar

11  to what I did here, I'll say, for purposes of my report,

12  without stating that the model is the one I would

13  choose, I'll use the opposing expert's model, in those

14  cases.  But in a number of cases, I've certainly, from

15  first princples, developed by own regression model and

16  my own event study.

17       Q.    Do you know if there's any academic literature

18  or do you have any idea what portion of, let's say,

19  NASDAQ stocks are efficient at any given point in time?

20             MR. MOSS:  Objection to form.

21       A.    That's not -- that's not an area of research

22  that I've seen tabulated in that way.  What -- you know,

23  what I've seen or, again, we've talked about papers on

24  initial public offerings, seasoned equity offerings,

25  post-earnings announcement drift.  So there's a large --



Page 56

1   there are large classes of stocks which would be

2   represented in NASDAQ, that the academic literature has

3   pointed to systematic inefficiency in those.  But I've

4   never seen anybody who's tried to tabulate, for a given

5   crossection of stocks on the NASDAQ at a given time,

6   what fraction of those are efficient and what fraction

7   are inefficient.  I've just never seen an academic paper

8   like that.

9        Q.   Would you say that a large portion of stocks

10  at any different time, you would expect on the NASDAQ to

11  be efficient?

12       A.   It would depend upon the time period.  So for

13  most time periods, that's probably true.  There are

14  certainly time periods in which there are sort of macro

15  dislocations in which large numbers of NASDAQ stocks and

16  other stocks at that time might be inefficient, but

17  it's --

18       Q.   Like the financial crisis?

19       A.   What?

20       Q.   The financial crisis?

21       A.   Potentially, the financial crisis, the .com

22  bubble.  There was a big biotech bubble in the early

23  1990s.  So we can go back to Tulipmania, back 1960s, in

24  Holland.

25                    But the financial literature is full of



Page 57

1   macro-events which have had systematic effects on a

2   large number of stocks.  So it really would depend on

3   the time period.  But even in a relatively "normal" time

4   period, you know, for example, I think the

5   Bristol-Myers-EntreMed example from Huberman and Regev

6   is like '97 or '98.

7            You know, here's an example in relatively

8   recently time period for pharmaceutical stocks in which

9   they were able to demonstrate inefficiency for NYSE, you

10  know, one of the largest stocks.  So even if it's a

11  relatively normal time period when most stocks are

12  likely to be efficient, we can still find inefficiency,

13  which is why it's an individual question, and why you

14  have to do the direct test.  It's why you have to do

15  that event study.

16       Q.   But, again, in general, you would say a

17  significant proportion of stocks in NASDAQ and NYSE are

18  going to be efficient at any given time?

19            MR. MOSS:  Objection.

20       A.   In most time periods, but not in all time

21  periods.

22       Q.   Okay.  Have you ever found a stock to be

23  efficient in litigation?

24       A.   So I have been a rebuttal expert to -- a

25  rebuttal expert on a number of 10b-5 matters in which



Page 58

1    the plaintiff expert has offered evidence that

2    demonstrated market efficiency.  So for maybe half a

3    dozen of times over the last number of years, when I --

4    when I examined what the plaintiff expert had offered, I

5    had, you know, through redoing the analysis and looking

6    through what was done, had to come to the conclusion

7    they had offered sufficient evidence to demonstrate that

8    the market was efficient.

9              And in each of those times, the primary

10   piece of evidence offered was a well-executed event

11   study that was -- that was comprehensive and consistent

12   with everything I've testified so far this morning.  So

13   it's not a rare thing to be able to demonstrate.  You

14   can demonstrate.  The tools exist to demonstrate that a

15   particular security is trading efficiently.

16        Q.   So if you turn to paragraph 16 of your report,

17   your report.

18             MR. MOSS:  So this is back to Exhibit 1?

19             MR. STERN:  Back to Exhibit 1, yes.

20             MR. MOSS:  Okay.

21             (Witness doing as requested)

22             THE WITNESS:  Okay.

23   BY MR. STERN:

24        Q.   So you see you have a 1 and 2?  You say --

25   you're characterizing Mr. Mulcahey's report, and you're



Page 59

1    saying that he, basically, says that direct evidence of
2    market inefficiency can be brushed off and ignored if a
3    preponderance of indirect evidence is consistent with
4    efficiency.
5                  That's your characterization, correct?  I
6    mean, he actually didn't say "brushed off or ignored"?
7         A.    That's -- so -- so these are -- these are a
8    summary of my valuation of the Mulcahey report, in terms
9    of how he comes to a conclusion of market efficiency.
10   And 1 and 2 here are the implicit assumptions that --
11   that are required in order for him to conclude that the
12   market for Montage was efficient.
13        Q.    And what do you mean in this context when you
14   say, "direct evidence of market inefficiency?
15        A.    So there are two -- so there a number of
16   examples.  I think I've highlighted a couple of those.
17   The first of which is that the Ferrillo, Dunbar and
18   Tabak test that he employes is a necessary, but not
19   sufficient condition.  So if you fail this test, the
20   market for that security is inefficient, but just
21   passing it, doesn't prove that the market's efficient.
22                  And I talk about a lot of ways that you
23   can get false positives in that test.  And I show that
24   if you implement the test the way the authors of that
25   test say is the right way, which is to exclude the



Page 60

1    corrected disclosure dates, you find that there is no

2    difference in the incidence of statistically significant

3    stock price reaction in Mr. Mulcahey's news days versus

4    non-news days.  That would be one.

5                    The second one would be the evidence that

6    he finds of serial correlation in Montage's stock, and

7    the fact he has to arbitrarily exclude a number of days

8    on both the beginning and the end, in order to reduce

9    the -- the autocorrelation to being less than 95 percent

10    significant.  It's still -- it's still there.  It's

11    significant at 10 percent, but he arbitrarily starts

12    lopping off days.  And that would be indicative of a

13    direct evidence of inefficiency of weak form efficiency.

14                    And then throughout my report, I talk

15    about a number of examples of days where it doesn't

16    appear that there's any new value relevant information,

17    yet the stock moved in a statistically significant

18    manner.  And, again, this would be evidence of

19    inefficiency.  So all of those are spread throughout the

20    report, and these are all within his own set of

21    analyses.

22        Q.   Okay.  Another example of direct evidence

23    would be something like the example you gave with

24    Bristol-Myers, right?  That would be direct evidence of

25    efficiency (sic), if you saw something like that?



Page 61

1      A.    Direct evidence of --

2      Q.    Inefficiency.

3      A.    -- inefficiency would be if you could

4  demonstrate that there was a systematic pattern of a

5  stock moving on the publication of old news.  So if you

6  could demonstrate that the repetition of previously

7  available information caused a subsequent statistically

8  significant stock price reaction, much like the Huberman

9  and Regev paper, that would be evidence of inefficiency.

10      Q.    Was that systematic or was that just one

11  instance of the stock reacting to old news?

12      A.    Are you talking about the Huberman and Regev

13  paper?

14      Q.    Yes.

15      A.    So they explore a single event of the

16  announcement for this particular drug, because it was

17  such a large event for both EntreMed and Bristol-Myers.

18  And it was just -- it was very clear that the

19  information was simply a regurgitation of information,

20  which had months earlier been announced.  And so their

21  paper is looking at only one example of the

22  republication of old information, but it is a

23  high-profile example.

24              There's another paper, by the way, which

25  was written on United Airlines.  And I can't remember



Page 62

1    the exact dates here, but I think in 2008, there was --

2    somebody had mistakenly republished an article from

3    2002, when United Airlines filed for bankruptcy.  And

4    when this article was inadvertently, sort of,

5    re-disseminated in 2008, the stock price of United

6    declined substantially on the republication of that news

7    article.

8                     But more comprehensively, the paper by

9    Tetlock that I talked about earlier, looks across

10   thousands of stocks and millions of articles to

11   demonstrate that reaction to old information is not a

12   rare event.

13        Q.   Okay.  But did you see any reaction to old

14   information in the Montage case?

15             MR. MOSS:  Objection to form.

16        A.   So I haven't -- I haven't taken -- I haven't

17   taken it upon myself to analyze the news, in terms of

18   whether or not the news is actually new.  I point out a

19   number of instances.

20                     So, for example, the -- I can't remember

21   the exact date, but there's a Zacks research report,

22   which Mr. Mulcahey highlights on one of his days during

23   his "reverse event study."  And I don't know if you ever

24   looked at a Zacks report, but it simply is a

25   republication of old information.  They take available



Page 63

1    information on stock price and past stock price

2    movements and past financials, and just, basically,

3    re-purpose them.

4                I mean, it's fairly well-known or

5    considered in the academic literature that these Zacks

6    research reports don't provide any new information.  And

7    so like with the Zacks report, and on a number of

8    circumstances, one of the things which is required for

9    Mr. Mulcahey to demonstrate that the market for Montage

10   is efficient, is to establish, both among his news days

11   that he asserts or on any day that he examines, what

12   piece of information is actually new.

13               So what's the expectation about this

14   event, and is this news -- is it new?  Is it different

15   from what was expected, and would we hypothesize that it

16   should move the stock price significantly?  So that's a

17   requirement that Mr. Mulcahey just does not do.

18        Q.   Okay.  And so I believe you also described

19   another anomaly with respect to the relationship between

20   Royal Dutch and Shell stock?

21        A.   Yes.

22        Q.   That particular sort of anomaly isn't really

23   at issue here, correct?

24        A.   That's correct.  The reason I put it into the

25   report is that Royal Dutch and Shell are among the



Page 64

1    largest stocks on the London and the Amsterdam Stock

2    Exchange.  You know, widely held by institutions; lots

3    of volume, followed by lots of analysts.  And this

4    anomaly was first identified by a colleague -- a former

5    colleague of mine, Ken Fru, in which the shares should

6    trade in an exact ratio, but they don't, and it's

7    uncertain why they don't.

8                    Sometimes Royal Dutch is expensive

9    relative to Shell and sometimes vice versa.  And so this

10   is just an anomaly which says the law of one price and

11   arbitrage should force these things to have the exact

12   ratio, but they don't.

13                   And every single one of the other

14   indirect factors that Mr. Mulcahey looks at would hold

15   for Royal Dutch and Shell, yet we know affirmatively,

16   with 100 percent certainty, that they're inefficient.

17       Q.   Is it possible that if we look at other types

18   of information, with respect to Royal Dutch and Shell,

19   that that information was rapidly incorporated into

20   their stock prices during that time period?

21       A.   It's possible, yes.

22       Q.   Is it likely?

23       A.   Again, I haven't done the test.  For most

24   periods, I would imagine that it's likely, but I just

25   haven't done the tests.



Page 65

1             But the important thing to note here is

2    that -- and the reason I put -- the main reason I put

3    all of these examples here -- and there are a myriad of

4    other examples -- is to demonstrate that the indirect

5    factors or the indirect tests that Mr. Mulcahey

6    tabulates aren't depositive of market efficiency.  You

7    have to do a properly specified event study, because all

8    of those other factors can hold and the market can still

9    be inefficient.

10        Q.   But don't you think those other factors have

11   some relevance?

12             MR. MOSS:   Objection to form.

13        A.   So the only factor which had any relevance at

14   all, potentially, is the bid-ask spread, because that

15   relates to arbitrage.   These other factors are just

16   characteristics of markets, characteristic of active

17   markets, and don't go to the notion of how markets

18   become efficient and certainly aren't direct evidence of

19   market efficiency.

20             So none of these other tests could --

21   could be considered, from a financial economics

22   perspective, evidence of -- of efficiency or

23   inefficiency.

24        Q.   And you're aware that that the defendants have

25   filed a motion to exclude Mr. Mulcahey's testimony, you



Page 66

1    know, under a Daubert motion, correct?

2         A.   I haven't read it, so I'm unaware of that.

3    But I haven't read the Daubert motion.

4         Q.   So then, were you asked to specifically opine

5    as to whether Mr. Mulcahey's report was scientifically

6    reliable?

7         A.   So I wasn't asked those terms.  Certainly, I

8    provide evidence that it's not; that there are numerous

9    ad-hoc decisions made.  The framework of the tests are

10   not consistent with demonstrating market efficiency.

11             So I certainly provide -- I provide

12   opinions that Mr. Mulcahey's report is not -- is not

13   authored and put together in a way in which meets the

14   standards of the peer-reviewed literature in financial

15   economics.  I wasn't asked to do that.  I was asked to

16   do the three things we talked about earlier.  I wasn't

17   directed to say that his analysis is not scientific.

18        Q.   Okay.  Would you say that the use of those

19   indirect tests factors into your negative assessment of

20   the validity of his report from a financial economics

21   perspective?

22             MR. MOSS:  Objection to form.

23        A.   My opinions about the scientific validity of

24   the approaches taken largely have to do with the choices

25   made both in his event study and the implementation of



Page 67

1   his event study and his autocorrelation tests.  You

2   know, the tabulation -- I mean, the tabulation of these

3   other indirect factors is -- is rather mechanical.

4           Certainly they don't provide evidence of

5   market efficiency from a financial economics

6   perspective.  But the scientific and the research

7   weaknesses, in terms of the methods employed, go more to

8   what he calls his direct tests, and the way his direct

9   tests are implemented.

10      Q.   And then circling back, you talked about

11  anomaly with respect to 3Com?

12      A.   Yes.

13      Q.   Again, that's not the sort of thing that was

14  at issue here, correct?

15      A.   No.

16           MR. MOSS:  Objection to form.

17      A.   Again, what -- the Palm-3Com example is,

18  again, another example of two stocks which -- you know,

19  one of which is an IPO, so that would be relative to

20  Montage.  But two stocks for which Mr. Mulcahey's

21  indirect factors would be above his threshold.  Yet the

22  academic literature has demonstrated that they were

23  inefficient.

24           So again, just supporting this notion

25  that from a financial economics perspective tabulating



Page 68

1   these other indirect factors are not evidence of

2   efficiency.

3       Q.   So you referred to, in paragraph 20, you refer

4   to "glamour stocks"?

5       A.   Yes.

6       Q.   Do you have any -- or did you reach any

7   conclusion as to whether Montage was a "glamour stock,"

8   as you described it?

9       A.   So I haven't tabulated -- and, typically, the

10  way stocks are characterized as glamour or value stocks

11  is on their relative market-to-book ratios.  So the

12  literature, typically, separates firms into those firms

13  that have high market-to-book and those that have low

14  market-to-book.

15              Firms that have high market-to-book

16  ratios are, typically, classified as glamour stocks.

17  And firms with low market-to-book are, typically,

18  considered to be value stocks.

19              Given that Montage is a recent IPO, most

20  IPOs generally tend to be glamour stocks, but I

21  haven't -- I haven't calculated Montage's market-to-book

22  ratio and compared it to the market-to-book ratio of

23  other companies to say, is it a glamour stock or a value

24  stock?

25      Q.   So are you saying, though, that a company with



Page 69

1    a high market-to-book ratio is significantly more likely

2    to be inefficient?

3        A.   So small -- so the small glamour stocks have,

4    typically, been shown to be -- or have a high propensity

5    to be inefficiently traded.  There's a whole set of

6    literature -- I highlight a couple of the papers down

7    here (Indicating), but there's a long literature that

8    has looked at whether or not small glamour stocks are

9    somehow inefficient both from a theoretical perspective

10   as well as from an empirical perspective.  And there are

11   a large number of papers that argue, yes, in fact, these

12   firms are systematically inefficient.

13       Q.   Wouldn't a high market-to-book ratio, though,

14   just be evidence of market expectations of future

15   growth?

16       A.   So certainly a high market-to-book ratio is

17   consistent with high expectations of future growth.  The

18   question is whether or not high market-to-book stocks

19   earn appropriate long-run risk-adjusted returns.  So the

20   literature -- and if you look at, you know, Jegadeesh

21   and Titman, if you look at Lakonishok, Shleifer and

22   Vishny, if you look at those papers, they argue that the

23   market is, in general -- the investors in these

24   companies are overly optimistic, and bid up the price of

25   glamour stocks above where they should be.  And that,



Page 70

1   ultimately, the expectations of growth don't come to

2   fruition.  And so long-run risk-adjusted returns are

3   poor.

4                    That's totally consistent with the 1991

5   paper by Jay Ritter, in which he was the first to

6   document that the 5-year risk-adjusted return on initial

7   public offerings is substantially negative.  And he

8   argued that, you know, the prime example of a small

9   growth stock is a recent IPO, and these recent IPOs

10  perform particularly poorly.

11                   I have a subsequent paper with Alon Brav

12  that shows that if you match small growth stocks to

13  recent IPOs, that those small growth stocks, which have

14  been around for a long time, have similarly poor

15  performance.  And so all small growth stocks seem to be

16  overvalued when you get lots of IPOs.  And that's sort

17  of the conclusion of -- of the first paper that I wrote

18  with Alon Brav.

19       Q.   So you mean during periods with a lot of IPOs,

20  you would expect even non-IPOs, small growth stocks, to

21  be overvalued?

22       A.   That is correct.

23       Q.   Okay.  Just so I guess this sounds a little

24  like a Warren Buffett thesis of discussion --

25       A.   Certainly, that would be consistent with the



Page 71

1    type of value investing that -- that Mr. Buffett

2    professes.

3        Q.   Yes.

4        A.   You know, it's interesting how this systematic

5    pattern exists.  So I, actually, wrote a paper with a

6    colleague at Harvard Business School, Josh Lerner, where

7    we hand-collected data on IPOs, back to the 1920s.  And

8    we looked at the long-run risk-adjusted performance of

9    IPOs, going back all the way to the 1920s.  And we

10   showed that the pattern that's documented in Jay

11   Ritter's work and my work with Alon Brav holds for all

12   IPO waves back to the 1920s.

13             So this is a systematic pattern which

14   isn't just an artifact of one time period, but in time

15   periods in which there are lots and lots of IPOs, small

16   growth stocks become overvalued.

17       Q.   Okay.  And you talk about herding as well?

18       A.   Yes.

19       Q.   Did you see any evidence -- or did you look to

20   see if there was any evidence of herding in Montage

21   stock?

22       A.   I didn't look at herding.  One of the things

23   that I want -- I point out from the herding, is that one

24   of the factors that Mr. Mulcahey looks at is

25   institutional investors.  And, certainly, there is



Page 72

1   evidence -- there's evidence in the academic literature

2   that institutional investors often herd, and that this

3   herding by institutional investors can be destabilizing.

4   And there's a whole set of theories around this.

5                   I have not looked at whether or not there

6   was herding by the investors in Montage's stock.  It was

7   merely meant as a reference to show that simply looking

8   at the level of institutional ownership is not

9   dispositive of a market being efficient.

10      Q.   Okay.  And then you talk about irrational

11  noise traders possibly contributing to inefficiency?

12      A.   Yes.

13      Q.   And did you see any evidence of that in this

14  case or did you look to see if there was any evidence of

15  that?

16      A.   I haven't looked at the presence of noise

17  traders for Montage.

18      Q.   Okay.  And if you found any of these anomalies

19  causing -- if you found any of these anomalies affecting

20  the price of stock, you would then conclude that the

21  stock is efficient, correct?

22          MR. MOSS:  Objection.

23      A.   There would evidence of inefficiency.  So

24  these are well-documented effects in the academic

25  literature.  To the extent they were documented in



Page 73

1    Montage, there would be evidence of inefficiency.  You

2    would still want to go and do the direct test looking at

3    a properly specified event study, but these kinds of

4    effects would be evidence of inefficiency.

5         Q.   But if you did a well-defined event study with

6    respect to the stock, even if they had some of these

7    anomalies, you could still find that the stock was

8    efficient, if the event study showed a strong positive

9    result?

10             MR. MOSS:  Objection to form.

11   BY MR. STERN:

12        Q.   Could you?

13        A.   Certainly, because the definition of market

14   efficiency has to do with a market rapidly and fully

15   incorporating new value relevant information.  So I

16   would -- I -- I don't know what that event study would

17   show in the presence of these.

18             But to the extent you did an event study

19   that had a reasonable number of corporate events over a

20   proposed period of time, and that those events, the vast

21   majority of those moved in an appropriate manner to the

22   information which is released, I would then conclude

23   that my tests were supportive of market efficiency.

24   That the evidence was supportive of the market for that

25   stock over that period of time being efficient.



Page 74

1        Q.    Okay.  So paragraph 23 to 24, you talk about

2    these two anomalies associated with stocks following an

3    IPO.  Can you just describe that first anomaly?  I think

4    it has to do with the end of the quiet period.

5             MR. MOSS:  You mean in paragraph 23?

6             MR. STERN:  Yes, sorry.  In paragraph 23.

7        A.    So after an initial public offering in the

8    U.S., analysts are restricted from issuing reports about

9    the firm for the first 25 days.  And for, virtually, all

10   IPOs, on the 25th day, there are research reports which

11   are written, analyst research reports.  And there is a

12   systematic stock price reaction positive and

13   statistically significant on the day of that initiation.

14                 Virtually, all, something like in excess

15   of 98 percent of those recommendations, are positive.

16   We know this from the literature.  And despite knowing

17   this, we get large and statistically significant stock

18   price reactions on a day that we know analysts are going

19   to issue reports and on a day we know the reports are

20   going to be positive.

21                 So it's this predictability of the stock

22   price reactions that we know is going to be happen 25

23   days after the offering.  And this is a similar effect

24   to the underwriter lockup.  Something that we know

25   that's going to happen, yet is associated with



Page 75

1    statistically significant stock price movements, even

2    though the day is known from the first day of trading.

3         Q.   Do you know if Montage was subject to the

4    quiet period?

5         A.   I haven't investigated, but because it -- I

6    mean, I would assume, but I haven't investigated that,

7    because it went public in the U.S. consistent with

8    regulations of the SEC, that it was governed by those

9    same restrictions; but I haven't checked.  I just don't

10   know.

11        Q.   Do you know what the day was that was 25 days

12   from the IPO?

13        A.   So it went public on the 26th of September, so

14   we could figure this out, but --

15        Q.   Does October 21st sound, right?

16        A.   You know, there are 30 days in September, so

17   minus five.  That would sound -- your math is as good as

18   mine.

19        Q.   So if we turn to your Exhibit 4, which is --

20   okay.  Do you have Exhibit 4?

21        A.   Yes.

22        Q.   So if you look at October 21st, was there a

23   statistically significant price increase on

24   October 21st?

25        A.   Oh, I was looking at -- so October 21st is the



Page 76

1      day where all the analysts report gets issued.

2             Q.   Yes.

3             A.   So this is certainly the end of the quiet

4      period.

5             Q.   Okay.  If you go to your Exhibit 4, that's the

6      actual --

7             A.   That's the actual stock price, yes.

8                        (Witness reviewing)

9             A.   So in Mr. Mulcahey's regression model, it

10     doesn't indicate that there was a statistically

11     significant stock price reaction on that day.

12            Q.   And do you have any reason to doubt that that

13     would be an accurate result?

14            A.   I talk about, in the -- in the report that the

15     lack of an industry control causes problems with his

16     model.  I discuss some of them in the paper.  So for the

17     purposes of my report, I utilize Mr. Mulcahey's

18     regression model.

19                        I certainly would have expected that it

20     would be important to have an industry index to control

21     for industry price movements as well.

22            Q.   But sitting here today, can you say that

23     Montage's stock had an abnormally large return on

24     October 21st, 2013?

25            A.   So I -- I can't say affirmatively because I



Page 77

1   certainly would have likely used a different control

2   period.  I certainly would have expected that I would

3   include an industry index.  So, you know, I can't say

4   whether or not the nominal return of 1.51 percent, when

5   adjusted for the industry, as well as a different

6   control period that may have different volatility or

7   different ways of adjusting, whether or not that would

8   have been statistically significant in my own

9   affirmative model.

10      Q.   Right.  But I guess just to keep this simple,

11  can you or can't you state -- withdrawn.

12           Do you, sitting here today, have any

13  reason to believe that Montage's stock price had an

14  abnormally large positive return on October 21st, 2013?

15           MR. MOSS:  Objection to form.

16      A.   Are you talking about nominal or residual

17  return?

18      Q.   Either.

19      A.   So the nominal return is 1.51 percent.  It's

20  certainly positive.  It's not in the right-hand tail of

21  the distribution, but it's certainly positive.  Without

22  a properly specified model, which would include some

23  industry controls, you really can't say whether or not

24  the residual would be -- would be large and positive and

25  statistically significant.



Page 78

1              So we can certainly -- I can certainly

2    opine on the nominal stock return.  Again,

3    affirmatively, I can't say what my residual return would

4    have been.  I can tell you what Mr. Mulcahey's return

5    is.

6         Q.   And under Mr. Mulcahey's model, the number is

7    not abnormally large; is that correct?

8         A.   That is correct.  But, again, I've already

9    mentioned a number of the shortcomings of his model.

10        Q.   I understand.

11             So the second anomaly you talk about in

12   paragraph 24, can you describe that anomaly?

13        A.   So when a firm goes public, the investment

14   banks underwriting the offering require pre-public

15   shareholders to agree to restrictions on the sale of

16   their securities.  So they can't sell their securities,

17   they can't short their securities, in the company for at

18   least 180 days.  Sometimes the underwriter lockup is

19   longer than that.

20             In a paper with Alon Brav, we actually

21   tabulate what these restrictions are for thousands of

22   IPOs, but the vast majority have a lockup of 180 days.

23   So that means that without getting prior approval of the

24   underwriters that the insiders can't sell.

25             And when you look at those firms, the



Page 79

1   date that the lockup expires is known with certainty.

2   It's right in the S1.  It's right in the offering

3   documents.  And there's some statistically significant

4   stock price decline on the expiration of the lockup.

5            And so, again, this is a situation where

6   on the day of IPO, you know a particular date with

7   certainty.  And you know that that this event, which is

8   known on day 1, is associated with statistically

9   significant stock price declines.

10            Again, it's the conclusion of my paper,

11   the Field and Hanka paper, are that there is strong

12   evidence of market inefficiency for this type of an

13   event.

14   Q.   Do you know when the end of the lockup period

15   was in this case?

16   A.   You're probably better at the math than I am,

17   but it's 180 days after September 26th.  I think that

18   actually happens after the merger -- acquisition

19   announcement was made.  So October, November, December,

20   January -- sometime in March.

21   Q.   Yeah, March 25th, I believe.  Does that sound

22   about right?

23   A.   Yeah, there's 365 days in a year, but February

24   only has 28 days.  Therefore, it's not going to -- so,

25   yeah, the 25th sounds about right, because you have



Page 80

1   October and November -- October and December have 31.

2   January is 31 --

3               So anyway, it sounds about right.  I'm

4   going to take the representation that it's March 25th.

5       Q.   So that's post class period, correct?

6       A.   That's correct.

7       Q.   And did you see any statistically significant

8   price reactions on March 25th?

9       A.   Well, you wouldn't expect it after there's

10  already been an agreement to an acquisition.

11      Q.   Why's that?

12      A.   Because, typically, the price of the security

13  gets, sort of, fixed within a narrow band of the

14  agreed-upon acquisition price.

15      Q.   So, essentially, after there's an agreement

16  for acquisition, in most companies, the fundamentals

17  are, sort of, not what people look at.  It's really, you

18  know, it's really a function of whatever the acquisition

19  price is offered to be?

20              MR. MOSS:  Objection --

21      A.   Right.  It's a function --

22              MR. MOSS:  -- to form.  Excuse me.

23      A.   -- it's a function of the acquisition price,

24  the expectation that the acquisition goes through, and

25  the expectation of probability of some topping bid


MAGNA
LEGAL SERVICES

Page 81

1    coming in.  So it's a function of those bids, and is not

2    directly tied to the underlying fundamentals of the

3    business, although one would expect that what a bidder

4    pays for that stock is somehow related to the underlying

5    cash flows of the business.

6                    And, certainly, a sophisticated private

7    equity investor, one would expect to base their

8    acquisition price on what they believed, you know, the

9    future revenue and cash flows from this business are

10   going to look like.

11       Q.   How about a local government entity?

12       A.   If that local government entity is a private

13   equity fund, that's funded by the government, again, I

14   think they would operate to try to maximize profits.

15   But, again, I haven't investigated it.  I have no

16   opinions about whether or not the price offered in the

17   acquisition was somehow tied to the -- to the future

18   revenue and cash flows of Montage.

19       Q.   So you think that government entities are

20   likely to be investors who focus on cash flows?

21       A.   Again, I haven't -- I haven't investigated

22   this.  It's my understanding that the -- again, I

23   haven't investigated, but it was my understanding that

24   the entity, which bid to acquire them, was a private

25   equity firm which had been funded by the Chinese



Page  82

1    government or some local Chinese government.

2                I've certainly -- I myself wrote a case

3    on a Chinese government venture capital firm in

4    Shenzhen.  And, certainly, even though they were funded

5    by local -- local governments, their incentive was to

6    make money, and they based it on financial decisions.

7                So at least what I've seen in

8    government-sponsored venture capital and private equity

9    vehicles in China, they're motivated to make money.

10    Q.   So it's fair to say that there's not any

11    evidence for either of the anomalies related to the IPO,

12    post IPO period, in Montage's stock?

13          MR. MOSS:  Objection to form.

14    A.   I haven't done my affirmative test -- I

15    haven't done my own affirmative event study of the end

16    of the quiet period.  I also just testified that the end

17    of the lockup period was after the acquisition agreement

18    had been put into place.  So I haven't done those

19    analyses.

20                But the important point to consider is

21    that Montage, being an IPO stock, the number of -- the

22    anomalies, dating all the way back to Ritter in '91,

23    state that the IPOs are the type of firms that

24    systematically seem to have market efficiencies.  This

25    literature should have informed Mr. Mulcahey that both



Page 83

1    his regression model should have taken these into

2    consideration, and he should have taken these things

3    into consideration when evaluating the evidence for

4    whether or not Montage was efficient.

5        Q.   Okay.

6            MR. STERN:   Should we take five minutes -- or

7        I don't know what the thought is for lunch?

8            MR. MOSS:   Why don't we go off the record.

9                        (Off Record Discussion)

10                       (Lunch Recess)

11           MR. STERN:   All right.   Mark this as

12       Exhibit 3.

13           (Exhibit 3 marked for identification)

14   BY MR. STERN:

15       Q.   Do you recognize Exhibit 3?

16       A.   I do.

17       Q.   What is it?

18       A.   It's the St. John's Law Review article that

19   discusses the -- what I called in the report, the FDT

20   test, which is comparing statistically significant days

21   on news versus non-news days.

22       Q.   So now, you criticize Mr. Mulcahey for not

23   analyzing the news days, to see if there is actually any

24   news.   How would one go about doing that?

25           MR. MOSS:   Objection to the form.



Page 84

1      A.   Well, one needs to pick a class of events that

2  you can do -- you can reasonably do a news search on.

3  So things like earnings announcements, earnings

4  revisions, dividend initiation or omissions, security

5  issuances.  So you can look at when that information

6  first came into the market.

7           You know, again, it's not the sort of

8  thing where you could subjectively read a particular

9  piece of news and, say, oh, this is new; this is not

10  news (sic).  The kind of tests that one does in an event

11  study is to look at particular events and identify the

12  first discussion of those events and identify that as

13  the date in which that information came to the market.

14      Q.   Okay.  And this report doesn't say that you

15  should -- I'm sorry.  Exhibit 3 does not actually say

16  that you should go through the event, the class events

17  you're proposed to study, and make a determination,

18  based on reading the contents of those, which ones

19  contain new information and which ones don't; is that

20  correct?

21      A.   So I'm sure we can go and discuss numerous

22  flaws in this as an affirmative approach to market

23  efficiency.  I talk in my report how this is not

24  designed as an affirmative test to market efficiency.

25  It's a threshold test, and how it's -- you can have



Page 85

1   false positives.

2                   Any event study, however, does require

3   you to identify what news is actually new.  We know, as

4   I said, that markets can react to repetition of old

5   news.  So just identifying that a piece of news came to

6   the market on a day, and observing a statistically

7   significant stock price reaction, can't be evidence of

8   market efficiency.  You need to establish that there was

9   new, unexpected value relevant information released on a

10  day, to have anything to say about whether or not the

11  stock is efficient.

12       Q.   How do you go about doing that?

13       A.   I just mentioned to you --

14       Q.   Well --

15       A.   -- you look objectively at a set of dates.

16       Q.   Right.  So you pick a set of --

17            MR. MOSS:  I'm sorry, could you let him finish

18       his answer?  Were you done?

19            THE WITNESS:  No.

20       A.   You look at a class of dates, which the

21  literature has identified as particular dates that you

22  believe, from the academic literature, are associated

23  with statistically significant stock price reactions.

24  And there's a lot of examples.

25                   I already mentioned earnings surprises.


MAGNA
LEGAL SERVICES

Page 86

1    Earnings forecast changes by analysts, stock splits,

2    dividend initiation or omissions, bond issuance, stock

3    issuance, CEO turnover.  All these things are known in

4    the literature to be associated with statistically

5    significant stock price movements.  You can see whether

6    or not, in how many of these different type of corporate

7    events, are announced during the relevant period of

8    examination, and then you can determine whether or not

9    this is the first instance of this announcement.

10              And so the first time it's announced that

11   the CEO's resigning, that's the date that you can look.

12   You can actually identify whether or not there's any

13   discussion of that in the news.  Similarly, with

14   earnings forecast revision, you have the history for

15   this analyst of their forecasted earnings.  Change in

16   guidance, you can look at that.

17              So there's a whole set of corporate

18   events that we know to look for.  And we can identify

19   the first instance in which -- in which we identify that

20   piece of information coming to the market.  It is

21   certainly not picking up an analyst report or news story

22   and saying, oh, there's news in here, because not every

23   analyst report has news.  Not every article has news.

24   Q.   Does every quarterly report have news?

25   A.   Not necessarily.  Every quarterly report does



Page 87

1    not necessarily have unexpected new value relevant

2    information.  You have to compare it to expectations.

3         Q.   But it's also possible that even a change in

4    forecast isn't unexpected, correct?

5         A.   That's right.  You would have to look at --

6    you'd have to look at the -- the context and whether or

7    not other analysts had already changed their forecasts.

8    So there are ways to evaluate whether or not a given

9    change in forecasts -- so, for example, typically,

10   what's done is to look at a change in the consensus

11   forecast, where you not just look at one, but you look

12   at all the analysts in the aggregate, and maybe you look

13   at the mean or the median forecast, and whether or not

14   that changes.

15                 And that is, typically, viewed as a good

16   measure.  And the literature has looked at that as a

17   good measure of information coming to the market when

18   there's a consensus change in the forecast.

19        Q.   Okay.  So where does this article refer to the

20   test as a threshold test?

21        A.   I'm going to have to go to my own report to

22   find the citation, but it's somewhere near the end.

23        Q.   I believe it's page 122.

24                 (Witness reviewing)

25        A.   I see, yes.



Page 88

1       Q.    It's the second paragraph.  You see where it
2   talks about that.  And it says, "While this test
3   addresses the question of whether the stock responds to
4   news, it does not answer the question about whether the
5   response is of the correct magnitude.  Therefore, this
6   test is a threshold step, not a sufficient condition, to
7   show that a stock traded in an efficient market."
8             Is this what you referred to when you
9   said they identified it as a threshold test?
10      A.    This is one of the elements how it is a
11  threshold step.  It is certainly the case that there are
12  numerous examples and, in the subsequent paper that --
13  none of which are peer reviewed, by the way.  Not a
14  single article -- there are two articles written by
15  Tabak on this:  This one and a 2000 paper.  Neither one
16  is peer reviewed in an academic journal.  They're both
17  published in student-run law review journals.
18            But this is one element; it has to do
19  with the magnitude.  But, certainly, in his 2014
20  paper -- I think I even cite to that in here -- it talks
21  about how instances in which you can pass -- you can be
22  affirmatively inefficient, but pass the FDT test.
23  Giving the example about the 8 percent stock price
24  reaction, and it only reacts on half the times, and you
25  end up with a smaller stock price.  That the market is


MAGNA
LEGAL SERVICES

Page 89

1    inefficient, yet it passes the FDT test.

2              And so, certainly, this is what they say

3    in this article, but there are numerous other ways in

4    which you can get false positives, many of which I talk

5    about in my report.

6         Q.   But in this article it refers to the test as a

7    threshold test.  What it means is, it's a threshold test

8    because it doesn't measure magnitude; is that correct?

9         A.   This is one thing that they say here.  It is

10   not the only reason it is a threshold test.

11        Q.   Is there any other reason that this article

12   identifies the test as a threshold test?

13             MR. MOSS:  I think you need to give him an

14        opportunity to look at --

15             MR. STERN:  Of course.  Take your time.

16             MR. MOSS:  -- his report.  If this is just

17        a -- you know --

18             MR. STERN:  No, absolutely.

19             MR. MOSS:  -- I don't think you intended it to

20        be a memory test.

21             MR. STERN:  No, I don't.

22   BY MR. STERN:

23        Q.   So feel free to take a look at whatever you

24   need to look at, but I am, just to be clear, I'm

25   referring to what it says in this article not what is



Page 90

1   said elsewhere.  But feel free to look at your report,

2   if you need to.

3        A.   I was looking for the other citation to the

4   other Tabak article.

5             MR. MOSS:  I think it's paragraph 44 of your

6             report.  There's more in there on threshold test.

7                  (Witness reviewing)

8        A.   So it certainly shows that not passing the

9   test is evidence of market inefficiency.  And also, it

10  talks about, on average.  So this would be on page 120

11  to 124 -- or, excuse me, 120 to 121.

12                  You know, just showing that stocks, on

13  average, move to news doesn't show that stocks always

14  incorporate new value relevant information.  And, again,

15  this is certainly something that...

16       Q.   But they don't refer to it as a threshold test

17  for that reason; is that correct?

18            MR. MOSS:  Objection to the form.

19  BY MR. STERN:

20       Q.   Do they refer to it as a threshold test for

21  that reason?

22       A.   I believe the only place in this article,

23  where they use threshold test, is on page 122.

24       Q.   And that --

25       A.   There are numerous failings of this test, not



Page 91

1    least of which is that it's never been peer reviewed.

2    It's never been subject to scrutiny within the academic

3    financial economics literature.  It's certainly not a

4    test affirmatively of market efficiency.

5              And we can go through some of the further

6    bases for why that's the case.

7    Q.   Right, but what I'm asking here is something

8    very specific.  In this paper, what they refer to --

9    when they refer to "threshold test," they mean because

10   it doesn't examine magnitude?

11   A.   It's certainly one of the failings that they

12   highlight here, and that's what they're referring to in

13   paragraph 122.  It's certainly not the only reason why

14   this is just a threshold test.

15   Q.   Is it the only reason that they identify in

16   this report as why it is a threshold test?

17   A.   This is the only --

18        MR. MOSS:  Objection.

19   A.   -- this is the only paragraph in which, I

20   believe, they use the term, "threshold steps."

21   Certainly, on page 120 and 121, they talk about

22   demonstrating that, on average, this test shows that

23   stocks respond to information, which is not -- which is

24   not consistent with the definition of market efficiency

25   that stocks always incorporate new value relevant



Page 92

1    information.

2        Q.   All right.  And you've agreed earlier that,

3    for our purposes, we aren't actually concerned with

4    whether the response is the correct magnitude?

5        A.   That's correct.  Nothing I've said would

6    indicate that I'm requiring a specific size stock price

7    reaction on any given day.

8        Q.   Right.  So then, this paragraph isn't really

9    relevant to our -- the caveat in this paragraph, they

10   use the term "threshold test," on 124 -- I'm sorry, on

11   122, is not relevant to this case; is that correct?

12       A.   I'm not requiring, for the definition of

13   "efficiency" that the stock price reaction on any day

14   for Montage is of a particular size.

15       Q.   Okay.  Have you ever used the test that you

16   identify as the FDT test?

17       A.   I've used it in one case to show that using a

18   variety of definition of news dates, that there was

19   never a statistically significant difference in the

20   incidents of significant stock price reaction on news

21   versus non-news days.  So, again, using this as a

22   necessary but not sufficient condition for market

23   efficiency.

24       Q.   And that is the FCStone matter?

25       A.   That is correct.



Page 93

1          Q.   All right.  Let's take a look at that.

2              MR. MOSS:  This is Exhibit 4.

3              (Exhibit 4 marked for identification)

4    BY MR. STERN:

5          Q.   Do you recognize Exhibit 4?

6          A.   I do.

7          Q.   And what is it?

8          A.   It's the expert report I offered in the

9    Luman V. Anderson case.

10         Q.   So it's that case you were just referring to?

11         A.   Yes.

12         Q.   Okay.  And this is where you performed the FDT

13   test?

14         A.   That's correct.

15         Q.   Were you aware at the time you performed it,

16   it had not been peer reviewed?

17         A.   Yes.

18         Q.   And you chose to perform it?

19         A.   I chose to perform it because it's a necessary

20   but not sufficient condition for market efficiency, and

21   I'm absolutely clear that that's the case.

22         Q.   Okay.  And how did you define "news days" in

23   this test?

24         A.   There are numerous definitions of "news,"

25   which are defined.  I think if you go to Exhibit 5.



Page 94

1    So -- and under none of these definitions were there

2    differences.  So one where the first was press releases

3    from FCStone.  The second one was -- I guess it was the

4    collection of all days that had some sort of news.  Then

5    analyst reports.  This would be what -- what

6    Mr. Mulcahey would call primary analyst reports.  So

7    excluding the analyst reports that had technical

8    analysis of FCStone.  Then excluding all analyst

9    reports, and then excluding public press.

10                  So there are multiple definitions that I

11   used to collect.  So looking at all news stories, all

12   press releases, all analysts reports, and then looking

13   at subsets of all of those as well.

14        Q.   Do you --

15        A.   And under no circumstance was there a

16   statistically significant difference in days that would

17   be classified as news versus non-news.

18        Q.   Okay.  And so when you talk about analyst

19   reports, was this all analyst reports during the class

20   period?

21        A.   I'd have to go back and look.  I just haven't

22   reviewed this, so let me go to the section and read it.

23                  (Witness reviewing)

24                  MR. MOSS:  Also, there are several pages of

25        Exhibit 5.



Page 95

1          THE WITNESS:  Yes.

2          MR. MOSS:  So are you talking about one

3      particular group of news here, Jon, or are you

4      talking about different ones, because there's one,

5      for example, that exclude analysts reports that

6      provide that analysis?

7  BY MR. STERN:

8      Q.   So to the extent that analysts reports are

9  included in this study at all, when analysts reports

10 were included were all analysts reports included?  What

11 I'm asking is, it's not just analysts reports that

12 contain surprises.  It's all analysts reports; is that

13 correct.

14     A.   So no.  This is -- if you go to page 16.  So

15 there are two definitions of analysts reports.  There

16 are five categories of news.  So this defines it.  One

17 is the earnings and business announcements by FCStone,

18 their own announcements.  Two were SEC filings related

19 to changes in share ownership related to FCStone.  Third

20 was the, sort of, so-called quantitative analyst

21 reports, which don't have anything except the historical

22 data.  These are things like the Zacks reports, which I

23 talked about earlier.  The fourth category would be

24 research analysts reports that had fundamental analysis

25 of FCStone.  And then the fifth would be all days on


MAGNA
LEGAL SERVICES

Page 96

1   which there is public press.

2                   And so this is a company for which there

3   is far fewer analysts than Montage.  There's fewer news

4   stories.  And so the relative number of days you can

5   sort of see in Exhibit 5.  I don't know how many days

6   there was news in the integrated chronology put together

7   by Mr. Mulcahey.  But there's a relatively small number

8   of days for which there's actually news stories, a small

9   number of days for which there's analysts reports, a

10  small number of days for which there's corporate

11  disclosures over the -- over the class period.

12                  So the relative number of these kinds of

13  announcements are -- are far fewer.

14      Q.   Okay.  But in this case, C and D is,

15  essentially, the same type of information that

16  Mr. Mulcahey used.  Is that --

17      A.   They're separated out, but yes.

18      Q.   Yes.  So it is the same.  I'm saying it is the

19  same class of information.  And you weren't excluding

20  analyst reports from this study?

21                  MR. MOSS:  Objection to form.

22      A.   I, certainly, for some of the tests excluded

23  C, and for some of the tests excluded D.  So the way to

24  think about this is, there are five classifications, and

25  I looked at all combinations of those five



Page 97

1    classifications --

2          Q.    I understand.

3          A.    -- and under no combination was there ever a

4    difference between statistically significant stock price

5    reactions in one group versus the other.

6          Q.    I understand, but you weren't -- but to be

7    clear, you didn't exclude individual analyst reports?

8          A.    There were so few of them that I did not,

9    that's correct.

10         Q.    Okay.  You criticize Mr. Mulcahey for

11   including the corrected disclosure day in his analysis,

12   correct?

13         A.    That's correct.

14         Q.    Did you include the corrected disclosure day

15   in your analysis in the FCStone case?

16         A.    I don't recall.

17         Q.    Do you want to just refresh your recollection,

18   and see if you did?

19                    (Witness reviewing)

20         A.    I can't tell from this right now whether I did

21   or did not.  I mean, if I did, it would only bias the

22   results against me, because you would have expected

23   this -- if I would have included it in my news

24   categories, it would bias me for finding a difference,

25   because statistically significant stock price reactions



Page 98

1    would be typical for the end of the class period but --
2    but I can't really tell from Exhibit 6 or even the
3    summary in Exhibit 5, whether I included it.  They
4    should not be included, and if I did, that would be a
5    mistake in this.  They should not be included in that,
6    and I would have to go to the backup to make sure.
7         Q.   Another criticism of the FDT test, you stated
8    that -- you know, you criticize the market model for not
9    including an industry index, correct?
10        A.   I do.
11        Q.   Have you ever conducted an event study, where
12   you did a one factor market model and did not include an
13   industry index?
14        A.   Only where a single factor model had a higher
15   adjusted R-squared.  So where the industry index did not
16   provide any incremental explanatory power, and within
17   which the single factor model had a higher adjusted
18   R-squared.
19        Q.   Have you identified, in this case, a market
20   model with a higher R-squared?
21        A.   We talked about this earlier.  So in preparing
22   for today's deposition, I looked through Mr. Mulcahey's
23   backup.  He has a number of regressions, which include a
24   number of different semiconductor indexes.  Many of
25   those have much higher R-squared than his single factor



```
 1   model, but he chose to use the single factor model.
 2               Again, I can only surmise that's because
 3   the coefficient on the industry index was negative,
 4   large, and significant.  But the multi-factor models in
 5   his backup, the industry factor did add explanatory
 6   power.
 7       Q.   So let's talk about the earnings announcement
 8   next.  Do you think that earnings announcements are a
 9   proper type of event to look at in an event study?
10       A.   It's a very common event to look at.
11   Typically, as I mentioned, what the -- the type of event
12   study done is not what Mr. Mulcahey does.  The type of
13   event study done, when looking at earnings
14   announcements, do something called an earnings surprise
15   test, in which you look at where realized earnings are
16   relative to forecasted earnings by analysts, and look at
17   the earnings surprise.
18               As a test of market efficiency, the
19   comparison of variance test is just -- it's never been
20   done in the academic literature.  And there's no basis
21   for concluding just because it's a higher volatility on
22   earnings announcements dates, than non-earnings
23   announcement dates, that that's evidence of market
24   efficiency.
25               There's no, A, priority basis either in
```



MAGNA
LEGAL SERVICES

Page 100

1    the academic empirical literature or in the academic

2    theoretical literature.

3         Q.   So what you're saying is, it's the earnings

4    surprise not the earnings announcement that you should

5    be looking at in line of expectations --

6         A.   What you should look at is --

7              MR. MOSS:  Objection to form.

8              Were you finished with your question?  I just

9         want to make sure we have a clean record.

10             MR. STERN:  Hang on.  Sorry.

11   BY MR. STERN:

12        Q.   So what I was saying is, if earnings are in

13   line with expectations, then there wouldn't be any

14   movement.  Is that what you're saying?

15        A.   That's correct.  So, typically, the way this

16   test is done is -- there are dozens and dozens of papers

17   written on this topic about stock price reactions to

18   earnings announcements.  The way these tests are done is

19   to create some measure of consensus forecast prior to

20   the announcement of the earnings.

21             Typically, what's done is to look at all

22   analysts who have made a forecast in the month prior to

23   the earnings announcement, and look at their last

24   forecasts made, and then look at either the mean or the

25   median or something like that.  And then you compare



Page 101

1     that consensus forecasts to what's announced for the

2     earnings, and you can look at earnings.  You can look at

3     EBITDA.  You can look at revenue, but then you can look

4     at the surprise.

5                    So, typically, one would expect that if

6     earnings come -- to give a concrete example.  If I

7     expect earnings to be 10 cents a share, and the company

8     announces 10 cents a share, one would not expect there

9     to be a statistically significant stock price reaction.

10                    If I expect 10 cents a share, and it's 20

11    cents a share, I would expect that the stock price would

12    go up by a statistically significant amount.  If it's a

13    loss of 5 cents, I'd expect the stock to go down.

14                    So you create a measure of the earnings

15    surprise.  And the literature, typically, looks at

16    whether or not smaller earnings surprises engender

17    smaller stock price reactions, and large earnings

18    surprise generate larger stock price reactions.  And the

19    literature is pretty clear that that is -- that

20    empirical regularity is there.

21         Q.   Isn't it possible, though, that the market

22    consensus and the analysts consensus are just not the

23    same?  In other words, you could have --

24         A.   I guess anything is possible.  Certainly, the

25    academic literature has used analysts forecasts and



Page 102

1    consensus forecasts as the best estimate.  And it's only

2    an estimate, but the best estimate of market

3    expectations.  We have no other estimate of market

4    expectations, other than what the analysts say.

5              And the literature there is pretty clear,

6    that if you do this, in general, you see what you

7    expect.  You see that large positive surprises lead to

8    stock increases.  Large negative surprises lead to stock

9    price decreases.

10             And so while anything is possible,

11   certainly, the literature has shown that consensus

12   analysts forecasts are reasonable measure to use for

13   market forecasts.

14   Q.   Let's look at the speed of price reaction

15   test.  You state that it's logically circular, in your

16   report, in paragraph 59.

17             Why do you find that it's logically

18   circular?

19   A.   So the first thing to note is that while there

20   is literature on speed of stock price adjustment, what

21   is proposed in the Mulcahey report, as a speed of

22   adjustment test, has zero bearing or zero relationship

23   to those tests.  Those tests, typically, look intraday,

24   and look at how quickly stock markets incorporate

25   information when things are announced, when markets are



Page 103

1    trading.

2                   In terms of the test that Mr. Mulcahey

3    does, he looks at the seven days that have statistically

4    significant stock price reaction at the 1 percent level.

5    And he just assumes that there's something that moves

6    the stock on those days.  So he's assuming there's an

7    efficient reaction on those seven days, without ever,

8    sort of, establishing that.

9                   So he's assuming that the market is

10   efficient.  And then he looks at whether or not those

11   seven dates are followed by a statistically significant

12   stock price reaction, and whether or not those

13   statistically significant stock price reactions can be

14   explained by something on those days.  So it has

15   somewhat of a feel to his reverse event study, because

16   he's looking at statistically significant days on the

17   second day, and looking for news.

18                   But the circular argument -- the circular

19   reference I make in that paragraph has to do with he's

20   just assuming that those seven days are efficient

21   reactions to information.

22   Q.   You mentioned that when examining if a market

23   is efficient, you would want to determine if there was

24   drift, right?  In the wake of big news, you saw

25   repeated -- you know, you saw continued movement; is



Page 104

1    that correct?

2              MR. MOSS:  Objection to form.

3         A.   So it's typical for the speed of adjustment

4    literature to say that if the stock price reacts to a

5    given piece of news, and it reacts over multiple days or

6    takes a long time to be incorporated, that's

7    inefficient.  The kind of drift I was talking about

8    earlier, typically, happens over weeks or months, not

9    days.

10        Q.   Okay.

11        A.   So that literature on, say, post-earnings

12   announcement drift or post-IPO performance all look at

13   abnormal performance over weeks or months as opposed to

14   over two days.

15              There is a literature that looks at speed

16   of adjustment, but, typically, that's done intraday.

17   And you look at if a news story comes out at 10:02, how

18   long does it take the market to incorporate that

19   information.  And, typically, that literature, starting

20   with papers by Patel and Wilson, in the early '80s,

21   showed that stock prices generally tend to react quite

22   rapidly, within an hour, to new information.  So this

23   would say that if the reaction continued over multiple

24   days, that would be inefficient.

25        Q.   And if you performed an event study -- I



1    guess, would you ever perform a speed of price reaction

2    test in analyzing a stock efficiency?

3        A.    So I certainly looked at speed of reaction

4    tests to see whether or not a given piece of information

5    is what caused the stock price to move.  So in the case

6    of a given stock, if you saw that the stock price --

7    something came out at 10 o'clock, and the stock price --

8    you know, a given piece of news and earnings

9    announcement came out at 10 o'clock, and the stock price

10   continued to move over the next two days relative to

11   that earnings announcement, and you saw a steady stock

12   price movement over two days, that would be evidence of

13   inefficiency, because the evidence on speed of

14   adjustment is that a given piece of news should be

15   incorporated rapidly and fully.

16                And again, the speed of adjustment

17   literature -- some of the speed of adjustment literature

18   shows that even within the first trade, the stock price

19   adjusts to, say, earnings announcements.  But that's

20   what you do.  You identify the news.  You look intraday

21   to see how the stock price reacts, and then you look to

22   see whether or not there's a continuation of that

23   news -- that stock price reaction to that news over a

24   multi-day period.

25        Q.    So how long of a period, to your mind, would



Page 106

1   be a sufficiently short period to allow an inference of

2   inefficiency?

3        A.    When I've opined on the matters from a 10b-5

4   securities matter, if it doesn't happen within the day,

5   I've opined that it's not efficient.  So if you have an

6   announcement at 10 o'clock, and there's a continued

7   reaction over a 2-day window, that's evidence of

8   inefficiency.

9             The literature is even more stringent

10  than that.  The literature would say that a stock price

11  reaction that doesn't happen within a couple of hours of

12  the announcement was inefficient.  But from a 10b-5

13  perspective, that by the end of the day for a market to

14  be efficient (sic), it would have to fully incorporate

15  that information.

16       Q.    But you could have new news on the following

17  day, which would cause another price reaction?

18       A.    But that's not a speed of adjustment test.

19  That's not the way you test -- tests for speed of

20  adjustments are done.

21       Q.    Well, I guess what I'm asking is, how would

22  you avoid that, sort of, situation contaminating results

23  that appear to create an above market -- you know, you'd

24  have larger than normal returns over the course of two

25  days if there's new news coming out each day?



Page 107

 1              MR. MOSS:  Objection to form.

 2         A.   You would look at the intraday stock price

 3    movement over multiple days.  And, certainly, have done

 4    that, where you look, and there's multiple pieces of

 5    news being announced.  And you can see, okay, this piece

 6    was announced and moved the stock price.  And then you

 7    can look to see on the second day, was there a stock

 8    price reaction to a second piece of news?

 9                   But you're doing intraday analysis.

10    You're not doing what Mr. Mulcahey does.  He hasn't gone

11    back to say, was there something that actually moved the

12    stock price on the first day, and is there a

13    continuation of that over a multi-day period of time?

14         Q.   So just going back, actually, to the earnings

15    announcement test, there's one more question I wanted to

16    ask you about that.

17                   I think you said the sample size was too

18    small because there were only three earnings

19    announcements?

20         A.   So what I said is, for the particular test

21    that -- there are a number of problems, the way

22    Mr. Mulcahey does it.  Certainly, if you only have three

23    earnings announcements during the period, that's all you

24    can examine.  He hasn't done the proper test.  He hasn't

25    looked at earnings surprises.



Page 108

```
 1                       But what I said is that the type of test
 2   he does is to look at what's the volatility across those
 3   three earnings announcements relative to all other days
 4   during the proposed class period, and is there a
 5   difference in the volatility of those three days versus
 6   the volatility on every other day.  And given the small
 7   number of days, and that he's averaging over a small
 8   number of days, one outlier can have a big effect.
 9                       And what I show is that if you take
10   out -- whatever.  January 9th, I think it is?  I think
11   it's January 9th.  If you take out January 9th, the --
12   the volatility actually becomes substantially smaller on
13   the remaining two earnings announcement dates than on
14   all the other dates.  And so because he's averaging
15   across a small number of examples, one day has a
16   significant impact.
17                       Certainly, you would still have a small
18   number of criticisms, if he did the proper event study,
19   but he would have an inference about each particular
20   date.  He doesn't have an inference around any one
21   particular date.  He has an inference around the
22   average.  And when you do averages, one particular
23   outlier can drive the entire result, as it does here.
24       Q.   But so, you're not saying if you only have
25   three earnings days, you can't do this test?
```



1      A.   We're not even getting into, yet, the

2    normality of the residuals.  Let's leave that aside.

3    Certainly, analytically, you can do an earnings surprise

4    test on three dates, absolutely.  He hasn't done that.

5    He hasn't done an earnings surprise test.  You know, you

6    only have as many earnings surprise dates as you have.

7                My criticism of the outlier is the fact

8    that when you look at averages -- a normal earnings test

9    looks at individual inferences on each individual day.

10   You treat each individual day as its own separate

11   observation.

12               What Mr. Mulcahey has done is, he has

13   grouped them together, and taken an average of -- he's

14   looked at, sort of, the average volatility on those

15   days.  And that's going to be driven by one big outlier,

16   because he's using that in the sample.

17               So it's not an inference on any one

18   individual day, which is the criticism of the small

19   numbers in the way that he's implemented this comparison

20   and volatility test.

21      Q.   So the autocorrelation test, what is the

22   significance of the autocorrelation test?

23      A.   So autocorrelation is a test of weak form

24   market efficiency, and weak form market efficiency says

25   that future stock returns can't be predicted from past



Page 110

1   returns.

2                   So if you find there's autocorrelation,

3   that says that tomorrow's return can be predicted from

4   past returns, which is a violation of weak form

5   efficiency, which is a requirement or a -- you know, a

6   necessary condition for semi-strong market efficiency,

7   but it's not sufficient because semi-strong market

8   efficiency states that all public information is rapidly

9   and fully incorporated into the stock price.

10                  One form of public information is past

11  returns, but there's other information beyond past

12  returns.  So a market can be weak form efficient, but

13  still be semi-strong inefficient.  But if you find there

14  is a violation of weak form efficiency, by definition,

15  the market would be semi-strong inefficient.

16                  So the autocorrelation test is just that

17  direct test of weak form efficiency.

18      Q.   So weak form efficiency is you can predict

19  future returns on the basis of past returns?

20      A.   Correct.

21      Q.   So then, you would be able to look at the

22  stock price, and come up with a profitable trading

23  strategy, based on what's happened before?

24      A.   You would be able to predict future returns

25  from past returns.  Whether or not there's a profitable



Page 111

1    trading strategy depends upon the size of the -- the

2    significance of the prediction or how large,

3    economically, that prediction effect is relative to

4    transaction of costs.

5         Q.   But, I guess, in the absence of transaction

6    costs, then it would be possible to develop a trading

7    strategy that, excluding transaction costs, would be

8    profitable?

9         A.   Correct.

10        Q.   Can you identify some strategy that would

11   apply to Montage?

12        A.   I haven't implemented it, but the fact that

13   there is significant autocorrelation.  I've done this in

14   other cases where, for example, in a case in which

15   there's positive autocorrelation, that says if you had

16   large -- if you had a past return and a large positive,

17   say, past return today, you would want to go long on the

18   stock.

19             If you had a large negative return, you

20   want to go short the stock.  If you have negative

21   autocorrelation, that would say that if you had a large

22   negative return, you would want to go long on the stock.

23   And if you had a large positive return, you would want

24   to go short the stock.

25             So you define the trading rule based on



Page 112

1    the autocorrelation.  And what would be typical is to

2    say, I'm going to not go long and short every day, but

3    I'm going to go long and short in the, say, the tails,

4    the 10 percent positive and negative tails, and

5    implement a trading strategy based on that.

6        Q.   If you extend the period out, though, the

7    autocorrelation wouldn't exist anymore, correct?

8            MR. MOSS:  Objection to form.

9        A.   I understand there was a subsequent

10   acquisition announcement that would go to effect the

11   stock returns going forward.  So once there's an

12   agreement on an acquisition, as we talked about this

13   morning, what would affect the stock prices; just the

14   agreed-upon acquisition price and the probability that

15   the market expected a successful acquisition to incur.

16       Q.   No, but there was even a month after the end

17   of the class period -- there was even some time after

18   the end of class period, but before the acquisition,

19   when the stock was still trading?

20       A.   I --

21           MR. MOSS:  Just let him finish.

22   BY MR. STERN:

23       Q.   And if the autocorrelations didn't continue,

24   then could you have a profitable trading strategy, since

25   it would have stopped working at that point, right?



Page 113

1          A.    So I haven't --

2                MR. MOSS:  Objection to form.

3          A.    -- I haven't looked at that, but if there was

4     no autocorrelation or if the autocorrelation reversed,

5     then you wouldn't have -- you couldn't implement the

6     same trading strategy.

7                     I don't know.  I haven't looked at what

8     the autocorrelation was in the time period between

9     February 7th, and when the acquisition was announced.

10               MR. STERN:  I'm going to have a chat for a

11          minute.  Can we take five minutes?

12               THE WITNESS:  Sure.

13                      (Short Recess)

14     BY MR. STERN:

15          Q.    So talking about event study, you say that it

16     has no basis in the academic literature as a test of

17     market efficiency?

18               MR. MOSS:  What paragraph?

19               MR. STERN:  I'm sorry, paragraph 67.

20          A.    Yes.

21          Q.    Have you seen a reverse event study used in

22     the academic literature?

23          A.    So a reverse event study is, they assume the

24     market is efficient, and then if you assume the market

25     is efficient, then the stock price reaction must have



MAGNA
LEGAL SERVICES

Page 114

1   been caused by something, and then you can infer, if

2   you're assuming the market is efficient.

3              But it's not a test of market efficiency,

4   because you need to make the prediction ex-ante.  You

5   need to make the prediction about what would happen.  So

6   I'm quite clear here that as a test of market

7   efficiency, there's no basis in financial economics to

8   utilize a reverse event study.

9   Q.   So what would you utilize it for?

10  A.   So, for example, in -- let's say we're looking

11  at loss causation in a securities matter.  If I assume

12  the market is efficient, I can look at a large stock

13  price decline and determine what caused that stock price

14  decline.

15             So, for example, in a given day, if there

16  are multiple pieces of news announced at different

17  times, then you can look to see, did the stock price

18  react when announcement one was made at 10:02 or when

19  announcement two was made at 1:53 or when announcement

20  three was made at 3:10?  So that kind of analysis

21  requires you to assume the market's efficient.

22             Similarly, if you want to look on a given

23  day, if you saw a big stock price movement on a given

24  day, and you want to determine what caused that stock

25  price movement, you can look for what was the value



Page 115

1    relevant news on a particular day.

2        Q.   Okay.  But can you use a reverse event study,

3    basically, taking the hypothesis that the market is

4    efficient, and then see if there is news that is

5    consistent with that hypothesis?

6        A.   No, for the following reason:  There's an

7    academic literature on what drives news.  So there's a

8    paper by Mark Mitchell, a former colleague of mine, who

9    looked at stock price movements driving news.

10             So it's an empirical fact that you're

11   more likely to get news stories about companies when

12   stock prices move by a large event.  It is also the case

13   that -- it is often the case that analysts and reporters

14   try to explain large stock price movements after the

15   fact.

16             So there's nothing in a reverse event

17   study that would allow you to test on an ex-ante basis.

18   Market efficiency is an ex-ante test.  It's when

19   unexpected, new information comes to the market, does

20   the market move in an appropriate manner?

21             It's just not designed to test it.  And

22   there's enough flaws in the reverse causality of news

23   and commentary that there's no way you could

24   affirmatively test market efficiency.

25             Now, if you assume the market is



Page 116

1   efficient, then you can look to see whether or not the

2   news, which came out, is what caused the stock price

3   movement.  So assume it's efficient, see what's

4   announced, and then you can attribute it to what was

5   announced.

6        Q.   Well, you talked about how causality could be

7   reversed and the stock price movement could be driving

8   people to write news articles to drive the stock price

9   movement.  Is that what you were saying earlier?

10       A.   Correct.

11       Q.   Isn't that easy to distinguish because those

12  news articles would come out after the stock price

13  movement?

14       A.   It's often the case that -- it's often the

15  case that the news stories are announced on that day.

16  You'd have to look intraday at what came out on those

17  days.

18            It's also the case that there's the

19  hindsight bias that you try to, after the fact, explain,

20  even if it's not the proximate cause, even if it's not

21  what caused the stock price, just because it's a news

22  story doesn't mean that is what caused the stock price

23  to move.

24            So there's no basis for using an ex-post

25  test as a market efficiency.  You have to do the ex-ante


MAGNA
LEGAL SERVICES

 1   test.

 2                  MR. STERN:  Off the record.

 3                       (Off Record Discussion)

 4   BY MR. STERN:

 5        Q.   Okay.  So going to some of the specific

 6   issues, so you identified on November 22nd, 2013 a

 7   Stifel analysts report that raised its rating.  That was

 8   not a news event that should have been considered

 9   something likely to cause a change in the stock price?

10        A.   No.  What I'm saying is that it could, but

11   there's no assessment that this was new value relevant

12   information.  So the question is, had other analysts

13   already upgraded?  Where did this -- you know, it has to

14   be put into context.  So did this change the consensus

15   forecast?  Did it change the market expectations?

16                  So that's the -- the general point is

17   that any one analyst report may or may not contain new

18   value relevant information.  If this was the

19   first analyst to change their forecast, then others

20   followed, or this was the last analyst to change their

21   forecast, and it didn't change the consensus, this is

22   what I mean by, in order to make an assessment about

23   whether or not this is value relevant and unexpected,

24   you'd have to look at the total mix of information.

25                  And all Mr. Mulcahey's done is to point



Page 118

1   to something which happened on that day as the cause.

2   So if something happened on that day, that must be the

3   cause of the stock price movement.

4        Q.   Let's talk about your price impact analysis,

5   page 49.  Did you determine whether the price of Montage

6   stock was impacted by the related-party allegations that

7   are discussed in the Complaint?

8        A.   So I have not -- in order to ascertain whether

9   or not the information released caused the stock price

10  to move on February 6th, you'd have to establish that

11  the market was efficient.  There's not sufficient

12  evidence to demonstrate market efficiency; and, in fact,

13  evidence against, based on Mr. Mulcahey's own analysis.

14             But directly to the point about

15  distinguishing between the allegations in the Gravity

16  report of overstated revenues versus or as opposed to

17  the related-party allegations, Mr. Mulcahey hasn't done

18  any analysis to demonstrate that it was the related

19  party.  Now, it's -- you know, certainly what matters

20  from an economic perspective is future revenue and cash

21  flows.

22             I'm uncertain how Mr. Mulcahey would be

23  able to, and he certainly has to date, showed that the

24  related-party allegations, separate from the revenue

25  overstatement, affected the stock price.  That those are



Page 119

1    what caused the stock price to decline on February 6th,

2    as is my understanding that the allegations, as it would

3    relate to the overstated revenue, are not -- are not

4    liable.  That that's not what is alleged to have been

5    misstated.

6            Q.   Do you think that -- well, okay.  Strike that.

7                 So you're not testifying that the

8    related-party transactions did not have a price impact?

9            A.   That's correct.

10           Q.   You don't take that position?

11           A.   I haven't done that analysis.  So I have not

12   established that there's no price impact of the related

13   party.  What I'm saying is that Mr. Mulcahey hasn't

14   established that the price decline, on February 6th, was

15   due to a revelation of misstatements about the

16   related-party issues at Montage.

17           Q.   Do you think large undisclosed related-party

18   transactions are the sort of thing that would be likely

19   to have a price impact on a stock in an efficient

20   market?

21           A.   It may or it may not.  I mean, I think it

22   would depend upon the particular circumstances.  And in

23   order to demonstrate that what caused the stock price to

24   decline on February 6th was the announcement of this

25   related party, as opposed to the arguments about -- or



Page 120

1    the allegations around overstated revenue, is something

2    that Mr. Mulcahey hasn't done.

3                 And if you think about, from the economic

4    first principles -- so one thing I talk about, in this

5    section, is that certainly allegations that revenue are

6    overstated from first principles would be expected to

7    affect a stock price, because if revenues were only half

8    as much as I thought they were, that would certainly

9    affect my assessment of value.

10                But from a first principles basis,

11   there's no reason that, for sure, a related-party

12   transaction revelation would affect the stock price.  It

13   could or it could not.  There's just no -- there's no

14   first principles basis to say that it automatically

15   would.

16        Q.    Would very large and disclosed related-party

17   transactions be an indication of poor corporate

18   governance?

19                MR. MOSS:  Objection to form.

20        A.    Again, it may or it may not.  Certainly, there

21   are many elements to some firms that operate in

22   different elements of a business, from manufacturing, to

23   sales and distribution, to marketing, to whatever.  And

24   so it's possible that related-party transactions could

25   be perceived as negative from a corporate governance



Page 121

1    perspective, and it's also possible that it might.

2                    So it just depends upon the

3    circumstances.

4        Q.   Well, is a GAAP violation the sort of thing

5    that would have a negative impact to the stock price, a

6    revelation of a GAAP?

7        A.   Not necessarily, only to the extent that it

8    affected your expectation for future revenues and cash

9    flows.  So if there was no -- so if you had a GAAP

10   violation but, you know, you misaccounted for something

11   but, you know, it had no affect on cash flow.  Those

12   kind of restatements, in general, don't affect the stock

13   price.

14                   So there's academic literature in

15   accounting on this, that the only type of accounting

16   restatements, which typically affect stock prices, are

17   those that have impact on the actual cash flows of a

18   business.  So, again, GAAP violation may or may not, but

19   from first principles, it's not automatic that it would.

20       Q.   So if there was as GAAP violation that led

21   people to mistrust the reported revenues, that is the

22   sort of thing that would have a price impact, correct?

23                   MR. MOSS:  Objection to the form.

24       A.   So if there were allegations that the

25   related-party transactions overstated revenues, it's the



Page 122

1   overstated revenues which impacts value, not necessarily

2   just the related-party transaction.  So you have to

3   separate out those two things, because you could have

4   related-party transactions, which are -- don't have any

5   effect on your expectations about revenues, and you can

6   have revenue schemes that are not related-party

7   transactions that affect your revenues.

8             And so the key is to try and separate out

9   those two things because, again, it's my understanding

10  that the allegations -- or the allegations in the

11  Gravity report, as it pertains to revenue potentially

12  being overstated, are not part of what's alleged to have

13  been misstated.  That's what's alleged to have been

14  misstated is the fact that there was this related-party

15  relationship between LQW and Montage.

16       Q.   In an efficient market would a base of

17  allegation of revenue fabrication have a price impact?

18       A.   If the market believed it, yes.  If there was

19  some expectation that the market thought this might be

20  true -- so it doesn't have to be proven true.  But if

21  there's a false allegation that somehow the market

22  thinks, gosh, there's a 10 percent chance this is true

23  or a 5 percent chance or a 20 percent chance that this

24  is true, then in an efficient market misinformation

25  about potentially overstated revenues could affect the



Page 123

1    stock price.

2         Q.   But there would have to be something apparent,

3    right?  You can't just write a report and say, hey, I

4    think IBM's revenues are overstated, and not provide any

5    rationale for that or evidence, and then cause a

6    significant stock price decline?

7              MR. MOSS:  Objection to the form.

8         A.   Again, it would depend upon the circumstance.

9    But certainly, the allegations that are in the Gravity

10   report, and the subsequent discussion in the press and

11   by investment analysts of the Gravity report, hinge upon

12   their belief that the revenue were overstated.

13             So it's not -- they're not focusing,

14   primarily, on the LQW allegations of related party.

15   They're focusing on the fact that there's an allegation

16   that revenues have been overstated.

17        Q.   Okay.  Let's take look at the Gravity report,

18   which we'll introduce as Exhibit 5.

19             (Exhibit 5 marked for identification)

20   BY MR. STERN:

21        Q.   Why would anyone -- I'm sorry.  Do you

22   recognize Exhibit 5?

23        A.   I do.

24        Q.   What is it?

25        A.   It's the Gravity report, which was issued on



Page 124

1   February 6th.

2       Q.   Why would anyone believe, on the basis of this

3   report, that revenues were fabricated?

4       A.   I don't know if anybody would believe with

5   certainty that revenue was fabricated, but certainly

6   there is a discussion.  There may be some in the market;

7   certainly, individuals who would read this, who might

8   believe it.  But even others may think that, based on

9   the report, that there's some possibility that revenue

10  was fabricated.

11              And to the extent they believe there's

12  some possibility that revenue was fabricated, it would

13  affect their expectation of the future economics of cash

14  flow and revenue.

15      Q.   But what, in this report, would lead someone

16  to think revenue might be fabricated or there's a chance

17  revenue is fabricated?

18              (Witness reviewing)

19      A.   So if you just go to the first page of the

20  report, which is actually page 2, you know in bold print

21  in the first paragraph, "We believe that Montage

22  Technology Group (sic) is committing fraud, and that

23  MONT's actual revenues are -- is significantly lower

24  than MONT has reported to investors due to overwhelming

25  evidence..."  And then it goes on and talks about the



Page 125

1    related party.

2                    But the argument here is that the revenue

3    is substantially overstated.

4        Q.    Because?

5        A.    Well, they say, because, and so the key is to

6    break the link between the related-party issues that

7    there's a related-party distributor and the allegations

8    of inflated revenue.  So just having a related

9    distributor wouldn't necessarily affect the stock price.

10                   But the allegation that there's

11   overstatement of revenue, certainly could, if the market

12   believed that there's some possibility that revenue is

13   overstated.

14       Q.    But, really, the allegation, when you take it

15   altogether, is that revenue is overstated because

16   they're using LQW to inflate revenue, right?

17       A.    Certainly --

18             MR. MOSS:  Object to form.

19       A.    -- certainly the Gravity report links them,

20   and says the mechanism by which they believe revenue is

21   overstated is the fact that LQW is a related party.  But

22   the question that -- from a price impact perspective, is

23   that you need to separate out the price impact of the

24   revenue overstatement allegations, because it's my

25   understanding that those aren't part of what is alleged


MAGNA
LEGAL SERVICES

Page 126

1    to have been misstated.  And you need to focus on absent

2    the revenue of overstatement, what would be the price

3    impact of a revelation that LQW was a related party.

4        Q.   But absent the related-party allegations,

5    would anyone have taken the revenue allegation

6    seriously?

7        A.   It depends upon what else a report in that

8    counter-factual may have said.

9        Q.   What did this report say?

10       A.   This report talks extensively about LQW, the

11   ownership structure of LQW, the address of LQW, the

12   various officers of LQW.  So, I mean, it goes and talks

13   about LQW.

14                But the allegations, which are value

15   relevant that would affect your expectation of value

16   from Montage, would be related to the revenue, not just

17   the fact that it's related party.

18       Q.   But that's the reason why you have these

19   related-party disclosures, right, is because with an

20   undisclosed related party, you can do things like

21   inflate revenue --

22           MR. MOSS:  Objection --

23   BY MR. STERN:

24       Q.   -- for instance?

25           MR. MOSS:  Objection to the form, and it calls



1        for a legal conclusion.

2   BY MR. STERN:

3        Q.    That's the reason one might want to know about

4   related-party transactions, because there's a concern of

5   potential things like inflated revenue?

6        A.    So you may be concerned about various

7   conflicts of interests.   There are a number of reasons

8   where you might want to have disclosures of related

9   parties.

10              The question is from a price impact

11   perspective, what would be the price impact of a

12   disclosure of -- so if this report had just said, LQW is

13   a related party; look at all these things we've

14   documented.   Absent the revenue allegations, what would

15   the price impact have been?

16              And there's nothing in Mr. Mulcahey's

17   report which goes to show that the February 6th price

18   reaction measures the price impact of that revelation.

19        Q.    But you're not prepared to testify that the

20   reaction would be zero?

21        A.    That's correct.

22        Q.    Are you prepared to testify as to what sort of

23   reaction it would be?

24        A.    I haven't been asked to look at and estimate

25   what that would be.   Certainly, from first principles



Page 128

1    and, certainly, from reading what the market commenters

2    were focused on, it, at least, appears to me that both

3    of those indicate that the far more important aspect of

4    the Gravity report is their discussion of the potential

5    revenue for being overstated.

6              But I can't say what fraction, if at all,

7    the allegations for the related-party issues would have

8    on the stock price.

9         Q.   And you also can't really say how serious the

10   revenue allegations would have been taken, had there not

11   been evidence for related-party transactions; isn't that

12   right?

13        A.   I haven't done that analysis, so I can't

14   opine.  That's correct.

15        Q.   If the market had actually credited Gravity's

16   report and people believed that revenues were

17   fabricated, 50 percent of revenues were fabricated, how

18   much of an impact would that have on Montage's stock

19   price?

20        A.   It depends upon what the belief about future

21   revenue and cash flows would have been.  So you would

22   have to look and see how -- how that overstatement in

23   revenue would affect expectations.

24              So I can't say it would be 50 percent or

25   10 percent or 25 percent.  It would depend upon how that



Page 129

1    translated into changes in future revenue and cash flow.

2              MR. STERN:  Can you just give me five minutes?

3                   (Short Recess)

4    BY MR. STERN:

5         Q.   So earlier you testified that you don't know

6    how much you were compensated -- or I guess you haven't

7    been compensated because you said you haven't submitted

8    your bill yet?

9         A.   Correct.

10        Q.   And you don't know what your bill is going to

11   be because you don't know how many hours you've spent?

12        A.   Yeah.  I keep it in a spreadsheet.  I haven't

13   added it up.  You know, again, I can rough ballpark

14   it --

15        Q.   Sure.

16        A.    -- and like I said, I think through the

17   report, was probably 50 to 60 hours-ish.  And then, I

18   don't know, 20 or so preparing to do a deposition;

19   something like that.

20             Again, I don't know the precise number.

21        Q.   Okay.  And do you know when you'll know that

22   precise number?

23        A.   Probably next week.  I mean, typically, what I

24   do is -- I submitted the report in December.  We then

25   went away for two weeks.  And then when I got back, the



Page 130

1    deposition was close enough.

2                So if -- if there's even no deposition or

3    the deposition isn't for a couple of months, I would,

4    typically, put together the bill, right after I do the

5    report, but there just wasn't a long period of time

6    between.

7        Q.    Okay.  Have you worked with this insurer

8    before?

9        A.    I don't know who this insurer actually is.  So

10   I'd have to go back to see whether or not I have an

11   official retention letter.  I don't know who the insurer

12   is on this matter.  So...

13       Q.    Over the last 12 months how many securities

14   litigations have you consulted on?

15       A.    It's been very busy, and I actually had to

16   take over two cases for two people who had family

17   tragedies; so probably 10.  There's been a lot, so 8,

18   10.

19                There's been a lot over the last 12

20   months.

21       Q.    And what's your total compensation been?

22             MR. MOSS:  Over what time?

23             MR. STERN:  Over the last 12 months.

24             MR. MOSS:  Only on security cases?

25             MR. STERN:  Only on security cases.  Thanks.



MAGNA
LEGAL SERVICES

Page 131

1      A.    Yeah, I don't know how to estimate that, but I

2    would guess it's probably 5, 600,000; in that range.   I

3    don't know for sure, but probably that's a reasonable

4    estimate.

5              Again, that would -- that's ballpark.

6    It's close enough for government work.

7      Q.    Okay.  And you said you've been doing this

8    sort of work for consulting in securities litigation for

9    how many years?

10     A.    Fourteen years.

11     Q.    Fourteen years.  Over, say, the past five

12    years, how much would you estimate, in total, you've

13    been paid for consulting securities work?

14     A.    So by far, by far, by far, 2014, was my --

15    excuse me, 2015 was my biggest year.  So, again, I --

16    for class action securities matters, probably, on

17    average, a couple hundred thousand a year would be a

18    rough ballpark, yeah.

19     Q.    So over the past five years more than a

20    million dollars?

21     A.    That -- I mean, again, that would be a

22    ballpark.  I don't have an exact estimate, but certainly

23    in that neighborhood.

24     Q.    Okay.

25              MR. STERN:  Let's go off the record for a



Page 132

1      second.

2                         (Off Record Discussion)

3                         (Short Recess)

4           MR. STERN:  Okay.  We can go back on record.

5           No further questions.

6           MR. MOSS:  Okay.  I just have just a couple.

7           MR. STERN:  Okay.

8

9                         EXAMINATION

10     BY MR. MOSS:

11          Q.   Dr. Gompers, can you take a look at the FDT

12     article, which was marked as an exhibit, The "Less Than"

13     Efficient Capital Markets Hypothesis?  Do you recall

14     Mr. Stern asked you some questions about the threshold

15     test language in this article?

16          A.   On page 122, yes.

17          Q.   So I want to direct your attention to

18     page 120, and this is the last couple sentences.  And it

19     says, "If it is," and meaning if it is statistically

20     significant, from the preceding sentence, "then the

21     evidence would show that on average the defendant stock

22     price reacts to news announcements; if the difference is

23     not statistically significant, then there would be no

24     basis for saying that the defendant's stock price is

25     affected by the news."



Page 133

1               Do you see that?

2          A.   Yes.

3          Q.   Now, can you explain to me what your

4     understanding is of that language, if any?

5          A.   So, remember, the test is comparing the

6     incidence of statistically significant stock price

7     reaction in a group of news days versus non-news days.

8     And what this is saying is that if you fail the test, if

9     there's no difference in statistical significance, then

10    you cannot conclude for market efficiency.  There's no

11    evidence of market efficiency.

12         Q.   And what, if anything, does that have to do

13    with the discussion you were having with Mr. Stern

14    earlier relating to the threshold test?

15         A.   So Mr. Stern had pointed out that the

16    language, on page 122, discusses the magnitude, and that

17    the test cannot measure the magnitude or that the

18    magnitude of the reaction is correct.  But here, on

19    page 120 and 121, this is independent.

20               There's no -- magnitude is not an

21    important component of concluding that the test fails,

22    and the market's not efficient.

23         Q.   So do you understand these sentences to mean

24    that the test is a threshold test without regard to

25    magnitude?


MAGNA
LEGAL SERVICES

Page 134

1      A.   That is correct.  That it is a necessary

2  condition for market efficiency, meaning that if you

3  fail it, regardless of what the magnitude of the

4  reaction is, and regardless if the magnitude is correct

5  or not, that you can't conclude market efficiency.

6      Q.   Okay.  We're done with that exhibit.  Thank

7  you.

8           Do you recall you were asked some

9  questions about your report in the Luman V. Anderson

10 case that was marked as Exhibit 4 --

11     A.   Yes.

12     Q.   -- in this deposition?

13     A.   Yes.

14     Q.   And I think you were asked whether or not you

15 included the corrected disclosure dates in your

16 application of the FDT test, and you testified that you

17 did not recall whether you did or didn't; is that

18 correct?

19     A.   That's correct.  I just haven't reviewed that

20 report, so I don't know.

21     Q.   Now, assume for a moment with me that you had

22 included the corrected disclosure dates, what, if

23 anything -- what impact, if any, would that have on your

24 criticism of Mr. Mulcahey for including the corrected

25 disclosure dates in his application of the FDT?



MAGNA
LEGAL SERVICES

```
 1        A.   So from the perspective of being conservative,

 2    including -- it's still my opinion, and the authors

 3    agree, that you should not include the corrected

 4    disclosures.  But from the perspective of seeing whether

 5    or not the market fails the FDT test, including the

 6    corrected disclosures is conservative because it biases

 7    you towards finding a difference in statistical

 8    significance; whereas, when you include them in the way

 9    that Mr. Mulcahey did, it biases him in favor of finding

10    that difference, and that's the perspective.

11              So it's aggressive or it's the opposite

12    of conservative in the case of what Mr. Mulcahey is

13    doing.

14         MR. MOSS:  All right.  I don't have any

15      further questions.

16         MR. STERN:  Just one question to follow-up.

17

18              FURTHER EXAMINATION

19    BY MR. STERN:

20        Q.   When you say it's conservative, in your case,

21    and aggressive, in Mulcahey's, it's not because those

22    would be two different things?  It's because of, for

23    lack of a better term, which side of the aisle you are

24    sitting on?

25        A.   That's correct.
```



Page 136

1            MR. STERN:  All right.  Nothing further.

2            MR. MOSS:  Nothing else.

3            (Deposition concluded at 2:55 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 137

```
 1                  C E R T I F I C A T E

 2    COMMONWEALTH OF MASSACHUSETTS

 3    COUNTY OF PLYMOUTH

 4            I, Rosemary F. Grogan, a Registered

 5    Professional Reporter and Notary Public duly

 6    commissioned and qualified in and for the Commonwealth

 7    of Massachusetts, do hereby certify:

 8            That PAUL A. GOMPERS, PH.D., the witness whose

 9    deposition is hereinbefore set forth, was duly

10    identified and sworn by me, and that the foregoing

11    transcript is a true record of the testimony given by

12    such witness to the best of my ability.

13            I further certify that I am not related to any

14    of the parties in this matter by blood or marriage, and

15    that I am in no way interested in the outcome of this

16    matter.

17            IN WITNESS WHEREOF, I have hereunto set my

18    hand and affixed my notarial seal this 21st day of

19    January, 2016.

20    _____

21            Rosemary F. Grogan, RPR

22            CSR No. 112993

23    My Commission Expires:  December 15, 2017

24

25
```



Page 138

1        ERRATA SHEET DISTRIBUTION INFORMATION

2        DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4        ERRATA SHEET DISTRIBUTION INFORMATION

5             The original of the Errata Sheet has

6        been delivered to Edward Moss, Esquire.

7        When the Errata Sheet has been completed by

8        the deponent and signed, a copy thereof should

9        be delivered to each party of record and the

10       Original forwarded to Jonathan Stern,

11       Esquire, to whom the original deposition

12       transcript was delivered.

13

14       INSTRUCTIONS TO DEPONENT

15            After reading this volume of your

16       deposition, please indicate any corrections or

17       changes to your testimony and the reasons

18       therefor on the Errata Sheet supplied to you

19       and sign it.  DO NOT make marks or notations

20       on the transcript volume itself.  Add

21       additional sheets, if necessary.   Please

22       refer to above instructions for errata sheet

23       distribution information.

24

25



Page 139

```
 1              SIGNATURE / ERRATA SHEET
 2       (Please refer to Page No. 138 for instructions)
 3  Case Caption:  In re:  Montage Technology Group
 4                 Securities Litigation
 5  Deposition of:  PAUL A. GOMPERS, PH.D.
 6            I, PAUL A. GOMPERS, PH.D., do hereby certify
 7  that I have read the foregoing transcript of my
 8  testimony, and I further certify that said transcript is
 9  a true and accurate record of said testimony given by
10  me, save and except for changes and/or corrections, if
11  any, as indicated by me on the DEPOSITION ERRATA SHEET
12  hereof, with the understanding that I offer these
13  changes as if still under oath.
14  Signed under the pains and penalties of perjury this
15  _____day of _____, 2016.
16  _____
17  PAUL A. GOMPERS, PH.D.
18
19            Subscribed and sworn to before me this ____day
20  of _____, 2016.
21  _____
22  Notary Public          My Commission Expires:_____
23
24
25
```



Page 140

1                    DEPOSITION ERRATA SHEET

2     Page No. _____  Line No. _____  Change to: _____

3     _____

4     Reason for change: _____

5     Page No. _____  Line No. _____  Change to: _____

6     _____

7     Reason for change: _____

8     Page No. _____  Line No. _____  Change to: _____

9     _____

10    Reason for change: _____

11    Page No. _____  Line No. _____  Change to: _____

12    _____

13    Reason for change: _____

14    Page No. _____  Line No. _____  Change to: _____

15    _____

16    Reason for change: _____

17    Page No. _____  Line No. _____  Change to: _____

18    _____

19    Reason for change: _____

20    Page No. _____  Line No. _____  Change to: _____

21    _____

22    Reason for change: _____

23    SIGNATURE:_____DATE:_____

24            PAUL A. GOMPERS, PH.D.

25



**A**

**ability** 5:4,7 18:25
 137:12
**able** 9:5 12:25 13:7
 16:23 34:5 46:16
 57:9 58:13 110:21
 110:24 118:23
**abnormal** 104:13
**abnormally** 76:23
 77:14 78:7
**absence** 20:14
 111:5
**absent** 126:1,4
 127:14
**absolutely** 9:2
 29:17 89:18 93:21
 109:4
**academic** 10:13
 17:20 27:9,14,20
 27:24 28:10 29:17
 30:8,12,25 31:5,9
 46:4,21 47:14
 49:16 51:6 55:17
 56:2,7 63:5 67:22
 72:1,24 85:22
 88:16 91:2 99:20
 100:1,1 101:25
 113:16,22 115:7
 121:14
**academics** 46:22
**accounting** 121:15
 121:15
**accurate** 76:13
 139:9
**accurately** 5:1 49:9
**accused** 35:11
**acquire** 81:24
**acquisition** 19:4,21
 79:18 80:10,14,16
 80:18,23,24 81:8
 81:17 82:17
 112:10,12,14,15
 112:18 113:9
**acquisitions** 20:3,4
 20:25

**action** 23:15 37:16
 131:16
**actions** 6:19 7:20
 18:12
**active** 23:5 65:16
**activists** 17:17,18
**activity** 8:22
**actual** 76:6,7
 121:17 124:23
**add** 35:21 99:5
 138:20
**added** 35:16,18
 129:13
**additional** 28:9
 37:10 138:21
**address** 126:11
**addresses** 88:3
**adjusted** 12:15
 36:10,21 77:5
 98:15,17
**adjusting** 37:1 77:7
**adjustment** 102:20
 102:22 104:3,16
 105:14,16,17
 106:18
**adjustments**
 106:20
**adjusts** 105:19
**advanced** 28:16
**ad-hoc** 66:9
**affect** 7:3 10:22
 11:1 19:10 112:13
 120:7,9,12 121:11
 121:12,16 122:7
 122:25 124:13
 125:9 126:15
 128:23
**affidavit** 22:25
**affirmative** 14:13
 14:15 25:21,23
 33:25 34:1,21
 42:17,18 54:3,13
 77:9 82:14,15
 84:22,24
**affirmatively** 25:6
 64:15 76:25 78:3

 88:22 91:4 115:24
**affixed** 137:18
**agency** 20:16
**aggregate** 87:12
**aggressive** 135:11
 135:21
**ago** 6:16 49:18
**agree** 49:13 78:15
 135:3
**agreed** 92:2
**agreed-upon** 80:14
 112:14
**agreement** 80:10
 80:15 82:17
 112:12
**ahead** 18:5
**Airlines** 61:25 62:3
**aisle** 135:23
**al** 3:19
**algorithms** 11:18
**allegation** 122:17
 122:21 123:15
 125:10,14 126:5
**allegations** 38:17
 118:6,15,17,24
 119:2 120:1,5
 121:24 122:10,10
 123:9,14 125:7,24
 126:4,14 127:14
 128:7,10
**alleged** 38:13 42:24
 119:4 122:12,13
 125:25
**Allen** 19:23
**allow** 40:24 106:1
 115:17
**allowed** 33:24 34:4
**allows** 19:15 41:4
**Alon** 70:11,18
 71:11 78:20
**altogether** 125:15
**Amended** 37:15
**amount** 101:12
**Amsterdam** 64:1
**analyses** 60:21
 82:19

**analysis** 5:23 11:15
 11:19 14:18 24:8
 24:17 31:13 43:14
 52:2,7,10 55:10
 58:5 66:17 94:8
 95:6,24 97:11,15
 107:9 114:20
 118:4,13,18
 119:11 128:13
**analyst** 12:11 53:19
 74:11 86:15,21,23
 94:5,6,7,8,18,19
 95:20 96:20 97:7
 117:17,19,20
**analysts** 27:2 30:15
 30:16 31:3 37:18
 37:23 42:1 64:3
 74:8,18 76:1 86:1
 87:7,12 94:12
 95:5,8,9,10,11,12
 95:15,24 96:3,9
 99:16 100:22
 101:22,25 102:4
 102:12 115:13
 117:7,12 123:11
**analytical** 30:19
**analytically** 109:3
**analyze** 62:17
**analyzing** 5:24
 83:23 105:2
**Anderson** 25:22
 26:17 93:9 134:9
**Andrew** 7:7 16:9
**and/or** 139:10
**announce** 20:3
**announced** 30:18
 61:20 86:7,10
 101:1 102:25
 107:5,6 113:9
 114:16 116:4,5,15
**announcement**
 44:5 46:25 53:18
 55:25 61:16 79:19
 86:9 99:7,23
 100:4,20,23
 104:12 105:9,11

 106:6,12 107:15
 108:13 112:10
 114:18,19,19
 119:24
**announcements**
 84:3 95:17,18
 96:13 99:8,14,22
 100:18 105:19
 107:19,23 108:3
 132:22
**announces** 101:8
**anomalies** 72:18,19
 73:7 74:2 82:11
 82:22
**anomaly** 63:19,22
 64:4,10 67:11
 74:3 78:11,12
**answer** 15:11 49:11
 85:18 88:4
**answered** 21:6
 52:21
**anybody** 56:4
 124:4
**anymore** 112:7
**anyway** 80:3
**app** 19:20
**apparent** 123:2
**appear** 60:16
 106:23
**APPEARANCES**
 2:1
**appears** 128:2
**application** 134:16
 134:25
**applied** 52:13
**apply** 111:11
**approach** 15:6
 84:22
**approaches** 66:24
**appropriate** 40:12
 43:12 69:19 73:21
 115:20
**appropriately** 41:6
 41:9,10
**approval** 78:23
**approximately**



23:18
**arbitrage** 27:7
28:10 44:8 54:2
64:11 65:15
**arbitrarily** 60:7,11
**area** 6:23 7:13 10:9
22:14 55:21
**areas** 21:21 22:4,7
22:8,10
**argue** 69:11,22
**argued** 20:17 70:8
**argument** 103:18
125:2
**arguments** 119:25
**article** 11:8 62:2,4
62:7 83:18 86:23
87:19 88:14 89:3
89:6,11,25 90:4
90:22 132:12,15
**articles** 12:1 62:10
88:14 116:8,12
**artifact** 71:14
**artificial** 31:18
**ascertain** 118:8
**aside** 109:2
**asked** 24:15,19
25:1,5,13 26:4
28:12 38:4,4,11
42:8,10 43:19,20
52:22 66:4,7,15
66:15 127:24
132:14 134:8,14
**asking** 40:14 51:19
91:7 95:11 106:21
**aspect** 6:2 10:3
128:3
**aspects** 5:21 9:14
9:15,16,17 34:5
**asserts** 63:11
**assessing** 45:12
**assessment** 18:20
45:23,25 46:10
50:13 66:19
117:11,22 120:9
**assign** 30:9
**assignment** 38:2

**associated** 27:17
74:2,25 79:8
85:22 86:4
**assume** 75:6 113:23
113:24 114:11,21
115:25 116:3
134:21
**assumes** 103:5
**assuming** 103:6,9
103:20 114:2
**assumptions** 59:10
**attached** 3:24
35:24
**Attachments** 3:9
3:12,20
**attention** 132:17
**Attorney** 3:25
**attribute** 116:4
**authored** 66:13
**authors** 59:24
135:2
**autocorrelation**
26:21 60:9 67:1
109:21,22,23
110:2,16 111:13
111:15,21 112:1,7
113:4,4,8
**autocorrelations**
112:23
**automatic** 121:19
**automatically**
120:14
**available** 45:15
49:19 61:7 62:25
**Avenue** 2:5
**average** 90:10,13
91:22 108:22
109:13,14 131:17
132:21
**averages** 108:22
109:8
**averaging** 108:7,14
**avoid** 106:22
**aware** 36:1 65:24
93:15
**a.m** 1:13

**B**

**B** 3:20
**back** 12:14 17:14
17:15 20:15 25:18
28:16 30:10 38:21
50:8 55:5 56:23
56:23 58:18,19
67:10 71:7,9,12
82:22 94:21
107:11,14 129:25
130:10 132:4
**background** 21:7
**backup** 36:1,12,14
37:10 98:6,23
99:5
**bad** 29:20,24 30:4,7
30:11 32:5,12
46:20 50:23,23
**ballpark** 129:13
131:5,18,22
**band** 80:13
**bankruptcy** 62:3
**banks** 78:14
**base** 81:7 122:16
**based** 15:10 26:7
34:23 49:12 50:7
82:6 84:18 110:23
111:25 112:5
118:13 124:8
**bases** 91:6
**basically** 59:1 63:2
115:3
**basis** 27:5 47:4
99:20,25 110:19
113:16 114:7
115:17 116:24
120:10,14 124:2
132:24
**bearing** 8:25
102:22
**beginning** 60:8
**begins** 48:23
**Behalf** 2:2,10
**behavior** 7:1 10:10
10:11 12:21 13:10

**belief** 123:12
128:20
**believe** 45:10 63:18
77:13 79:21 85:22
87:23 90:22 91:20
124:2,4,8,11,21
125:20
**believed** 81:8
122:18 125:12
128:16
**Bert** 35:3
**best** 18:13 36:9
102:1,2 137:12
**beta** 36:24
**better** 18:1,5,7,16
79:16 135:23
**better-governed**
18:14
**beyond** 110:11
**bias** 97:21,24
116:19
**biases** 135:6,9
**bid** 69:24 80:25
81:24
**bidder** 81:3
**bids** 81:1
**bid-ask** 65:14
**big** 56:22 103:24
108:8 109:15
114:23
**biggest** 131:15
**bill** 32:15,18 129:8
129:10 130:4
**biotech** 56:22
**bit** 28:21
**blanket** 10:4
**blinded** 17:11
**blood** 137:14
**board** 19:2
**bold** 124:20
**bond** 86:2
**Boston** 1:17
**Boylston** 1:16
**Brav** 70:11,18
71:11 78:20
**break** 125:6

**Bristol-Myers** 11:3
11:11 60:24 61:17
**Bristol-Myers-E...**
57:5
**broad** 6:23
**broad-based** 7:9
17:6
**brought** 34:11
**brushed** 59:2,6
**bubble** 56:22,22
**bucket** 6:15 7:4,5
15:24
**buckets** 6:14
**budgeting** 20:21
**Buffett** 70:24 71:1
**build** 20:22,25
**built** 6:3
**bunch** 17:4,18
**burden** 38:15
**business** 5:11 21:16
71:6 81:3,5,9
95:17 120:22
121:18
**busy** 130:15
**buyers** 13:2
**bylaw** 16:11
**bylaws** 16:4,15

**C**

**C** 96:14,23 137:1,1
**calculated** 68:21
**CALIFORNIA** 1:2
**call** 6:24 18:17
23:13 42:4,6
49:23,25 94:6
**called** 16:14 21:14
27:7,21 51:17
52:8,10 83:19
99:14
**calls** 28:5 50:3 67:8
126:25
**CalPERS** 8:6
**cap** 19:20 36:18
**capital** 3:15 5:21,24
6:11,16,18 7:13
8:7 20:20 82:3,8



132:13
**capitalists** 6:20,21
  7:18,21 8:2,22 9:4
**Caption** 139:3
**case** 1:3 21:24
  22:25 24:14,17
  25:23 26:17 35:23
  62:14 72:14 79:15
  82:2 88:11 91:6
  92:11,17 93:9,10
  93:21 96:14 97:15
  98:19 105:5
  111:14 115:12,13
  116:14,15,18
  134:10 135:12,20
  139:3
**cases** 3:18 23:7,10
  24:6,25 25:13,14
  25:19 26:2 27:12
  33:4 54:12 55:6
  55:14,14 111:14
  130:16,24,25
**cash** 18:21 19:10
  20:8,16 81:5,9,18
  81:20 118:20
  121:8,11,17
  124:13 128:21
  129:1
**categories** 95:16
  97:24
**category** 95:23
**causality** 19:12
  115:22 116:6
**causation** 114:11
**cause** 29:2 106:17
  116:20 117:9
  118:1,3 123:5
**caused** 61:7 105:5
  114:1,13,24 116:2
  116:21,22 118:9
  119:1,23
**causes** 76:15
**causing** 29:19,20
  32:12,12 72:19
**caveat** 92:9
**cede** 18:8

**ceded** 16:16
**cents** 30:20,22
  101:7,8,10,11,13
**CEO** 86:3
**CEO's** 86:11
**cert** 25:8
**certain** 9:19,19,20
  40:6 41:21 47:15
**certainly** 9:3,8
  13:21,23 14:3,10
  14:12,17 15:5
  17:21 21:8,18
  22:13 26:25 33:1
  35:9 37:22 39:14
  42:20,23 43:5
  47:14 48:4 51:9
  53:12 54:3,13
  55:3,10,14 56:14
  65:18 66:7,11
  67:4 69:16 70:25
  71:25 73:13 76:3
  76:19 77:1,2,20
  77:21 78:1,1 81:6
  82:2,4 86:21
  88:11,19 89:2
  90:8,15 91:3,11
  91:13,21 96:22
  101:24 102:11
  105:3 107:3,22
  108:17 109:3
  118:19,23 120:5,8
  120:20 123:9
  124:5,7 125:11,17
  125:19 127:25
  128:1 131:22
**certainty** 64:16
  79:1,7 124:5
**certification** 24:3
  24:22 35:23
**certify** 137:7,13
  139:6,8
**challenged** 35:8
**chance** 13:20 43:2
  43:3 122:22,23,23
  124:16
**Chancery** 23:13

**change** 86:15 87:3
  87:9,10,18 117:9
  117:14,15,19,20
  117:21 140:2,4,5
  140:7,8,10,11,13
  140:14,16,17,19
  140:20,22
**changed** 87:7
**changes** 31:2,3
  53:19 86:1 87:14
  95:19 129:1
  138:17 139:10,13
**chapters** 5:20
**characteristic**
  65:16
**characteristics**
  65:16
**characterization**
  49:12 59:5
**characterized**
  68:10
**characterizing**
  58:25
**charter** 16:4,11,15
**chat** 113:10
**checked** 75:9
**Chicago** 28:18
**China** 82:9
**Chinese** 81:25 82:1
  82:3
**choices** 66:24
**choose** 8:16 55:13
**chop** 8:10
**chose** 93:18,19 99:1
**chronology** 96:6
**circling** 67:10
**circular** 102:15,18
  103:18,18
**circumstance** 94:15
  123:8
**circumstances** 33:1
  63:8 119:22 121:3
**citation** 87:22 90:3
**cite** 37:25 88:20
**cited** 17:20 37:19
  37:22

**claim** 22:9
**clarify** 4:20
**class** 13:16 23:15
  24:3,22 25:8
  35:23 38:10 39:5
  42:14 53:13 80:5
  84:1,16 85:20
  94:19 96:11,19
  98:1 108:4 112:17
  112:18 131:16
**classes** 56:1
**classifications**
  96:24 97:1
**classified** 68:16
  94:17
**class-wide** 38:16
**clean** 100:9
**clear** 14:22 17:24
  29:17 30:8 36:22
  37:3 42:8 49:13
  61:18 89:24 93:21
  97:7 101:19 102:5
  114:6
**client** 32:24 33:1
**close** 23:4 32:17
  130:1 131:6
**coefficient** 99:3
**Cohen** 12:24
**colleague** 64:4,5
  71:6 115:8
**colleagues** 7:7
**collect** 94:11
**collected** 6:4
**collection** 94:4
**collective** 45:23
**com** 56:21
**combination** 97:3
**combinations**
  96:25
**combined** 5:14 6:6
**come** 58:6 70:1
  101:6 110:22
  116:12
**comes** 13:1,5 29:1,7
  29:8 32:4,5,25
  33:2 59:9 104:17

115:19
**coming** 25:21 81:1
  86:20 87:17
  106:25
**commentary**
  115:23
**commenters** 128:1
**Commission**
  137:23 139:22
**commissioned**
  137:6
**committing** 124:22
**common** 99:10
**Commonwealth**
  137:2,6
**companies** 9:19
  11:25 16:10,22
  17:8 20:19 37:12
  68:23 69:24 80:16
  115:11
**company** 7:25
  11:22 20:23 21:1
  37:4 68:25 78:17
  96:2 101:7
**compare** 28:5 87:2
  100:25
**compared** 68:22
**comparing** 36:15
  83:20 133:5
**comparison** 99:19
  109:19
**compensated** 32:23
  129:6,7
**compensation**
  32:14,21 33:3
  130:21
**complaint** 37:15
  38:14 118:7
**completed** 138:7
**completely** 34:8
**component** 28:23
  133:21
**comprehensive**
  54:5 58:11
**comprehensively**
  62:8



computer 11:18
concept 50:25
concern 127:4
concerned 13:22
   14:3 29:14 92:3
   127:6
conclude 11:12
   59:11 72:20 73:22
   133:10 134:5
concluded 136:3
concluding 99:21
   133:21
conclusion 12:1
   13:6 26:3,5,9
   41:10 50:4 58:6
   59:9 68:7 70:17
   79:10 127:1
conclusions 25:2
concrete 101:6
condition 59:19
   88:6 92:22 93:20
   110:6 134:2
conduct 43:8 45:13
conducted 98:11
confident 53:4,7,7
   53:24
confined 52:8
confirmed 16:24
conflicts 127:7
consensus 30:15
   87:10,18 100:19
   101:1,22,22 102:1
   102:11 117:14,21
conservative 135:1
   135:6,12,20
consider 14:12
   82:20
consideration
   13:25 83:2,3
considered 14:19
   37:25 43:5 63:5
   65:21 68:18 117:8
consistent 27:20
   29:6,13 38:16
   39:8,17 50:19
   51:16 53:21 58:11

59:3 66:10 69:17
   70:4,25 75:7
   91:24 115:5
constitution 16:5
constructed 38:18
consulted 130:14
consulting 131:8,13
contain 11:20
   84:19 95:12
   117:17
contained 35:23
contaminating
   106:22
content 11:15
contents 84:18
context 45:17 54:9
   59:13 87:6 117:14
continuation 6:15
   105:22 107:13
continue 47:2
   112:23
continued 103:25
   104:23 105:10
   106:6
contributing 72:11
control 13:23 18:10
   18:12 19:18 20:10
   20:14 76:15,20
   77:1,6
controls 77:23
copy 44:21 138:8
Cornerstone 1:15
   32:21
corporate 7:6,8,9
   15:20,25 17:6,23
   18:11 19:13,15,18
   20:10 21:15 30:24
   31:10 40:22 41:4
   41:5 44:4 53:11
   53:13,15 73:19
   86:6,17 96:10
   120:17,25
correct 5:10 15:14
   15:16 29:16 32:3
   35:2 40:19 43:9
   43:10 52:4 59:5

63:23,24 66:1
   67:14 70:22 72:21
   78:7,8 80:5,6
   84:20 87:4 88:5
   89:8 90:17 92:4,5
   92:11,25 93:14
   95:13 97:9,12,13
   98:9 100:15 104:1
   110:20 111:9
   112:7 116:10
   119:9 121:22
   127:21 128:14
   129:9 133:18
   134:1,4,18,19
   135:25
corrected 42:24
   60:1 97:11,14
   134:15,22,24
   135:3,6
corrections 138:16
   139:10
correctly 31:22
   49:9
correlation 37:12
   43:1 60:6
correlations 48:2
cost 27:8,13 43:25
costs 20:16 27:22
   111:4,6,7
count 23:12
counter-factual
   126:8
COUNTY 137:3
couple 4:14 12:23
   59:16 69:6 106:11
   130:3 131:17
   132:6,18
course 5:15 21:14
   43:9 89:15 106:24
courses 21:9
court 1:1 33:21
   39:12
courts 31:24 32:7
   33:22 39:11 49:15
   49:21,23,25 50:19
   51:17 52:8,10

cover 22:6
Craig 29:22
create 28:4,21 29:9
   30:13 40:24 45:22
   55:9 100:19
   101:14 106:23
created 16:13,21
   36:2
creates 36:7
creating 15:6 29:23
   30:1
credited 128:15
Cremers 19:24
crisis 56:18,20,21
criticism 98:7
   109:7,18 134:24
criticisms 50:16
   108:18
criticize 83:22
   97:10 98:8
critique 52:5
crossection 56:5
CSR 1:18 137:22
curious 36:4

D

D 96:14,23
damages 34:12,24
   38:16
Dan 34:9
data 6:4 27:8 29:12
   71:7 95:22
date 11:22 62:21
   79:1,6 84:13
   86:11 108:20,21
   118:23 140:23
dates 20:15 43:1
   60:1 62:1 85:15
   85:20,21 92:18
   99:22,23 103:11
   108:13,14 109:4,6
   134:15,22,25
dating 82:22
Daubert 34:17 35:1
   35:3,8,10 66:1,3
day 63:11 74:10,13

74:18,19 75:2,2
   75:11 76:1,11
   79:6,8 85:6,10
   92:7,13 97:11,14
   103:17 106:4,13
   106:17,25 107:7
   107:12 108:6,15
   109:9,10,18 112:2
   114:15,23,24
   115:1 116:15
   118:1,2 137:18
   139:15,19
days 12:13 53:23
   60:3,4,7,12,15
   62:22 63:10 74:9
   74:23 75:11,16
   78:18,22 79:17,23
   79:24 83:20,21,23
   92:21 93:22 94:4
   94:16 95:25 96:4
   96:5,8,9,10 103:3
   103:6,7,14,16,20
   104:5,9,14,24
   105:10,12 106:25
   107:3 108:3,5,7,8
   108:25 109:15
   116:17 133:7,7
debt 31:5
December 79:19
   80:1 129:24
   137:23
decide 8:9 30:11
decision 8:12
decisions 39:12
   66:9 82:6
decision-making
   16:8
declaration 22:25
decline 8:16,18
   9:10 12:12 79:4
   114:13,14 119:1
   119:14,24 123:6
declined 62:6
declines 32:13 79:9
decreases 102:9
defendant 132:21



**defendants** 2:10
24:23 65:24
**defendant's** 132:24
**defense** 24:17
**define** 31:25 32:8
93:22 111:25
**defined** 18:1,6,7
50:19 93:25
**defines** 95:16
**definition** 10:16
31:18 44:1 45:19
46:6,7 49:16 50:6
51:16 73:13 91:24
92:12,18 110:14
**definitions** 93:24
94:1,10 95:15
**Delaware** 23:13
**delivered** 138:6,9
138:12
**demand** 47:12
**democracy** 18:15
**demonstrate** 7:9
25:11 28:11 38:9
42:12 48:5 51:10
52:17,20 57:9
58:7,13,14,14
61:4,6 62:11 63:9
65:4 118:12,18
119:23
**demonstrated**
38:17 42:6 46:22
47:15 51:16 58:2
67:22
**demonstrating**
66:10 91:22
**depend** 53:11 56:12
57:2 119:22 123:8
128:25
**depends** 54:6 111:1
121:2 126:7
128:20
**deponent** 138:8,14
**DEPONENT'S**
138:2
**deposed** 4:11,15
**deposition** 1:9

32:17,19 35:25
38:8 98:22 129:18
130:1,2,3 134:12
136:3 137:9
138:11,16 139:5
139:11 140:1
**depositive** 65:6
**describe** 74:3 78:12
**described** 32:8
63:18 68:8
**DESCRIPTION**
3:8
**designed** 45:14
84:24 115:21
**despite** 74:16
**destabilizing** 72:3
**detail** 16:2
**detect** 46:16
**determination**
42:15 84:17
**determine** 11:19
86:8 103:23
114:13,24 118:5
**develop** 7:8 111:6
**developed** 15:25
55:15
**dictatorships** 18:17
**difference** 21:1
42:25 51:20 60:2
92:19 94:16 97:4
97:24 108:5
132:22 133:9
135:7,10
**differences** 94:2
**different** 15:11,12
15:20 26:8 36:4
40:15 53:12,20
56:10 63:14 77:1
77:5,6,7 86:6 95:4
98:24 114:16
120:22 135:22
**dilute** 19:3
**direct** 26:16,22,25
27:5 44:3,10
52:19 57:14 59:1
59:14 60:13,22,24

61:1 65:18 67:8,8
73:2 110:17
132:17
**directed** 66:17
**direction** 17:9
26:19 29:10,16
30:3 37:5 47:3
**directions** 30:5
**directly** 32:22,23
32:25 45:19 81:2
118:14
**directors** 19:1
**disagree** 28:7
**discernible** 8:15
**disciplining** 20:10
**disclosed** 120:16
**disclosure** 60:1
97:11,14 127:12
134:15,22,25
**disclosures** 42:25
96:11 126:19
127:8 135:4,6
**discuss** 76:16 84:21
**discussed** 49:17
118:7
**discusses** 83:19
133:16
**discussion** 17:13
36:12 43:16 70:24
83:9 84:12 86:13
117:3 123:10
124:6 128:4 132:2
133:13
**dislocations** 56:15
**dispositive** 72:9
**disproportion** 21:3
**distinction** 26:1
31:18 49:5,14,15
49:22 50:1,6 51:7
**distinguish** 116:11
**distinguishing**
118:15
**distribute** 7:24 8:4
8:9,17,18 9:4
**distribution** 9:6,10
9:13 77:21 120:23

138:1,4,23
**distributions** 9:3
**distributor** 125:7,9
**DISTRICT** 1:1,2
**divide** 8:10
**dividend** 53:18
84:4 86:2
**document** 3:23
13:12 45:7 48:16
70:6
**documented** 71:10
72:25 127:14
**documents** 3:24
79:3
**doing** 28:14 35:7
37:8 58:21 83:24
85:12 107:9,10
131:7 135:13
**dollars** 131:20
**doubt** 76:12
**dozen** 4:14 58:3
**dozens** 100:16,16
**Dr** 4:8 132:11
**draw** 26:8 41:11
49:22
**drawing** 51:7
**drew** 26:5
**drift** 46:25 55:25
103:24 104:7,12
**drive** 108:23 116:8
**driven** 109:15
**driver's** 4:3
**drives** 115:7
**driving** 115:9 116:7
**drug** 61:16
**due** 119:15 124:24
**duly** 4:3 137:5,9
**Dunbar** 59:17
**Dutch** 63:20,25
64:8,15,18

**E**
**E** 137:1,1
**earlier** 11:22 15:2
15:10 38:25 40:16
43:19 46:24 49:12

61:20 62:9 66:16
92:2 95:23 98:21
104:8 116:9 129:5
133:14
**early** 56:22 104:20
**earn** 69:19
**earning** 30:12 47:1
**earnings** 30:14,17
30:21,23 31:2,3
40:25 42:1 47:2,5
47:22,24 48:1,2
53:18 84:3,3
85:25 86:1,14,15
95:17 99:7,8,13
99:14,15,16,17,22
100:3,4,12,18,20
100:23 101:2,2,6
101:7,14,16,17
105:8,11,19
107:14,18,23,25
108:3,13,25 109:3
109:5,6,8
**easy** 116:11
**EBITDA** 101:3
**econ** 21:16
**econometric** 21:15
**econometrics** 21:7
21:9,18,20
**economic** 6:3 22:11
118:20 120:3
**economically** 111:3
**economics** 5:9,11
5:13,16 10:13
22:14 31:17 50:5
51:1,6 65:21
66:15,20 67:5,25
91:3 114:7 124:13
**economist** 21:10
22:2,3,12
**Edward** 2:11 138:6
**effect** 19:3,16 74:23
108:8 111:3
112:10 122:5
**effects** 28:24 57:1
72:24 73:4
**efficiencies** 82:24



efficiency 8:25 9:18
  9:21 10:16 23:19
  24:8,14,16 25:6
  25:14 26:15,20
  27:3,6,16 28:13
  29:19,25 31:14,15
  31:19,25 32:8,9
  39:1,1 43:20 44:1
  45:13,20 46:8,14
  48:6 49:6,8,17,24
  49:25 50:7,15,20
  50:25 51:3,8,8,22
  52:11,15,17,18,20
  53:2,16 54:16
  58:2 59:4,9 60:13
  60:25 65:6,19,22
  66:10 67:5 68:2
  73:14,23 84:23,24
  85:8 91:4,24
  92:13,23 93:20
  99:18,24 105:2
  109:24,24 110:5,6
  110:8,14,17,18
  113:17 114:3,7
  115:18,24 116:25
  118:12 133:10,11
  134:2,5
efficient 3:15 9:14
  15:22 25:2,12
  26:24 28:8 30:4
  31:22 38:9 39:4,5
  39:12 40:16 41:18
  41:23 42:3,3,5,6,9
  42:13,16 50:10
  51:11,18 52:9
  53:4 55:19 56:6
  56:11 57:12,18,23
  58:8 59:12,21
  63:10 65:18 72:9
  72:21 73:8,25
  83:4 85:11 88:7
  103:7,10,20,23
  106:5,14 110:12
  113:24,25 114:2
  114:12,21 115:4
  116:1,3 118:11

119:19 122:16,24
  132:13 133:22
efficiently 9:22,25
  15:13 40:25 41:16
  41:22,25 58:15
eight 24:6,9
either 10:6 32:23
  77:18 82:11 99:25
  100:24
elected 19:1
element 88:18
elements 8:21 9:12
  42:23 88:10
  120:21,22
emoss@omm.com
  2:17
empirical 6:4,6
  21:9,11,12,14,16
  21:19 22:3,13,13
  40:5 69:10 100:1
  101:20 115:10
employed 67:7
employes 59:18
ended 34:18
engage 19:19 20:11
  20:13,24
engagements 23:24
engender 20:8
  31:10 47:25
  101:16
engenders 47:10
enhance 6:20
enormous 33:9
entail 29:25
entire 108:23
entities 81:19
entity 81:11,12,24
EntreMed 11:3,11
  61:17
equity 6:17,18,19
  7:13,18,21,23 8:2
  8:13,16,23 9:4
  31:4 55:24 81:7
  81:13,25 82:8
errata 138:1,2,4,5,7
  138:18,22 139:1

139:11 140:1
error 40:6
Esquire 2:3,11
  138:6,11
essentially 16:5
  28:3 34:22 80:15
  96:15
establish 14:15
  52:15 63:10 85:8
  118:10
established 119:12
  119:14
establishing 103:8
estimate 23:9 33:10
  33:16 102:1,2,2,3
  127:24 131:1,4,12
  131:22
estimation 6:5 40:7
et 3:19
evaluate 25:1 38:4
  38:6 87:8
evaluating 17:22
  39:3 43:20 83:3
event 15:6 28:17,20
  29:21 30:2 37:19
  43:8,22 44:3,10
  52:16,20,21,24
  53:1,15 54:4,5,8
  54:13,20 55:7,9
  55:10,16 57:15
  58:10 61:15,17
  62:12,23 63:14
  65:7 66:25 67:1
  73:3,5,8,16,18
  79:7,13 82:15
  84:10,16 85:2
  98:11 99:9,9,10
  99:11,13 103:15
  104:25 108:18
  113:15,21,23
  114:8 115:2,12,16
  117:8
events 10:6 15:20
  20:1 30:9,24
  31:10,11 40:23
  41:4,5 44:4 47:19

53:11,13,20 54:7
  73:19,20 84:1,11
  84:12,16 86:7,18
evidence 9:11
  11:12 14:12,19
  25:11,20,24 26:2
  26:6,15,18 27:9
  37:6 38:6,7,12
  39:8,17 42:12,21
  43:5 44:10 52:6
  53:14,15,17 54:3
  58:1,7,10 59:1,3
  59:14 60:5,13,18
  60:22,24 61:1,9
  65:18,22 66:8
  67:4 68:1 69:14
  71:19,20 72:1,1
  72:13,14,23 73:1
  73:4,24 79:12
  82:11 83:3 85:7
  90:9 99:23 105:12
  105:13 106:7
  118:12,13 123:5
  124:25 128:11
  132:21 133:11
exact 4:15 11:9
  38:2 62:1,21 64:6
  64:11 131:22
examination 3:1,3
  4:6 86:8 132:9
  135:18
examine 91:10
  107:24
examined 4:4 47:17
  58:4
examines 63:11
examining 103:22
example 7:22 8:21
  11:2,2 12:4 25:22
  26:17 41:2 45:1
  57:4,5,7 60:22,23
  61:21,23 62:20
  67:17,18 70:8
  87:9 88:23 95:5
  101:6 111:14
  114:10,15

examples 10:11,14
  46:22,24 47:7
  59:16 60:15 65:3
  65:4 85:24 88:12
  108:15
excess 74:14
excessive 17:4
Exchange 64:2
exclude 33:19
  59:25 60:7 65:25
  95:5 97:7
excluded 33:21,23
  34:7,20,22,25
  35:5,9 96:22,23
excluding 42:24
  94:7,8,9 96:19
  111:7
exclusion 24:21
exclusively 6:11
excuse 24:23 80:22
  90:11 131:15
execution 9:10
exhibit 3:9,9,12,12
  3:15,20,20,23
  44:14,15 48:9,10
  54:24 58:18,19
  75:19,20 76:5
  83:12,13,15 84:15
  93:2,3,5,25 94:25
  96:5 98:2,3
  123:18,19,22
  132:12 134:6,10
exhibits 3:7 35:24
exist 50:6 58:14
  112:7
exists 49:16 71:5
exit 6:21 7:15,17
expect 29:2,11
  30:21 39:16 40:3
  40:10,12 47:24
  56:10 70:20 80:9
  81:3,7 101:5,7,8
  101:10,11,13
  102:7
expectation 29:24
  30:2,14 63:13



80:24,25 121:8
122:19 124:13
126:15
**expectations** 30:18
69:14,17 70:1
87:2 100:5,13
102:3,4 117:15
122:5 128:23
**expected** 30:20
40:1,8 63:15
76:19 77:2 97:22
112:15 120:6
**expensive** 27:10,24
64:8
**expert** 3:10,13,21
21:21 22:9,9 23:1
23:2,6 24:2 25:8,8
25:9,10,20 34:10
34:11,18,19,20,21
34:22 35:7 44:21
44:22 57:24,25
58:1,4 93:8
**expertise** 22:7,15
**experts** 25:3
**expert's** 55:13
**expiration** 79:4
**expires** 8:9 79:1
137:23 139:22
**explain** 16:2 115:14
116:19 133:3
**explained** 103:14
**explains** 20:5
**explanatory** 98:16
99:5
**explicit** 46:6
**exploit** 12:25 13:7
**explore** 61:15
**extend** 112:6
**extensively** 16:24
126:10
**extent** 37:21 41:20
42:5 72:25 73:18
95:8 121:7 124:11
**ex-ante** 28:25 29:10
30:9 31:12 32:11
53:21 114:4

115:17,18 116:25
**ex-post** 116:24

**F**
**F** 1:18 137:1,4,21
**fabricated** 124:3,5
124:10,12,16,17
128:17,17
**fabrication** 122:17
**face** 30:6
**fact** 7:6 9:5 17:19
19:23 37:4 40:5
52:18 60:7 69:11
109:7 111:12
115:10,15 116:19
118:12 122:14
123:15 125:21
126:17
**factor** 27:4 36:25
65:13 98:12,14,17
98:25 99:1,5
**factors** 64:14 65:5
65:8,10,15 66:19
67:3,21 68:1
71:24
**fail** 59:19 133:8
134:3
**failings** 90:25 91:11
**fails** 133:21 135:5
**fair** 18:18 24:20
82:10
**fairly** 63:4
**false** 59:23 85:1
89:4 122:21
**Fama** 31:21,21
41:18 45:19,20,20
46:3,7 49:18 50:9
**Fama's** 29:18
**familiar** 4:17
**family** 130:16
**far** 58:12 96:3,13
128:3 131:14,14
131:14
**Farmer** 28:16
**Fascell** 34:10,12,21
**fast** 45:21

**favor** 53:16 135:9
**FCStone** 25:25
55:3 92:24 94:3,8
95:17,19,25 97:15
**FDT** 42:24 83:19
88:22 89:1 92:16
93:12 98:7 132:11
134:16,25 135:5
**February** 79:23
113:9 118:10
119:1,14,24 124:1
127:17
**feel** 89:23 90:1
103:15
**Ferrell** 19:23
**Ferrillo** 3:19 59:17
**fewer** 96:3,3,13
**Field** 79:11
**Fifteen** 23:25
**fifth** 95:25
**figure** 75:14
**file** 32:18,18
**filed** 44:22 62:3
65:25
**filings** 95:18
**finance** 17:20 21:15
**financial** 10:13
21:9,23 22:2,3,12
22:14 31:17 50:5
51:1,6 56:18,20
56:21,25 65:21
66:14,20 67:5,25
82:6 91:3 114:7
**financials** 63:2
**find** 39:16 41:8
53:12 57:12 60:1
73:7 87:22 102:17
110:2,13
**finding** 41:6 51:17
97:24 135:7,9
**finds** 60:6
**finish** 18:2 85:17
112:21
**finished** 100:8
**firm** 2:4 4:9 6:20
7:10 8:8 10:4 16:4

16:5 17:1 19:14
21:4 31:12 33:2
36:18 47:17 74:9
78:13 81:25 82:3
**firms** 7:19 9:5
16:16 18:14,15,16
18:18 20:2,6,19
68:12,12,15,17
69:12 78:25 82:23
120:21
**firm's** 46:11
**firm-specific** 28:22
**first** 6:3,14 7:8,13
12:11 17:5 25:15
28:15,17 33:23
38:5,20 43:21
55:15 59:17 64:4
70:5,17 74:3,9
75:2 84:6,12 86:9
86:10,19 94:2
102:19 105:18
107:12 117:19
120:4,6,10,14
121:19 124:19,21
127:25
**Fisher** 28:17
**five** 75:17 83:6
95:16 96:24,25
113:11 129:2
131:11,19
**fixed** 80:13
**flag** 14:7
**flawed** 34:24
**flaws** 84:22 115:22
**Floor** 2:5
**flow** 18:21 20:16
121:11 124:14
129:1
**flows** 19:10 20:8
81:5,9,18,20
118:21 121:9,17
128:21
**focus** 6:12 81:20
126:1
**focused** 5:18 7:14
128:2

**focusing** 123:13,15
**followed** 64:3
103:11 117:20
**following** 74:2
106:16 115:6
**follows** 4:4
**follow-up** 135:16
**force** 64:11
**forecast** 53:19 86:1
86:14 87:4,11,13
87:18 100:19,22
117:15,19,21
**forecasted** 86:15
99:16
**forecasts** 30:16,16
31:3 87:7,9
100:24 101:1,25
102:1,12,13
**foregoing** 137:10
139:7
**foremost** 28:15
**form** 7:16 9:1 14:9
15:15 21:24 22:19
26:10 33:5 39:6
39:23 41:9,12
50:3 51:23 54:10
55:20 60:13 62:15
65:12 66:22 67:16
73:10 77:15 80:22
82:13 83:25 90:18
96:21 100:7 104:2
107:1 109:23,24
110:4,10,12,14,17
110:18 112:8
113:2 120:19
121:23 123:7
125:18 126:25
**former** 64:4 115:8
**forth** 137:9
**forward** 42:20
112:11
**forwarded** 138:10
**found** 14:4 36:14
57:22 72:18,19
**Fourteen** 131:10,11
**fourth** 95:23



**fraction** 56:6,6
　128:6
**frame** 25:18
**framework** 66:9
**fraud** 124:22
**Fraud-On-The-...**
　3:18
**free** 20:16 89:23
　90:1
**front-page** 11:8
**Fru** 64:5
**fruition** 70:2
**full** 5:13 10:14
　56:25
**fully** 9:23 10:18
　15:17 31:19 39:9
　39:18 41:19 44:5
　44:24 45:14,16,22
　47:16 49:19 50:10
　51:4 73:14 105:15
　106:14 110:9
**function** 27:6 80:18
　80:21,23 81:1
**functioning** 54:2
**fund** 8:7 81:13
**fundamental** 27:5
　31:14 32:8 44:7
　49:8,25 51:8,22
　52:11 95:24
**fundamentals**
　80:16 81:2
**funded** 81:13,25
　82:4
**funds** 6:18
**further** 91:5 132:5
　135:15,18 136:1
　137:13 139:8
**future** 17:1 18:21
　19:10 20:8 69:14
　69:17 81:9,17
　109:25 110:19,24
　118:20 121:8
　124:13 128:20
　129:1

**G**

**GAAP** 121:4,6,9,18
　121:20
**Gary** 2:20
**general** 21:25 22:1
　26:12,14 47:1
　57:16 69:23 102:6
　117:16 121:12
**generally** 68:20
　104:21
**generate** 101:18
**getting** 78:23 109:1
**give** 14:20 32:19
　89:13 101:6 129:2
**given** 14:1 18:10
　21:1,1 24:1 25:12
　27:22 38:25 41:20
　51:12 52:21 55:19
　56:4,5 57:18
　68:19 87:8 92:7
　104:5 105:4,6,8
　105:14 108:6
　114:15,22,23
　137:11 139:9
**Giving** 88:23
**glamour** 68:4,7,10
　68:16,20,23 69:3
　69:8,25
**glass** 30:11
**gleaned** 40:23
**go** 4:19 9:13 17:14
　18:5 28:13 29:8,9
　29:20,21 30:22
　32:4,5 34:2 37:21
　43:19 50:8 56:23
　65:17 67:7 73:2
　76:5 83:8,24
　84:16,21 85:12
　87:21 91:5 93:25
　94:21,22 95:14
　98:6 101:12,13
　111:17,20,22,24
　112:2,3,10 124:19
　130:10 131:25
　132:4
**goes** 8:1,8 21:12
　28:16 32:20 78:13

80:24 124:25
　126:12 127:17
**going** 8:9 12:14
　13:11 14:24 18:20
　33:9 36:1,15
　44:13 48:14 50:21
　50:22 54:21 55:5
　57:18 71:9 74:18
　74:20,22,25 79:24
　80:4 81:10 87:21
　107:14 109:15
　112:2,3,11 113:10
　117:5 129:10
**gold** 28:15
**Goldman** 54:14,14
　54:17
**Gompers** 1:10 3:2
　3:11,22 4:1,8
　132:11 137:8
　139:5,6,17 140:24
**good** 8:14 29:7,19
　29:24 30:3,7,11
　32:4,11 34:8
　46:20 50:22 75:17
　87:15,17
**goodness** 36:10
**gosh** 122:22
**govern** 16:1,6,7,12
**governance** 7:6,8
　7:10 15:25 17:6
　18:1,5,7 19:13,15
　19:17 20:7 120:18
　120:25
**governed** 75:8
**government** 15:25
　81:11,12,13,19
　82:1,1,3 131:6
**governments** 82:5
**government-spo...**
　82:8
**Gravity** 3:23
　118:15 122:11
　123:9,11,17,25
　125:19 128:4
**Gravity's** 128:15
**greater** 18:19 21:4

**Grogan** 1:18 137:4
　137:21
**ground** 4:17
**group** 1:6 95:3 97:5
　124:22 133:7
　139:3
**grouped** 109:13
**groups** 43:1
**growing** 21:3
**growth** 69:15,17
　70:1,9,12,13,15
　70:20 71:16
**guess** 7:14 14:22
　23:3,4,22 24:5
　33:7,17 50:24
　51:19 70:23 77:10
　94:3 101:24 105:1
　106:21 111:5
　129:6 131:2
**guidance** 31:2
　86:16
**G-index** 16:14

**H**

**half** 23:11,16 58:2
　88:24 120:7
**hand** 137:18
**hand's** 33:13
**hand-collected**
　71:7
**Hang** 100:10
**Hanka** 79:11
**happen** 74:22,25
　106:4,11 114:5
**happened** 35:9
　110:23 118:1,2
**happens** 7:23 32:17
　45:21 79:18 104:8
**hard** 24:18
**Harvard** 5:12
　21:17 71:6
**hazard** 23:3
**hearing** 34:17
　38:20
**hedge-fund** 17:17
　17:18

**Grogan** (cont.)
**heightened** 14:8
**held** 64:2
**herd** 72:2
**herding** 71:17,20
　71:22,23 72:3,6
**hereinbefore** 137:9
**hereof** 139:12
**hereunto** 137:17
**hey** 123:3
**high** 27:17 68:13,15
　69:1,4,13,16,17
　69:18
**higher** 36:21 98:14
　98:17,20,25 99:21
**highest** 36:10
**highlight** 11:1 69:6
　91:12
**highlighted** 59:16
**highlights** 62:22
**highly** 17:20
**high-profile** 61:23
**hindsight** 116:19
**hinge** 123:11
**hired** 24:13
**historical** 95:21
**history** 86:14
**hit** 36:10
**hold** 64:14 65:8
**holds** 52:9 71:11
**Holland** 56:24
**Hong** 47:8
**hour** 104:22
**hours** 35:14 106:11
　129:11
**hours-ish** 129:17
**Howard** 3:14
**Huberman** 11:3,11
　57:5 61:8,12
**huge** 17:16
**hundred** 131:17
**hypotheses** 29:23
**hypothesis** 3:16
　29:10 30:1 31:12
　40:24 53:22 115:3
　115:5 132:13
**hypothesize** 63:15



**hypothetical** 41:13

**I**

**IBM's** 123:4
**idea** 16:15 20:20
  55:18
**identification** 44:15
  48:10 83:13 93:3
  123:19
**identified** 4:2 40:11
  64:4 85:21 88:9
  98:19 117:6
  137:10
**identifies** 89:12
**identify** 13:15 54:7
  84:11,12 85:3
  86:12,18,19 91:15
  92:16 105:20
  111:10
**identifying** 40:9
  45:5,6 85:5
**ignored** 59:2,6
**ignores** 43:6
**imagine** 64:24
**immediate** 8:17
**impact** 17:21 38:13
  54:18,20 108:16
  118:4 119:8,12,19
  121:5,17,22
  122:17 125:22,23
  126:3 127:10,11
  127:15,18 128:18
  134:23
**impacted** 118:6
**impacts** 122:1
**impair** 5:4,6
**imperative** 45:13
**imperfect** 39:14
  40:6
**implement** 59:24
  112:5 113:5
**implementation**
  66:25
**implemented** 67:9
  109:19 111:12
**implications** 46:10

**implicit** 46:6 59:10
**important** 31:16
  49:5 65:1 76:20
  82:20 128:3
  133:21
**impounded** 49:7,9
**inadvertently** 62:4
**incentive** 20:17
  82:5
**incentives** 21:2
**incidence** 60:2
  133:6
**incidents** 92:20
**include** 6:25 8:21
  8:21 36:5,17 37:7
  77:3,22 97:14
  98:12,23 135:3,8
**included** 36:21
  95:9,10,10 97:23
  98:3,4,5 134:15
  134:22
**including** 3:10,13
  3:21 11:6 97:11
  98:9 134:24 135:2
  135:5
**incomplete** 41:12
  47:6
**inconsistent** 26:20
**incorporate** 9:22
  31:20,22 44:2
  46:20 90:14 91:25
  102:24 104:18
  106:14
**incorporated** 9:25
  10:2,18 15:13,17
  39:9 41:22 44:5
  47:16 51:5 64:19
  104:6 105:15
  110:9
**incorporates** 41:19
  49:19 50:10
**incorporating**
  39:19 42:1 73:15
**incorporation** 47:5
**increase** 11:10
  12:10 75:23

**increases** 32:12
  102:8
**incremental** 98:16
**incur** 112:15
**independent**
  133:19
**index** 3:1,7 7:8,10
  16:1,25 36:5,18
  36:18,19 76:20
  77:3 98:9,13,15
  99:3
**indexes** 16:21 36:9
  36:16,22,24 37:11
  98:24
**indicate** 9:13 13:22
  37:13 76:10 92:6
  128:3 138:16
**indicated** 37:24,24
  139:11
**indicates** 9:8
**indicating** 12:17
  69:7
**indication** 120:17
**indications** 14:20
**indicative** 19:13
  27:3 60:12
**indicator** 27:16
**indirect** 59:3 64:14
  65:4,5 66:19 67:3
  67:21 68:1
**individual** 13:1,8
  13:10,10 15:3,8
  42:22 57:13 97:7
  109:9,9,10,18
**individually** 15:2
**individuals** 12:22
  13:3 124:7
**industry** 5:22,24
  28:24 36:5,9,16
  36:17,22 37:2,5
  37:11 76:15,20,21
  77:3,5,23 98:9,13
  98:15 99:3,5
**inefficiency** 9:8,15
  10:2 11:13 14:13
  15:4 25:21,22,24

26:3,6,7,15,25
  27:10,16 28:11
  37:6 42:6,21 43:7
  52:7 56:3 57:9,12
  59:2,14 60:13,19
  61:2,3,9 65:23
  72:11,23 73:1,4
  79:12 90:9 105:13
  106:2,8
**inefficient** 9:16
  10:4 14:6,16,24
  27:25 41:15 56:7
  56:16 59:20 64:16
  65:9 67:23 69:2,9
  69:12 88:22 89:1
  104:7,24 106:12
  110:13,15
**inefficiently** 10:1
  14:21 25:25 27:18
  37:14 41:1 69:5
**infer** 114:1
**inference** 40:15
  106:1 108:19,20
  108:21 109:17
**inferences** 40:5
  109:9
**inflate** 125:16
  126:21
**inflated** 125:8
  127:5
**inform** 15:6
**information** 9:20
  9:22,23,25 10:1,5
  10:7,17,19,21
  11:1,9,17,21 12:6
  13:1,5 15:12,13
  15:14,16,18,22
  29:1,4,6,6,8,23
  30:1 31:20,23
  39:2,3,10,19,22
  40:6,10,17 41:7,9
  41:14,17,20,21,25
  42:4 44:2,25
  45:15,24 46:1,5,9
  46:10 47:8,9,11
  47:15 49:7,8,20

49:23 50:8,11,13
  50:21,22,23 51:4
  51:13 53:3 60:16
  61:7,19,19,22
  62:11,14,25 63:1
  63:6,12 64:18,19
  73:15,22 84:5,13
  84:19 85:9 86:20
  87:2,17 90:14
  91:23 92:1 96:15
  96:19 102:25
  103:21 104:19,22
  105:4 106:15
  110:8,10,11
  115:19 117:12,18
  117:24 118:9
  138:1,4,23
**informational**
  31:14,25 49:6,24
  50:20,25 51:8
**informationally**
  51:17 52:8
**informative** 44:9
**informed** 31:9
  82:25
**initial** 7:2,3 12:8,16
  13:21 14:1 55:24
  70:6 74:7
**initiation** 53:19
  74:13 84:4 86:2
**insiders** 78:24
**instance** 44:25
  61:11 86:9,19
  126:24
**instances** 62:19
  88:21
**institution** 13:2
**institutional** 7:1
  71:25 72:2,3,8
**institutions** 12:22
  12:25 13:7 64:2
**instructions** 138:2
  138:14,22 139:2
**insufficiency** 9:11
**insulated** 20:9
**insurer** 130:7,9,11



**integrated** 96:6
**intended** 89:19
**interest** 18:13
  27:14,15,17,19
  44:8 54:1
**interested** 17:19
  137:15
**interesting** 19:11
  71:4
**interests** 127:7
**intervention** 18:10
**intraday** 102:23
  104:16 105:20
  107:2,9 116:16
**introduce** 44:13
  123:18
**invest** 20:21
**invested** 8:7
**investigate** 13:17
**investigated** 75:5,6
  81:15,21,23
**investing** 71:1
**investment** 6:18
  17:4 19:19,20,21
  20:12,14 21:3
  78:13 123:11
**investments** 6:1,11
**investor** 12:21
  13:10 81:7
**investors** 6:20 7:1
  7:18,21,24 8:2,3
  8:11,13,16,23 9:4
  13:1,2,8 17:17,22
  18:11 69:23 71:25
  72:2,3,6 81:20
  124:24
**involve** 6:8 7:15
**involved** 8:23
**IPO** 7:22 14:23,24
  25:17 67:19 68:19
  70:9 71:12 74:3
  75:12 79:6 82:11
  82:12,21
**IPOs** 14:4 68:20
  70:9,13,16,19
  71:7,9,15 74:10

78:22 82:23
**irrational** 72:10
**Ishii** 7:7 16:9
**isolates** 28:22
**issuance** 31:4 86:2
  86:3
**issuances** 84:5
**issue** 31:4,5 63:23
  67:14 74:19
**issued** 12:12 76:1
  123:25
**issues** 13:13 16:20
  22:13 34:13,15
  117:6 119:16
  125:6 128:7
**issuing** 74:8
**i.e** 10:3 49:6,8

———————
**J**
**J** 3:14
**January** 1:12 79:20
  80:2 108:10,11,11
  137:19
**Jay** 12:15 70:5
  71:10
**Jegadeesh** 69:20
**Jensen** 20:16 28:17
**job** 5:25 6:10
**John's** 83:18
**joint** 5:12
**Jon** 95:3
**Jonathan** 2:3 4:8
  138:10
**Josh** 71:6
**journal** 88:16
**journals** 88:17
**Joy** 7:7 16:9
**jstern@rosenleg...**
  2:8
**judge** 33:24

———————
**K**
**keep** 77:10 129:12
**Ken** 64:5
**key** 122:8 125:5
**kind** 13:12 84:10

104:7 114:20
  121:12
**kinds** 13:13 73:3
  96:12
**know** 4:14 10:12
  22:4,12,14,19
  23:3,5,11,12,16
  33:11 35:19 37:4
  39:1 41:5 46:24
  49:11 50:8 55:17
  55:22 57:4,7,10
  58:5 62:23 64:2
  64:15 66:1 67:2
  67:18 69:20 70:8
  71:4 73:16 74:16
  74:18,19,22,24
  75:3,10,11,16
  77:3 79:6,7,14
  80:18 81:8 83:7
  84:7 85:3 86:18
  89:17 90:12 96:5
  98:8 103:25 105:8
  106:23 109:5
  110:5 113:7
  117:13 118:19
  121:10,11 124:4
  124:20 127:3
  129:5,10,11,13,18
  129:20,21,21
  130:9,11 131:1,3
  134:20
**knowing** 74:16
**known** 75:2 79:1,8
  86:3

———————
**L**
**L** 3:9
**lack** 76:15 135:23
**Lakonishok** 69:21
**language** 11:19
  132:15 133:4,16
**large** 12:19 13:12
  20:4 21:8 47:1,2
  47:24 55:25 56:1
  56:9,15 57:2
  61:17 69:11 74:17

76:23 77:14,24
  78:7 99:4 101:17
  102:7,8 111:2,16
  111:16,19,21,23
  114:12 115:12,14
  119:17 120:16
**largely** 66:24
**larger** 20:19 47:25
  101:18 106:24
**largest** 16:10 57:10
  64:1
**late** 20:16 28:16
**law** 2:4 4:9 33:2
  64:10 83:18 88:17
**lead** 14:7 21:4
  102:7,8 124:15
**leave** 109:2
**led** 121:20
**legal** 50:4 127:1
**Lerner** 71:6
**letter** 130:11
**let's** 7:12 23:23
  55:18 93:1 99:7
  102:14 109:2
  114:10 118:4
  123:17 131:25
**level** 27:13,15 72:8
  103:4
**levels** 27:19
**liable** 119:4
**license** 4:3
**limitation** 40:20
**limited** 1:6 8:5 34:5
**line** 100:5,13 140:2
  140:5,8,11,14,17
  140:20
**link** 125:6
**links** 125:19
**literature** 10:13
  12:20 13:11,21
  14:4 27:14,20,24
  28:10 29:17 30:8
  30:12,15,25 31:5
  31:9 40:23 46:21
  47:4,14 49:16
  51:7 55:17 56:2

56:25 63:5 66:14
  67:22 68:12 69:6
  69:7,20 72:1,25
  74:16 82:25 85:21
  85:22 86:4 87:16
  91:3 99:20 100:1
  100:2 101:15,19
  101:25 102:5,11
  102:20 104:4,11
  104:15,19 105:17
  105:17 106:9,10
  113:16,22 115:7
  121:14
**litigation** 1:7 4:10
  23:15 34:9 35:12
  46:19 54:9,15
  57:23 131:8 139:4
**litigations** 130:14
**little** 23:16 28:21
  36:11 38:19 70:23
**LLP** 2:12
**loading** 36:25
**local** 81:11,12 82:1
  82:5,5
**lockup** 8:8 12:13
  13:19 74:24 78:18
  78:22 79:1,4,14
  82:17
**logically** 102:15,17
**London** 64:1
**long** 28:4,5 69:7
  70:14 104:6,18
  105:25 111:17,22
  112:2,3 130:5
**longer** 78:19
**long-run** 9:6 69:19
  70:2 71:8
**look** 7:20 8:12
  12:21,22 14:10,18
  16:10,15 18:24
  20:1 26:8 27:20
  28:2,10,25 29:18
  30:15 41:3 43:1
  43:25 44:1 45:2
  46:13,14,19 47:18
  47:18 51:6 52:2



53:3,8,18,25 54:2
54:21 64:17 69:20
69:21,22 71:19,22
72:14 75:22 78:25
80:17 81:10 84:5
84:11 85:15,20
86:11,16,18 87:5
87:6,10,11,11,12
89:14,23,24 90:1
93:1 94:21 99:9
99:10,15,16 100:6
100:21,23,24
101:2,2,3,3
102:14,23,24
104:12,17 105:20
105:21 107:2,4,7
108:2 109:8
110:21 114:12,17
114:22,25 116:1
116:16 117:24
123:17 127:13,24
128:22 132:11
**looked** 5:21 6:1
16:11,11 26:23,24
27:12,15 28:18
62:24 69:8 71:8
72:5,16 87:16
96:25 98:22 105:3
107:25 109:14
113:3,7 115:9
**looking** 6:10,19,21
7:1,15,22 27:6,7
44:7 54:24 58:5
61:21 72:7 73:2
75:25 90:3 94:11
94:12 99:13 100:5
103:16,17 114:10
**looks** 7:23 9:21
12:24 42:23 44:4
62:9 64:14 71:24
101:15 103:3,10
104:15 109:9
**lopping** 60:12
**loss** 101:13 114:11
**lot** 8:3 11:15 53:20
55:5 59:22 70:19

85:24 130:17,19
**lots** 17:2 53:17 64:2
64:3 70:16 71:15
71:15
**low** 27:19 68:13,17
**lower** 124:23
**LQW** 122:15
123:14 125:16,21
126:3,10,11,11,12
126:13 127:12
**Luman** 25:22 26:17
93:9 134:9
**lunch** 83:7,10

_____

**M**

**MacKinley** 29:22
**macro** 56:14
**macro-events** 57:1
**Madison** 2:5
**magnitude** 46:13
46:15 52:3 88:5
88:19 89:8 91:10
92:4 133:16,17,18
133:20,25 134:3,4
**main** 65:2
**major** 17:21
**majority** 19:25
20:5 32:25 39:24
40:11 53:20 73:21
78:22
**making** 49:14
**manage** 20:19,19
**managerial** 18:17
**managers** 16:7,13
16:17,19 17:23
18:9,9,12 19:8,14
19:15,17 20:11,13
20:17 21:2
**manner** 60:18
73:21 115:20
**manufacturing**
120:22
**March** 79:20,21
80:4,8
**Mark** 83:11 115:8
**marked** 44:15 48:8

48:10 83:13 93:3
123:19 132:12
134:10
**market** 5:25 6:10
6:25 7:4,11 8:4,14
8:22,25 9:5,18,21
10:10,11,14,16,20
12:21 13:2,5,23
14:16 15:21 18:11
18:20 19:18 20:10
23:19 24:8,14,16
25:1,6,11,25
26:20,24 27:3,16
28:7,11,19,23
29:2,5,7,9,19,25
30:4 31:18 32:4,5
32:9 36:8 37:1
38:9 39:4,9,13,18
40:16 41:6,8,14
41:18,23,25 42:2
42:9,12,13,16
43:20 44:1 45:12
45:20,24 46:7
48:5 49:18 50:9
50:15 51:3 52:7
52:15,17,18,20
54:2 58:2,8 59:2,9
59:12,14,20 63:9
65:6,8,19 66:10
67:5 69:14,23
72:9 73:13,14,23
73:24 79:12 82:24
84:6,13,22,24
85:6,8 86:20
87:17 88:7,25
90:9 91:4,24
92:22 93:20 98:8
98:12,19 99:18,23
101:21 102:2,3,13
103:9,22 104:18
106:13,23 109:24
109:24 110:6,7,12
110:15 112:15
113:17,24,24
114:2,3,6,12
115:3,18,19,20,24

115:25 116:25
117:15 118:11,12
119:20 122:16,18
122:19,21,24
124:6 125:11
128:1,15 133:10
133:11 134:2,5
135:5
**marketing** 120:23
**markets** 3:16 6:9
7:14 9:14,21
13:14 31:22 44:2
46:4,23 47:6,7,13
50:20,21 51:18
65:16,17,17 85:4
102:24,25 132:13
133:23
**market's** 59:21
114:21 133:22
**market-makers**
27:2
**market-to-book**
68:11,13,14,15,17
68:21,22 69:1,13
69:16,18
**marks** 138:19
**marriage** 137:14
**Martijn** 19:24
**Martoma** 33:24
34:3
**Massachusetts** 1:17
137:2,7
**match** 70:12
**matching** 11:23
**material** 10:17 29:2
**materials** 37:25
**math** 75:17 79:16
**matter** 14:7 25:17
32:14 34:9 38:17
44:22 46:19 47:18
48:6,20 50:5,15
50:16 51:5 55:3
92:24 106:4
114:11 130:12
137:14,16
**matters** 17:24
24:24 57:25 106:3

118:19 131:16
**Matthew** 34:3
**maximize** 81:14
**MBA** 5:13,17
**mean** 9:17 16:3
21:24 23:4,20,25
24:9,21 33:8
35:16 39:5 45:16
46:2 59:6,13 63:4
67:2 70:19 74:5
75:6 87:13 91:9
97:21 100:24
116:22 117:22
119:21 126:12
129:23 131:21
133:23
**meaning** 18:14
36:25 50:12
132:19 134:2
**meaningful** 50:25
**means** 45:21,22
46:3 78:23 89:7
**meant** 72:7
**measure** 17:6 30:13
30:17 36:11 47:22
87:16,17 89:8
100:19 101:14
102:12 133:17
**measures** 47:21
127:18
**measuring** 32:9
**mechanical** 67:3
**mechanism** 19:16
20:7 125:20
**media** 11:6
**median** 87:13
100:25
**medications** 5:3
**meetings** 17:18
**meets** 66:13
**memory** 89:20
**mentioned** 25:7
78:9 85:13,25
99:11 103:22
**merely** 72:7
**merger** 79:18



merits 34:11,24
met 5:16 38:15
Methodology 29:22
methods 21:15,16
  67:7
Metrick 7:7 16:9
MicroStrategy
  25:16
Mike 20:16
million 131:20
millions 12:1 62:10
MiMedx 55:2
mind 34:2 53:22
  105:25
mine 64:5 75:18
  115:8
minority 55:6
minus 75:17
minute 113:11
minutes 83:6
  113:11 129:2
misaccounted
  121:10
mischaracterizes
  53:9
misinformation
  122:24
misstated 119:5
  122:13,14 126:1
misstatements
  38:13 119:15
mistake 98:5
mistakenly 62:2
mistrust 121:21
misunderstanding
  40:21
Mitchell 115:8
mix 117:24
model 6:4,5 15:7
  21:11 28:22 36:2
  36:6,8,9,17 38:16
  40:8,9 43:12,13
  55:9,12,13,15
  76:9,16,18 77:9
  77:22 78:6,9 83:1
  98:8,12,14,17,20

99:1,1
modeling 6:2
models 36:20 39:14
  39:25,25 40:2
  99:4
moment 134:21
money 82:6,9
MONT 124:24
Montage 1:6 13:16
  13:19,23 14:1,16
  14:20 37:12,13
  38:9 39:4,18
  47:18 51:10 59:12
  62:14 63:9 67:20
  68:7,19 71:20
  72:17 73:1 75:3
  81:18 82:21 83:4
  92:14 96:3 111:11
  118:5 119:16
  122:15 124:21
  126:16 139:3
Montage's 36:25
  42:9,12,16 60:6
  68:21 72:6 76:23
  77:13 82:12
  128:18
month 30:17
  100:22 112:16
months 11:5,9 47:3
  61:20 104:8,13
  130:3,13,20,23
MONT's 124:23
morning 22:5
  51:15 58:12
  112:13
Moss 2:11 3:5 7:16
  9:1 14:9 15:15
  18:2 21:22,24
  22:18 23:20 26:10
  33:5 39:6,23
  41:12 50:3 51:2
  51:23 53:5,9
  54:10,23 55:20
  57:19 58:18,20
  62:15 65:12 66:22
  67:16 72:22 73:10

74:5 77:15 80:20
  80:22 82:13 83:8
  83:25 85:17 89:13
  89:16,19 90:5,18
  91:18 93:2 94:24
  95:2 96:21 100:7
  104:2 107:1 112:8
  112:21 113:2,18
  120:19 121:23
  123:7 125:18
  126:22,25 130:22
  130:24 132:6,10
  135:14 136:2
  138:6
motion 33:19 35:4
  65:25 66:1,3
motivated 82:9
move 29:11 47:2
  63:16 90:13 105:5
  105:10 115:12,20
  116:23 118:10
moved 60:17 73:21
  107:6,11
movement 100:14
  103:25 105:12
  107:3 114:23,25
  116:3,7,9,13
  118:3
movements 31:7
  63:2 75:1 76:21
  86:5 115:9,14
moves 30:3,4 37:4
  103:5
moving 26:18
  49:22 61:5
Mulcahey 3:14
  14:11,18,19 36:1
  36:5,15 38:1,5,12
  38:15 39:8 42:11
  42:20 43:6 48:15
  48:19 49:4,14
  50:17 52:6 59:8
  62:22 63:9,17
  64:14 65:5 71:24
  82:25 83:22 94:6
  96:7,16 97:10

99:12 102:21
  103:2 107:10,22
  109:12 118:17,22
  119:13 120:2
  134:24 135:9,12
Mulcahey's 36:13
  37:11,19 38:7
  43:13 58:25 60:3
  65:25 66:5,12
  67:20 76:9,17
  78:4,6 98:22
  117:25 118:13
  127:16 135:21
multiple 94:10
  104:5,23 107:3,4
  114:16
multi-day 105:24
  107:13
multi-factor 99:4
mumbled 22:20
MYERS 2:12
myriad 65:3

—————————
                N
—————————
name 4:8
names 25:14
narrow 80:13
NASDAQ 55:19
  56:2,5,10,15
  57:17
natural 11:19
nature 11:6
near 87:22
necessarily 39:21
  86:25 87:1 121:7
  122:1 125:9
necessary 44:10
  52:22 54:4 59:18
  92:22 93:19 110:6
  134:1 138:21
need 15:19,19
  28:19,21,25 31:8
  31:8 53:2 54:3
  85:8 89:13,24
  90:2 114:4,5
  125:23 126:1

needs 41:3 51:10,15
  84:1
negative 9:6 12:17
  13:6 16:19 18:20
  19:25 20:3,5,8
  29:8 30:5,23
  36:24,24 37:11
  47:2,9,10,19
  66:19 70:7 99:3
  102:8 111:19,20
  111:22 112:4
  120:25 121:5
negatively 37:1
  46:21 47:20 50:23
neighborhood
  131:23
Neither 88:15
net 13:2,4
never 24:15 27:1
  34:25 35:5 39:15
  39:16 51:23 56:4
  56:7 91:1,2 92:19
  99:19
new 2:6,15 6:12
  9:22 10:17 11:6
  15:22 29:1 31:20
  39:9,19,21 40:9
  41:7,19 44:2 46:8
  49:19 50:8,10,21
  60:16 62:18 63:6
  63:12,14 73:15
  84:9,19 85:3,9
  87:1 90:14 91:25
  104:22 106:16,25
  115:19 117:11,17
newly 15:5
news 10:15 11:17
  11:20,21 12:3
  26:19 29:7,19,20
  30:3,4,6,7,7,10
  32:4,5,11,12 40:3
  40:11 41:2 46:20
  46:20 50:23 60:3
  61:5,11 62:6,17
  62:18 63:10,14
  83:21,23,24 84:2



84:9,10 85:3,5,5
86:13,21,22,23,23
86:24 88:4 90:13
92:18,20 93:22,24
94:4,11,17 95:3
95:16 96:3,6,8
97:23 103:17,24
104:5,17 105:8,14
105:20,23,23
106:16,25 107:5,8
114:16 115:1,4,7
115:9,11,22 116:2
116:8,12,15,21
117:8 132:22,25
133:7
**NII** 55:4
**nine** 24:6
**noise** 38:21 72:11
72:16
**nominal** 77:4,16,19
78:2
**nonpublic** 7:14
**non-earnings** 99:22
**non-IPOs** 70:20
**non-news** 60:4
83:21 92:21 94:17
133:7
**normal** 57:3,11
106:24 109:8
**normality** 109:2
**NORTHERN** 1:2
**notarial** 137:18
**Notary** 4:3 137:5
139:22
**notations** 138:19
**note** 31:16 65:1
102:19
**notice** 37:8
**notion** 9:18 31:25
32:3 39:10 65:17
67:24
**November** 79:19
80:1 117:6
**NPV** 20:22
**number** 3:8 4:15,15
6:14 7:2,19 8:20

9:11 10:24 17:17
21:8 25:5 26:2,8
27:1,2,12 28:1
34:14 36:3 39:12
42:19 45:7 53:23
54:6 55:14 57:2
57:25 58:3 59:15
60:7,15 62:19
63:7 69:11 73:19
78:6,9 82:21 96:4
96:7,9,10,12
98:23,24 107:21
108:7,8,15,18
127:7 129:20,22
**numbers** 30:19,19
56:15 109:19
**numerous** 34:12
66:8 84:21 88:12
89:3 90:25 93:24
**NY** 2:6,15
**NYSE** 57:9,17

**O**

**oath** 4:23 139:13
**Object** 39:23 53:5
125:18
**objection** 7:16 9:1
14:9 15:15 21:22
22:18 26:10 33:5
39:6 41:12 50:3
51:2,23 53:9
54:10 55:20 57:19
62:15 65:12 66:22
67:16 72:22 73:10
77:15 80:20 82:13
83:25 90:18 91:18
96:21 100:7 104:2
107:1 112:8 113:2
120:19 121:23
123:7 126:22,25
**objectively** 85:15
**observation** 109:11
**observing** 85:6
**October** 75:15,22
75:24,25 76:24
77:14 79:19 80:1

80:1
**odd** 37:2
**offer** 25:9 26:4 37:9
37:10 139:12
**offered** 25:11 58:1
58:4,7,10 80:19
81:16 93:8
**offering** 7:3 14:2
35:22 43:11 74:7
74:23 78:14 79:2
**offerings** 7:2 12:8
12:16 13:21 55:24
55:24 70:7
**officers** 126:12
**official** 130:11
**oh** 75:25 84:9 86:22
**okay** 5:9 6:8,12
7:12 10:8 14:22
15:23 18:3 21:5
21:21 22:8,17
24:25 26:5 28:12
31:13 32:20 33:3
33:14,18 38:2,23
40:14 42:7 43:15
44:12,23 45:11
48:7 54:8,19 55:1
57:22 58:20,22
60:22 62:13 63:18
66:18 70:23 71:17
72:10,18 74:1
75:20 76:5 83:5
84:14 87:19 92:15
93:12,22 94:18
96:14 97:10
104:10 107:5
115:2 117:5 119:6
123:17 129:21
130:7 131:7,24
132:4,6,7 134:6
**old** 10:15 12:3 41:2
61:5,11,22 62:11
62:13,25 85:4
**omissions** 84:4 86:2
**once** 112:11
**ones** 22:8,10 25:15
84:18,19 95:4

**open** 8:4
**operate** 18:15
81:14 120:21
**operates** 19:16
**operating** 25:25
**opine** 24:14 25:6,13
28:13 42:8,10
66:4 78:2 128:14
**opined** 26:6,14
106:3,5
**opinion** 25:10,21
25:23 26:4,11
34:13 37:10 43:11
135:2
**opinions** 35:22
66:12,23 81:16
**opportunities**
45:22
**opportunity** 18:19
43:4 89:14
**opposed** 104:13
118:16 119:25
**opposing** 55:13
**opposite** 26:19 37:5
135:11
**optimistic** 69:24
**order** 59:11 60:8
117:22 118:8
119:23
**organization** 6:17
**original** 3:24,24
138:5,10,11
**outcome** 137:15
**outlier** 108:8,23
109:7,15
**outlined** 22:4
**outside** 16:6,8 18:8
18:11,24 19:3
27:4
**overall** 24:1
**overly** 69:24
**overreact** 46:5 47:8
**overreaction** 46:17
47:10
**overstated** 118:16
119:3 120:1,6

121:25 122:1,12
122:25 123:4,12
123:16 125:3,13
125:15,21 128:5
**overstatement**
118:25 125:11,24
126:2 128:22
**overvalued** 9:8
12:18 70:16,21
71:16
**overwhelming**
124:24
**ownership** 72:8
95:19 126:11
**o'clock** 105:7,9
106:6
**O'Melveny** 2:12
32:20,22,24 33:4
33:7,11

**P**

**page** 3:3,8 45:2,9
45:10 48:13,21
87:23 90:10,23
91:21 95:14 118:5
124:19,20 132:16
132:18 133:16,19
139:2 140:2,5,8
140:11,14,17,20
**pages** 45:5,6,7
94:24
**paging** 45:8
**paid** 32:16,22
131:13
**pains** 139:14
**Palm-3Com** 67:17
**paper** 6:1,1,10 7:22
9:2,12 11:3,12
12:2 17:5,16,20
19:24 29:18,21
31:21 47:9 56:7
61:9,13,21,24
62:8 70:5,11,17
71:5 76:16 78:20
79:10,11 88:12,15
88:20 91:8 115:8



papers 7:2,19 8:11
  8:20 9:12 10:25
  11:16 12:20,23,23
  13:9 21:10,11
  28:2 55:23 69:6
  69:11,22 100:16
  104:20
paragraph 45:1,9
  45:10 48:24 49:1
  49:5 58:16 68:3
  74:1,5,6 78:12
  88:1 90:5 91:13
  91:19 92:8,9
  102:16 103:19
  113:18,19 124:21
parity 27:7 28:1
  43:24 44:8 54:1
part 20:4 122:12
  125:25
particular 10:3
  13:18 30:2 31:1
  31:10 42:4 48:4
  51:11,12 58:15
  61:16 63:22 79:6
  84:8,11 85:21
  92:14 95:3 107:20
  108:19,21,22
  115:1 119:22
particularly 70:10
parties 127:9
  137:14
partners 8:5
party 118:19
  119:13,25 123:14
  125:1,21 126:3,17
  126:20 127:13
  138:9
pass 88:21,22
passes 89:1
passing 59:21 90:8
Patel 104:20
pathologies 6:25
  7:3 10:10 13:13
  13:18
pathology 10:11
  12:5 13:15

pattern 61:4 71:5
  71:10,13
patterns 14:4 15:4
Paul 1:10 3:2,11,22
  4:1 137:8 139:5,6
  139:17 140:24
pause 17:10
payment 32:20,25
  33:2
pays 81:4
peaks 8:14
peer 88:13,16 91:1
  93:16
peer-reviewed
  66:14
penalties 139:14
pent-up 47:12,12
people 17:2 80:17
  116:8 121:21
  128:16 130:16
perceived 120:25
percent 8:18 23:17
  23:21,24,25 24:3
  39:16 40:3 53:7
  60:9,11 64:16
  74:15 77:4,19
  88:23 103:4 112:4
  122:22,23,23
  128:17,24,25,25
percentage 23:9
percentages 20:18
perfect 39:25,25
  40:2
perfectly 39:5,12
perform 5:23 18:16
  70:10 93:18,19
  105:1
performance 6:19
  7:11 17:7 19:25
  20:5 70:15 71:8
  104:12,13
performed 52:2
  53:1 54:8 93:12
  93:15 104:25
period 12:9,11
  13:16,19,24 14:2

38:10 39:5 41:21
  41:23 42:2,5,14
  53:13 54:7 56:12
  57:3,4,8,11 64:20
  71:14 73:20,25
  74:4 75:4 76:4
  77:2,6 79:14 80:5
  82:12,16,17 86:7
  94:20 96:11 98:1
  105:24,25 106:1
  107:13,23 108:4
  112:6,17,18 113:8
  130:5
periods 56:13,14
  57:20,21 64:24
  70:19 71:15
perjury 35:11
  139:14
perspective 14:15
  19:20,22 31:17
  51:1 65:22 66:21
  67:6,25 69:9,10
  106:13 118:20
  121:1 125:22
  127:11 135:1,4,10
pertains 122:11
Pfizer 34:9
pharmaceutical
  57:8
Pharmaceuticals
  34:1,4
phase 34:12 35:23
phrases 11:24
Ph.D 1:10 3:2,11,22
  4:1 5:9,11,13,16
  5:19 21:14,16
  137:8 139:5,6,17
  140:24
pick 30:9 84:1
  85:16
picking 86:21
piece 30:6 42:4
  51:12 53:15 58:10
  63:12 84:9 85:5
  86:20 104:5 105:4
  105:8,14 107:5,8

pieces 33:23 107:4
  114:16
pills 19:2
place 82:18 90:22
plaintiff 24:13,18
  24:19 25:10 28:12
  34:10,19 43:21
  58:1,4
plaintiffs 2:2 3:17
  4:9 24:23 25:3,8
Plaintiff's 44:13
please 4:20 138:16
  138:21 139:2
plus 5:13
PLYMOUTH
  137:3
point 8:8 15:9
  55:19 62:18 71:23
  82:20 112:25
  117:16,25 118:14
pointed 56:3
  133:15
points 10:7 43:7
poison 19:2
policy 9:13
poor 19:13,14 20:7
  70:3,14 120:17
poorly 70:10
poorly-governed
  20:2,6
popular 11:6
portion 23:18,20,22
  55:18 56:9
posed 14:24
position 8:24 28:4,6
  119:10
positive 16:17
  20:22 30:3,21
  47:1,11,19 73:8
  74:12,15,20 77:14
  77:20,21,24 102:7
  111:15,16,23
  112:4
positively 46:20
  47:20 50:22
positives 59:23

85:1 89:4
possibility 124:9,12
  125:12
possible 9:24 15:20
  40:24 64:17,21
  87:3 101:21,24
  102:10 111:6
  120:24 121:1
possibly 72:11
post 7:22 80:5
  82:12
post-earnings
  46:25 55:25
  104:11
post-IPO 104:12
potential 127:5
  128:4
potentially 37:13
  56:21 65:14
  122:11,25
power 16:16,18
  98:16 99:6
powerful 17:7
power-sharing
  16:12 18:7,23
  19:7,9
practical 46:12
practice 17:22
pre 7:21
preceding 132:20
precise 129:20,22
predict 17:7 110:18
  110:24
predictability
  74:21
predictable 12:10
predicted 109:25
  110:3
predicter 13:5
predicting 40:2
prediction 32:11
  111:2,3 114:4,5
predicts 13:3
predisposed 20:13
predisposition
  20:11



**prepared** 127:19
127:22
**preparing** 35:14,25
38:3 98:21 129:18
**preponderance**
59:3
**presence** 72:16
73:17
**present** 2:19 14:5
**presented** 36:17
**press** 94:2,9,12
96:1 123:10
**pretty** 30:8 101:19
102:5
**previously** 61:6
**pre-public** 8:1
78:14
**price** 8:15,18 9:9
10:19,22 11:1,10
12:10,12 15:17
20:2 28:2,6 29:3
29:11,12 30:22
31:1,6,11 32:1,2
32:12,13 38:13
40:12 44:6,24
46:8 47:16,25
48:3,4 49:7,10
50:17 51:5,11,12
53:21 54:17,20
60:3 61:8 62:5
63:1,1,16 64:10
69:24 72:20 74:12
74:18,22 75:1,23
76:7,11,21 77:13
79:4,9 80:8,12,14
80:19,23 81:8,16
85:7,23 86:5
88:23,25 92:6,13
92:20 97:4,25
100:17 101:9,11
101:17,18 102:9
102:14,20 103:4
103:12,13 104:4
105:1,5,6,17,22
105:18,21,23
106:10,17 107:2,6

107:8,12 110:9,22
112:14 113:25
114:13,13,17,23
114:25 115:9,14
116:2,7,8,12,21
116:22 117:9
118:3,4,5,9,25
119:1,8,12,14,19
119:23 120:7,12
121:5,13,22
122:17 123:1,6
125:9,22,23 126:2
127:10,11,15,17
127:18 128:8,19
132:22,24 133:6
**priced** 27:18
**prices** 29:8,9,20,21
30:3,5 32:4,5
45:14 47:20 49:24
50:12,12 64:20
104:21 112:13
115:12 121:16
**primarily** 7:14
20:11 24:2 123:14
**primary** 19:16 58:9
94:6
**prime** 70:8
**principes** 55:15
**principles** 6:3
120:4,6,10,14
121:19 127:25
**print** 124:20
**prior** 37:8 78:23
100:19,22
**priority** 99:25
**private** 6:11,17,18
6:19 7:13,18,21
7:23,25 8:2,13,16
8:23 9:4 81:6,12
81:24 82:8
**probability** 80:25
112:14
**probably** 4:14
14:11 23:11,16
24:3 33:7,16
35:17 47:21 56:13

79:16 129:17,23
130:17 131:2,3,16
**problem** 40:4
**problems** 34:13,15
34:16 76:15
107:21
**produce** 37:22
**produced** 37:20,23
**production** 4:2
38:1
**professes** 71:2
**Professional** 137:5
**professor** 6:13,13
11:14 34:12,21
**proffered** 14:18
**profit** 45:22
**profitable** 7:17
110:22,25 111:8
112:24
**profits** 81:14
**program** 5:12,14
**projects** 20:21
**promulgates** 46:7
**Proof** 3:17
**propensity** 69:4
**proper** 99:9 107:24
108:18
**properly** 14:19
42:19 43:5 45:13
52:16,19,24 65:7
73:3 77:22
**proportion** 57:17
**propose** 47:17
**proposed** 38:10
42:13 51:9 73:20
84:17 102:21
108:4
**protected** 18:10
**prove** 59:21
**proven** 122:20
**provide** 63:6 66:8
66:11,11 67:4
95:6 98:16 123:4
**provided** 26:2 38:6
38:7,12 39:8,17
42:11

**provides** 14:20
**provision** 16:16
**provisions** 16:12
**proximate** 116:20
**public** 4:3 6:9,25
7:2,3,10,19 8:1,8
8:14,22 10:10,11
10:20 11:17 12:8
12:16,21 13:13,13
13:21 14:2 15:5
16:10 17:8 49:6
49:19,20 55:24
70:7 74:7 75:7,13
78:13 94:9 96:1
110:8,10 137:5
139:22
**publication** 61:5
**publicly** 45:15
**publicly-available**
44:25
**published** 11:5,9,20
11:21 21:5,10
88:17
**purported** 53:13
**purposes** 43:10
46:18 55:11 76:17
92:3
**put** 45:18 63:24
65:2,2 66:13
82:18 96:6 117:14
130:4
**puts** 28:5 42:20
45:20
**put-call** 27:7 28:1
43:24 44:8 54:1
**put-calls** 28:3
**puzzled** 36:11
**P.A** 2:4
**p.m** 136:3

**Q**

**qualified** 137:6
**quantitate** 30:19
**quantitative** 95:20
**quantitatively**
47:22

**quarterly** 86:24,25
**question** 4:20 15:3
15:8 18:2 19:11
22:19,23 31:12
39:17 49:11 57:13
69:18 88:3,4
100:8 107:15
117:12 125:22
127:10 135:16
**questions** 132:5,14
134:9 135:15
**quickly** 45:21 49:7
102:24
**quiet** 12:9,11 13:18
74:4 75:4 76:3
82:16
**quite** 13:11 16:24
16:24 17:7 104:21
114:6
**quotations** 45:18

**R**

**R** 137:1
**raised** 117:7
**raises** 14:7
**Randy** 12:24
**range** 24:11 131:2
**rapidly** 9:23 10:18
15:17 31:19 39:9
39:18 41:19 44:5
45:14 49:18 50:10
51:4 64:19 73:14
104:22 105:15
110:8
**rare** 58:13 62:12
**rate** 27:21 40:7
54:1
**rating** 117:7
**ratio** 64:6,12 68:22
68:22 69:1,13,16
**rationale** 123:5
**ratios** 68:11,16
**reach** 68:6
**reached** 25:2
**react** 12:5 40:25
41:1 47:20 50:21



50:22 85:4 104:21
114:18
**reacting** 10:14 41:6
41:9,10,16 50:7
61:11
**reaction** 12:3 15:21
20:2,4 28:19
29:15,15 32:1,2
40:13 46:8,15
48:3,5 49:23
51:12 60:3 61:8
62:11,13 74:12
76:11 85:7 88:24
92:7,13,20 101:9
102:14 103:4,7,12
104:23 105:1,3,23
106:7,11,17 107:8
113:25 127:18,20
127:23 133:7,18
134:4
**reactions** 29:3,5,12
31:2,11 47:25
50:17 53:21 74:18
74:22 80:8 85:23
97:5,25 100:17
101:17,18 103:13
103:21
**reacts** 88:24 104:4
104:5 105:21
132:22
**read** 10:18 30:10
37:15,18,20,23
38:21,22 49:3
66:2,3 84:8 94:22
124:7 139:7
**reading** 84:18
128:1 138:15
**realized** 99:15
**really** 17:5 31:13
36:4 40:20 57:2
63:22 77:23 80:17
80:18 92:8 98:2
125:14 128:9
**reason** 4:25 5:6
34:8 40:4 47:11
63:24 65:2,2

76:12 77:13 89:10
89:11 90:17,21
91:13,15 115:6
120:11 126:18
127:3 140:4,7,10
140:13,16,19,22
**reasonable** 73:19
102:12 131:3
**reasonably** 84:2
**reasons** 35:10
127:7 138:17
**rebate** 27:21 54:1
**rebuttal** 24:2 25:8
25:9,20 34:11,20
57:24,25
**recall** 25:14 35:6,8
97:16 132:13
134:8,17
**received** 5:9,11
**Recess** 43:17 83:10
113:13 129:3
132:3
**recognize** 44:17
48:16 83:15 93:5
123:22
**recollection** 54:25
97:17
**recommendations**
74:15
**reconsider** 42:19
**record** 4:22 17:13
17:15 38:22 43:16
49:3,13 54:23
83:8,9 100:9
117:2,3 131:25
132:2,4 137:11
138:9 139:9
**red** 14:7
**redoing** 58:5
**reduce** 60:8
**refer** 44:23 45:7
68:3 87:19 90:16
90:20 91:8,9
138:22 139:2
**reference** 72:7
103:19

**referred** 68:3 88:8
**referring** 89:25
91:12 93:10
**refers** 89:6
**reflect** 45:15 50:12
**reflecting** 44:24
**refresh** 54:24 97:17
**regard** 25:9 133:24
**regarding** 54:16
**regardless** 134:3,4
**Regev** 11:4,11 57:5
61:9,12
**Registered** 137:4
**regression** 15:7
28:22 36:6,8,20
43:12,13 55:9,15
76:9,18 83:1
**regressions** 98:23
**regularity** 101:20
**regulations** 75:8
**regurgitation** 61:19
**relate** 19:7 119:3
**related** 7:10 17:1,3
37:1 81:4 82:11
95:18,19 118:18
119:12,25 123:14
125:1,8,21 126:3
126:16,17,20
127:8,13 137:13
**related-party** 118:6
118:17,24 119:8
119:16,17 120:11
120:16,24 121:25
122:2,4,6,14
125:6,7 126:4,19
127:4 128:7,11
**relates** 12:7 15:2
65:15
**relating** 133:14
**relation** 16:25
**relationship** 16:6
16:12 28:2 31:6
63:19 102:22
122:15
**relative** 9:14,16,17
29:24 30:2,18

42:3 64:9 67:19
68:11 96:4,12
99:16 105:10
108:3 111:3
**relatively** 13:7
20:18 33:12 57:3
57:7,11 96:7
**released** 10:23
15:18 73:22 85:9
118:9
**releases** 94:2,12
**relevance** 65:11,13
**relevant** 9:22 10:17
14:2 15:22 29:1
31:20 39:10,19,22
40:10 41:20 44:2
46:9 49:20 50:2
50:11 60:16 73:15
85:9 86:7 87:1
90:14 91:25 92:9
92:11 115:1
117:11,18,23
126:15
**reliable** 66:6
**remaining** 108:13
**remember** 55:2,4
61:25 62:20 133:5
**repeated** 10:19
103:25
**repetition** 10:15,20
10:21,25 11:4
41:1 61:6 85:4
**rephrase** 51:25
**replete** 46:21
**report** 3:10,13,21
11:2 22:25 28:21
32:18 34:13 35:15
35:24 36:13 37:7
37:9,9,23 38:3,7
43:9,11 44:21,22
44:23 45:6 48:15
48:19 52:5,9
54:24 55:11 58:16
58:17,25 59:8
60:14,20 62:21,24
63:7,25 66:5,12

66:20 76:1,14,17
83:19 84:14,23
86:21,23,24,25
87:21 89:5,16
90:1,6 91:16 93:8
102:16,21 117:7
117:17 118:16
122:11 123:3,10
123:11,17,25
124:3,9,15,20
125:19 126:7,9,10
127:12,17 128:4
128:16 129:17,24
130:5 134:9,20
**reported** 121:21
124:24
**Reporter** 1:18
137:5
**reporters** 115:13
**reports** 12:11 34:14
37:19 55:5 63:6
74:8,10,11,19,19
94:5,6,7,9,12,19
94:19 95:5,8,9,10
95:11,12,15,21,22
95:24 96:9,20
97:7
**represent** 4:9
**representation**
39:15 80:4
**represented** 56:2
**republication** 12:6
61:22 62:6,25
**republished** 62:2
**requested** 58:21
**require** 32:9 48:4
50:17 78:14 85:2
**required** 52:18
59:11 63:8
**requirement** 63:17
110:5
**requirements** 5:16
**requires** 21:19 32:2
32:3 51:11 114:21
**requiring** 3:16 92:6
92:12



MAGNA
LEGAL SERVICES

research 1:15 3:23
5:18 6:7,8,12,15
6:17,24 7:6 21:19
22:4,7,11,13,16
46:4 55:21 62:21
63:6 67:6 74:10
74:11 95:24
researchers 16:24
residual 40:1 77:16
77:24 78:3
residuals 40:8
43:13 109:2
resigning 86:11
respect 9:20 15:12
39:2 40:17,18
63:19 64:18 67:11
73:6
respond 9:23 91:23
responds 88:3
response 34:14
88:5 92:4
restatements
121:12,16
restricted 74:8
restrictions 75:9
78:15,21
result 27:20 73:9
76:13 108:23
results 11:5 17:19
97:22 106:22
retained 3:25 25:7
retention 130:11
return 9:7 12:16
28:23 36:25 70:6
76:23 77:4,14,17
77:19 78:2,3,4
110:3 111:16,17
111:19,22,23
returns 13:3,6 17:2
40:1,8 69:19 70:2
106:24 109:25
110:1,4,11,12,19
110:19,24,25
112:11
revelation 119:15
120:12 121:6

126:3 127:18
revenue 31:3 81:9
81:18 101:3
118:20,24 119:3
120:1,5 122:6,11
122:17 123:12
124:5,9,12,14,16
124:17 125:2,8,11
125:12,15,16,20
125:24 126:2,5,16
126:21 127:5,14
128:5,10,21,23
129:1
revenues 118:16
120:7 121:8,21,25
122:1,5,7,25
123:4,16 124:3,23
128:16,17
reverse 62:23
103:15 113:21,23
114:8 115:2,16,22
reversed 113:4
116:7
review 83:18 88:17
reviewed 88:13,16
91:1 93:16 94:22
134:19
reviewing 44:18
45:3 48:11,25
54:22 76:8 87:24
90:7 94:23 97:19
124:18
revised 34:14
revision 86:14
revisions 42:1 84:4
re-disseminated
62:5
re-purpose 63:3
right 24:1 32:10
37:18 40:1,21
49:24 50:12,18
51:19 59:25 60:24
75:15 77:10 79:2
79:2,22,25 80:3
80:21 83:11 85:16
87:5 91:7 92:2,8

93:1 97:20 103:24
112:25 123:3
125:16 126:19
128:12 130:4
135:14 136:1
rights 16:8 18:8
right-hand 77:20
risk 12:15
risk-adjusted 9:7
47:4 69:19 70:2,6
71:8
Ritter 12:15 70:5
82:22
Ritter's 71:11
Roll 28:17
Rosemary 1:18
137:4,21
Rosen 2:4 4:9
rough 129:13
131:18
Royal 63:20,25
64:8,15,18
RPR 1:18 137:21
rule 111:25
rules 4:17 18:8,23
19:7,9
runs 19:12
R-squared 36:10
98:15,18,20,25
R-squares 36:21

S

SAC 34:3
Sachs 54:14,14,17
sale 78:15
sales 120:23
sample 107:17
109:16
satisfactorily 4:2
save 139:10
saw 60:25 103:24
103:25 105:6,11
114:23
saying 10:9 32:10
51:21 59:1 68:25
86:22 96:18 100:3

100:12,14 108:24
116:9 117:10
119:13 132:24
133:8
says 32:10 41:18
50:9,12 59:1
64:10 88:2 89:25
109:24 110:3
111:15 125:20
132:19
schemes 122:6
School 71:6
scientific 66:17,23
67:6
scientifically 66:5
scope 24:1
scratch 22:23
scrutiny 14:8 91:2
se 14:6
seal 137:18
search 84:2
seasoned 55:24
SEC 75:8 95:18
second 6:23 7:4
10:9 17:10 38:11
48:23 49:17 60:5
78:11 88:1 94:3
103:17 107:7,8
132:1
secretary 32:16
section 21:12,12
94:22 120:5
securities 1:7 6:9
6:22 7:15 8:17
23:7,14,15 25:17
46:19 54:14 78:16
78:16,17 106:4
114:11 130:13
131:8,13,16 139:4
security 13:14
19:10 23:10 25:12
31:4 34:9 58:15
59:20 80:12 84:4
130:24,25
see 15:21 27:21
29:11 40:12 48:23

49:1,1 58:24
62:13 71:19,20
72:13,14 80:7
83:23 86:5 87:25
88:1 96:5 97:18
102:6,7 105:4,21
105:22 107:5,7
114:17 115:4
116:1,3 128:22
130:10 133:1
seeing 135:4
seen 55:22,23 56:4
56:7 82:7 113:21
self-dealing 18:19
sell 8:3 78:16,24
sellers 13:4
semiconductor
36:22,24 37:2,4,5
37:12 98:24
seminal 29:21
31:20
semi-strong 110:6
110:7,13,15
sense 9:7 10:8
sentence 48:23 49:1
50:11,11 132:20
sentences 50:9
132:18 133:23
separate 109:10
118:24 122:3,8
125:23
separated 96:17
separates 68:12
September 43:3
75:13,16 79:17
serial 43:1 60:6
series 13:9
serious 128:9
seriously 126:6
set 12:20 60:20
69:5 72:4 85:15
85:16 86:17 137:9
137:17
seven 103:3,7,11,20
share 18:25 21:4
95:19 101:7,8,10



101:11
**shareholder** 16:18
18:24
**shareholders** 16:7
16:8,13,16,19
18:8,13,16,23
19:8,18 20:9 21:2
78:15
**shares** 7:24 8:4,10
8:19 64:5
**sheet** 138:1,4,5,7,18
138:22 139:1,11
140:1
**sheets** 138:21
**Shell** 63:20,25 64:9
64:15,18
**Shenzhen** 82:4
**shielded** 19:17
**Shleifer** 69:21
**shocked** 36:12
**short** 27:10,14,15
27:17,19,22,24
43:17 44:8 54:1
78:17 106:1
111:20,24 112:2,3
113:13 129:3
132:3
**shortcomings** 78:9
**shorting** 27:8,13
43:25
**show** 8:15 16:23
17:3,5 19:25 28:6
34:23 37:11 52:18
59:23 72:7 73:17
88:7 90:13 92:17
108:9 127:17
132:21
**showed** 12:15
25:24 47:9 53:2
71:10 73:8 104:21
118:23
**showing** 38:15
90:13
**shown** 10:25 27:24
28:11 31:6 46:4
51:10 69:4 102:11

**shows** 8:13 9:3
17:24 27:9 30:25
36:3 52:7 70:12
90:8 91:22 105:18
**sic** 51:3 60:25 84:10
106:14 124:22
**side** 24:17 47:10
135:23
**sign** 138:19
**SIGNATURE**
138:2 139:1
140:23
**signed** 138:8
139:14
**significance** 109:22
111:2 133:9 135:8
**significant** 8:15 9:9
11:10 20:3 26:21
27:9 29:3 55:6
57:17 60:2,10,11
60:17 61:8 74:13
74:17 75:1,23
76:11 77:8,25
79:3,9 80:7 83:20
85:7,23 86:5
92:19,20 94:16
97:4,25 99:4
101:9,12 103:4,11
103:13,16 108:16
111:13 123:6
132:20,23 133:6
**significantly** 26:19
63:16 69:1 124:23
**silent** 16:20
**similar** 55:10 74:23
**similarly** 9:9 27:25
30:22 70:14 86:13
114:22
**simple** 16:14 77:10
**simply** 61:19 62:24
72:7
**single** 26:7 33:12
52:14 61:15 64:13
88:14 98:14,17,25
99:1
**sit** 30:10

**sitting** 76:22 77:12
135:24
**situation** 79:5
106:22
**size** 20:22,25 21:3
32:3,10,10 48:2,3
48:5 50:18 51:11
92:6,14 107:17
111:1
**slate** 19:1
**slightly** 40:14
**small** 20:18 25:5
33:12 36:18,18
48:1 53:23 69:3,3
69:8 70:8,12,13
70:15,20 71:15
96:7,8,10 107:18
108:6,7,15,17
109:18
**smaller** 88:25
101:16,17 108:12
**sold** 34:3
**solved** 34:15
**somebody** 62:2
**somewhat** 103:15
**sophisticated** 81:6
**sorry** 21:6 22:18
38:19 48:16 74:6
84:15 85:17 92:10
100:10 113:19
123:21
**sort** 5:23 11:23
15:12 19:11 20:15
22:3,4,7 23:12,25
24:21 36:11,22
56:14 62:4 63:22
67:13 70:16 80:13
80:17 84:7 94:4
95:20 96:5 103:8
106:22 109:14
119:18 121:4,22
127:22 131:8
**sought** 14:14
**sound** 75:15,17
79:21
**sounds** 24:1,5

70:23 79:25 80:3
**so-called** 95:20
**spawned** 17:16
**specialization**
21:17
**specific** 10:6,6,6,7
13:15 26:11 41:24
91:8 92:6 117:5
**specifically** 66:4
**specified** 52:16,24
65:7 73:3 77:22
**speed** 102:14,20,21
104:3,15 105:1,3
105:13,16,17
106:18,19
**spent** 35:14 129:11
**splits** 28:19 86:1
**spoken** 17:17
**spread** 60:19 65:14
**spreadsheet** 35:20
36:3 129:12
**Square** 2:13,14
**St** 83:18
**stage** 24:3,22
**staggered** 19:2
**stake** 34:3
**standard** 28:15
52:10,12
**standards** 66:14
**started** 6:16
**starting** 104:19
**starts** 60:11
**state** 34:2 77:11
82:23 102:15
**stated** 32:2 50:14
98:7
**statement** 10:4
49:13
**states** 1:1 45:21
110:8
**stating** 55:12
**statistical** 40:5,15
40:20 133:9 135:7
**statistically** 26:18
26:21 29:3 60:2
60:17 61:7 74:13

74:17 75:1,23
76:10 77:8,25
79:3,8 80:7 83:20
85:6,23 86:4
92:19 94:16 97:4
97:25 101:9,12
103:3,11,13,16
132:19,23 133:6
**steady** 105:11
**Stein** 47:8
**step** 88:6,11
**steps** 91:20
**Stern** 2:3 3:4,25 4:7
4:8 17:14 18:4
22:1,21 23:22
26:13 38:19,23,24
43:18 44:13,16
45:4 48:8,12
51:25 52:1 53:6
55:1 58:19,23
73:11 74:6 83:6
83:11,14 89:15,18
89:21,22 90:19
93:4 95:7 100:10
100:11 112:22
113:10,14,19
117:2,4 123:20
126:23 127:2
129:2,4 130:23,25
131:25 132:4,7,14
133:13,15 135:16
135:19 136:1
138:10
**Stifel** 117:7
**stock** 7:11 8:3,15
8:18 9:9 10:19,22
11:1,10 12:10,12
13:4,16,23 14:16
14:20,23,24 15:1
15:8,17 17:2 20:2
27:13,22 28:3,6,7
28:13,19,23 29:3
29:8,9,11,12,20
29:20 30:3,4,22
31:1,6,11 32:1,2,4
32:5,12,13 39:4



39:18 40:12,25
42:9,13,16 44:6
44:24 46:8,14
47:16,20,25 48:3
48:4 49:7,9 51:5
51:11 53:4 57:22
60:3,6,17 61:5,8
61:11 62:5 63:1,1
63:16,20 64:1,20
68:7,23,24 70:9
71:21 72:6,20,21
73:6,7,25 74:12
74:17,21 75:1
76:7,11,23 77:13
78:2 79:4,9 81:4
82:12,21 85:7,11
85:23 86:1,2,5
88:3,7,23,25 92:6
92:13,20 97:4,25
100:17 101:9,11
101:13,17,18
102:8,8,20,24
103:4,6,12,13
104:4,21 105:2,5
105:6,6,7,9,11,18
105:21,23 106:10
107:2,6,7,12
109:25 110:9,22
111:18,20,22,24
112:11,13,19
113:25 114:12,13
114:17,23,24
115:9,12,14 116:2
116:7,8,12,21,22
117:9 118:3,6,9
118:25 119:1,19
119:23 120:7,12
121:5,12,16 123:1
123:6 125:9 128:8
128:18 132:21,24
133:6
**stocks** 11:17 12:5
15:5 26:18 27:10
27:18,23,25 31:19
46:20,25 49:22
50:7 55:19 56:1,5

56:9,15,16 57:2,8
57:10,11,17 62:10
64:1 67:18,20
68:4,10,10,16,18
68:20 69:3,8,18
69:25 70:12,13,15
70:20 71:16 74:2
90:12,13 91:23,25
**stop** 13:11
**stopped** 112:25
**stories** 11:17,20
94:11 96:4,8
115:11 116:15
**story** 11:21 41:2
86:21 104:17
116:22
**strategy** 110:23
111:1,7,10 112:5
112:24 113:6
**Street** 1:16
**Strike** 119:6
**stringent** 106:9
**strings** 11:24
**strong** 11:12 13:3
16:25,25 37:6
73:8 79:11
**stronger** 53:14
**strongly** 17:1
**structure** 126:11
**structured** 52:19
**students** 21:17
**student-run** 88:17
**studies** 54:14
**study** 15:7 28:16,17
28:20 29:21 37:19
43:8,22 44:4,10
45:14 52:16,20,22
52:24 53:2 54:4,5
54:9,20 55:7,9,10
55:16 57:15 58:11
62:23 65:7 66:25
67:1 73:3,5,8,16
73:18 82:15 84:11
84:17 85:2 95:9
96:20 98:11 99:9
99:12,13 103:15

104:25 108:18
113:15,21,23
114:8 115:2,17
**studying** 46:13
**subject** 13:16 33:18
35:3 75:3 91:2
**subjectively** 84:8
**submit** 32:19
**submitted** 22:22,24
32:15 34:14 129:7
129:24
**Subscribed** 139:19
**subsequent** 9:6
47:3 61:7 70:11
88:12 112:9
123:10
**subsets** 94:13
**substantially** 12:16
18:16 62:6 70:7
108:12 125:3
**subtle** 26:1
**successful** 112:15
**sufficient** 38:8
42:11 52:15,23,25
53:22 54:6 58:7
59:19 88:6 92:22
93:20 110:7
118:11
**sufficiently** 106:1
**suggesting** 14:23
**summary** 59:8 98:3
**supplied** 138:18
**support** 26:3
**supporting** 67:24
**supportive** 54:3
73:23,24
**sure** 13:20 17:12
24:12 43:2,3,4
84:21 98:6 100:9
113:12 120:11
129:15 131:3
**surmise** 99:2
**surprise** 30:21,23
40:25 47:23,25
48:2 99:14,17
100:4 101:4,15,18

109:3,5,6
**surprises** 30:12
47:1,2,5 48:1
85:25 95:12
101:16 102:7,8
107:25
**sworn** 4:3 137:10
139:19
**Sycamore** 25:17
**synthetic** 28:4,5
**systematic** 12:2,10
12:12 14:3 31:6
56:3 57:1 61:4,10
71:4,13 74:12
**systematically**
12:17 31:1 69:12
82:24
**systemic** 15:4
**S&P** 36:18
**S1** 79:2

**T**

**T** 137:1,1
**Tabak** 59:18 88:15
90:4
**tabulate** 37:21 56:4
78:21
**tabulated** 55:22
68:9
**tabulates** 65:6
**tabulating** 67:25
**tabulation** 67:2,2
**tail** 77:20
**tails** 112:3,4
**take** 6:20 7:12,21
13:24 18:12 45:2
62:25 80:4 83:6
89:15,23 93:1
104:18 108:9,11
113:11 119:10
123:17 125:14
130:16 132:11
**taken** 10:25 21:8
62:16,17 66:24
83:1,2 109:13
126:5 128:10

**takes** 104:6
**talk** 12:9 13:20
42:22 43:2,3 52:4
59:22 60:14 71:17
72:10 74:1 76:14
78:11 84:23 89:4
91:21 94:18 99:7
118:4 120:4
**talked** 28:20 39:11
51:14 55:23 62:9
66:16 67:10 95:23
98:21 112:12
116:6
**talking** 23:14 26:10
26:11 61:12 77:16
95:2,4 104:7
113:15
**talks** 10:2 29:18,19
29:22 88:2,20
90:10 124:25
126:10,12
**teach** 21:14,15
22:15
**technical** 94:7
**Technology** 1:6
124:22 139:3
**tell** 30:6 78:4 97:20
98:2
**tend** 68:20 104:21
**term** 91:20 92:10
135:23
**terms** 46:12 47:12
48:5 50:7,14 51:9
51:15 59:8 62:17
66:7 67:7 103:2
**test** 9:20 10:6 15:1
15:19 26:7,22
27:8 29:5,11 32:9
39:20 40:22 41:5
41:24 42:24 43:24
44:3 45:14 50:15
50:17 51:3,21,24
52:14,19,22 57:14
59:18,19,23,24,25
64:23 73:2 82:14
83:20 84:24,25



87:20,20 88:2,6,9
88:22 89:1,6,7,7
89:10,12,12,20
90:6,9,16,20,23
90:25 91:4,9,14
91:16,22 92:10,15
92:16 93:13,23
98:7 99:15,18,19
100:16 102:15,22
103:2 105:2
106:18,19 107:15
107:20,24 108:1
108:25 109:4,5,8
109:20,21,22,23
110:16,17 113:16
114:3,6 115:17,18
115:21,24 116:25
117:1 132:15
133:5,8,14,17,21
133:24,24 134:16
135:5
**testified** 4:4 22:22
40:16 42:7 58:12
82:16 129:5
134:16
**testify** 4:25 5:4,7
33:24 34:4,5
127:19,22
**testifying** 4:23
119:7
**testimony** 33:19,21
33:23 34:6 38:8
38:25 53:10 65:25
137:11 138:17
139:8,9
**testing** 51:3,4
**tests** 14:11,13 15:7
26:8,17,25 27:5
28:9 29:25 42:18
42:19 64:25 65:5
65:20 66:9,19
67:1,8,9 73:23
84:10 96:22,23
100:18 102:23,23
105:4 106:19
**Tetlock** 11:14 62:9

**Thank** 48:21 134:6
**thanks** 15:23 38:23
130:25
**theoretical** 6:2 69:9
100:2
**theories** 72:4
**theory** 6:6
**therefor** 138:18
**thereof** 138:8
**thesis** 5:20,21 70:24
**thing** 31:16 38:11
43:21 58:13 65:1
67:13 84:8 89:9
102:19 119:18
120:4 121:4,22
**things** 5:25 7:4
10:14 11:24 17:3
17:4 24:2 27:1,2,7
28:7 30:12 31:2,5
36:4 38:5 42:23
47:22 53:25 63:8
64:11 66:16 71:22
83:2 84:3 86:3
95:22 102:25
122:3,9 126:20
127:5,13 135:22
**think** 7:25 16:4
17:22 18:9 19:6
21:5 25:23 28:20
35:5,6 40:14 42:7
44:9 49:11 50:1
50:24 51:20 52:21
53:14 57:4 59:16
62:1 65:10 74:3
79:17 81:14,19
88:20 89:13,19
90:5 93:25 96:24
99:8 107:17
108:10,10 119:6
119:17,21 120:3
123:4 124:8,16
129:16 134:14
**thinking** 20:20
**thinks** 122:22
**third** 7:5 15:24
38:14 95:19

**thought** 83:7 120:8
122:19
**thousand** 131:17
**thousands** 11:25
62:10 78:21
**three** 5:20 33:8
38:5 66:16 107:18
107:22 108:3,5,25
109:4 114:20
**threshold** 67:21
84:25 87:20 88:6
88:9,11 89:7,7,10
89:12 90:6,16,20
90:23 91:9,14,16
91:20 92:10
132:14 133:14,24
**thrown** 34:18,22
**tied** 81:2,17
**time** 7:12 9:5 10:7
14:2 15:9 25:7,18
26:23 32:25 34:7
40:3 41:21,23
42:2 54:7 55:19
56:5,10,12,13,14
56:16 57:3,3,8,11
57:18,20,20 64:20
70:14 71:14,14
73:20,25 86:10
89:15 93:15 104:6
107:13 112:17
113:8 130:5,22
**times** 2:13,14 4:13
4:16 9:19 10:5
11:7 22:22,24
33:8,12,13 39:25
40:11 55:8 58:3,9
88:24 114:17
**timing** 8:14
**Titman** 69:21
**today** 37:9 76:22
77:12 111:17
**today's** 98:22
**tomorrow's** 110:3
**tools** 58:14
**top** 45:7
**topic** 100:17

**topping** 80:25
**total** 23:23 33:3
117:24 130:21
131:12
**totally** 50:18 70:4
**Tower** 2:13
**trade** 64:6 105:18
**traded** 27:11 38:9
39:4 42:13 69:5
88:7
**traders** 72:11,17
**trading** 14:21 28:4
37:14 47:12 58:15
75:2 103:1 110:22
111:1,6,25 112:5
112:19,24 113:6
**tragedies** 130:17
**trained** 21:18
**transaction** 111:4,5
111:7 120:12
122:2
**transactions** 119:8
119:18 120:17,24
121:25 122:4,7
127:4 128:11
**transcript** 3:24
137:11 138:12,20
139:7,8
**translated** 129:1
**treat** 109:10
**trial** 11:4 33:24
**tried** 31:24 32:7
36:3,16 49:22
56:4
**tries** 36:8
**trouble** 38:20
**true** 39:15 40:2
56:13 122:20,20
122:22,24 137:11
139:9
**truthfully** 5:1
**try** 12:22 81:14
115:14 116:19
122:8
**trying** 55:2
**Tulipmania** 56:23

**Tuomo** 12:24
**turn** 48:13,21 58:16
75:19
**turnover** 86:3
**two** 25:5 28:9 33:7
33:22 42:25 50:9
50:11 59:15 67:18
67:20 74:2 88:14
95:15,18 104:14
105:10,12 106:24
108:13 114:19
122:3,9 129:25
130:16,16 135:22
**type** 7:17,20 15:7
19:14 29:4 31:9
41:14,17,21 71:1
79:12 82:23 86:6
96:15 99:9,11,12
108:1 121:15
**types** 9:20,24 10:1
10:5,6 15:20
30:24 31:1,10
40:17,22 41:24
47:15 53:12 64:17
**typical** 8:1 23:15
98:1 104:3 112:1
**typically** 8:3 12:13
19:19 20:18 30:14
32:17,23 36:7
47:9 68:9,12,16
68:17 69:4 80:12
87:9,15 99:11
100:15,21 101:5
101:15 102:23
104:8,16,19
121:16 129:23
130:4

_____

**U**

**ultimately** 34:17
70:1
**unaware** 66:2
**unbiased** 45:23,25
46:2,9 50:13
**uncertain** 64:7
118:22



**underlying** 28:3
81:2,4
**underreact** 46:5,23
47:6
**understand** 4:20,22
39:10 78:10 97:2
97:6 112:9 133:23
**understanding**
15:11 81:22,23
119:2 122:9
125:25 133:4
139:12
**underwriter** 12:13
74:24 78:18
**underwriters** 78:24
**underwriting** 78:14
**undisclosed** 119:17
126:20
**unexpected** 10:17
15:22 29:4 39:19
39:21 40:9 41:7
44:4 46:9 49:20
85:9 87:1,4
115:19 117:23
**uninformed** 12:25
13:8
**uninvited** 19:3
**United** 1:1 61:25
62:3,5
**University** 28:18
**upgraded** 117:13
**use** 13:24 21:20
40:4 55:13 66:18
90:23 91:20 92:10
99:1 102:12 115:2
**uses** 11:18 36:9,18
**utilize** 31:11 76:17
114:8,9
**utilized** 27:1
**U.S** 74:8 75:7

**V**

**V** 25:22 26:17 93:9
134:9
**validity** 66:20,23
**valuation** 7:10 17:1

23:12 33:25 34:2
59:8
**value** 6:21 9:22
10:17 15:22 21:4
23:19 29:1 31:20
39:9,19,22 40:10
41:19 44:2 46:9
46:11 49:20 50:10
60:16 68:10,18,23
71:1 73:15 85:9
87:1 90:14 91:25
114:25 117:11,18
117:23 120:9
122:1 126:14,15
**variance** 99:19
**variety** 5:25 36:8
36:16,21 41:4
92:18
**various** 126:12
127:6
**vast** 19:25 39:24
40:11 53:20 73:20
78:22
**vehicles** 82:9
**venture** 5:21,24
6:11,16,18,20,21
7:13,18,20 8:2,7
8:22 9:3 82:3,8
**versa** 64:9
**versus** 12:22 18:9
21:2 25:2 49:24
60:3 83:21 92:21
94:17 97:5 108:5
118:16 133:7
**vice** 64:9
**viewed** 87:15
**views** 45:24
**violation** 28:1
110:4,14 121:4,10
121:18,20
**virtually** 74:9,14
**Vishny** 69:22
**volatility** 77:6
99:21 108:2,5,6
108:12 109:14,20
**volume** 27:1 64:3

138:15,20
**vote** 18:25
**Vuolteenaho** 12:24

**W**

**wake** 103:24
**want** 17:10 20:25
27:22 30:9,10
40:22 45:2 71:23
73:2 97:17 100:9
103:23 111:17,20
111:22,23 114:22
114:24 127:3,8
132:17
**wanted** 107:15
**Warren** 70:24
**wasn't** 66:7,15,16
130:5
**wasteful** 19:19,20
19:21 20:12,14,24
**waves** 71:12
**way** 11:24 15:6
17:7,22 19:6,12
32:7 33:6,6,10,15
33:15,17 40:15
44:1 45:20 46:22
47:17 50:19 55:22
59:24,25 61:24
66:13 67:8 68:10
71:9 82:22 88:13
96:23 100:15,18
106:19 107:21
109:19 115:23
135:8 137:15
**ways** 6:21 59:22
77:7 87:8 89:3
**weak** 60:13 109:23
109:24 110:4,12
110:14,17,18
**weaknesses** 67:7
**week** 129:23
**weeks** 104:8,13
129:25
**weigh** 53:16
**well-defined** 73:5
**well-documented**

72:24
**well-executed**
58:10
**well-known** 63:4
**went** 75:7,13
129:25
**weren't** 96:19 97:6
**we'll** 13:20 43:2,3,4
123:18
**we're** 109:1 114:10
134:6
**we've** 51:14 55:23
127:13
**WHEREOF**
137:17
**Why's** 80:11
**wide** 41:4
**widely** 64:2
**Wilson** 104:20
**window** 106:7
**wine** 30:11
**withdrawn** 77:11
**witness** 3:2 18:3
44:18 45:3 48:11
48:25 54:22,23
58:21,22 76:8
85:19 87:24 90:7
94:23 95:1 97:19
113:12 124:18
137:8,12,17
**words** 11:24,25
101:23
**work** 5:15 12:7,14
20:15 23:12,14
24:8,18 34:23,24
35:7 42:21 71:11
71:11 131:6,8,13
**worked** 12:7 23:25
24:22 25:15,16
33:7,11 130:7
**working** 23:2 44:7
112:25
**world** 39:15
**worth** 33:13
**wouldn't** 46:13,14
48:4 53:2 69:13

80:9 100:13 112:7
113:5 125:9
**write** 116:8 123:3
**writes** 49:4
**written** 7:2,6 9:12
11:15 19:24 61:25
74:11 88:14
100:17
**wrote** 70:17 71:5
82:2

**X**

**x** 1:4,8

**Y**

**yeah** 4:15 5:15
23:22 24:7 79:21
79:23,25 129:12
131:1,18
**year** 79:23 131:15
131:17
**years** 6:16 10:13
17:21 23:3,4,5
33:8 35:7 58:3
131:9,10,11,12,19
**York** 2:6,15 11:6

**Z**

**Zacks** 62:21,24
63:5,7 95:22
**zero** 16:21 102:22
102:22 127:20
**Zimmermann** 2:20

**É**

**Élan** 33:25 34:2,3

**$**

**$100,000** 33:14

**1**

**1** 3:9,12 44:14,15
58:18,19,24 59:10
79:8 103:4
**1.51** 77:4,19
**1:53** 114:19
**10** 10:12 24:3,9



**30:20** 33:11 60:11
101:7,8,10 105:7
105:9 106:6 112:4
122:22 128:25
130:17,18
**10b-5** 23:15 24:23
50:16 57:25 106:3
106:12
**10/24/11** 3:22
**10:02** 104:17
114:18
**100** 23:24 39:16
40:3 53:7 64:16
**10016** 2:6
**10036** 2:15
**112993** 1:18 137:22
**12** 130:13,19,23
**12/18/15** 3:11
**120** 90:10,11 91:21
132:18 133:19
**121** 90:11 91:21
133:19
**122** 87:23 90:23
91:13 92:11
132:16 133:16
**123** 3:23
**124** 90:11 92:10
**13** 45:2,10 48:13,21
**132** 3:5
**138** 139:2
**14** 23:2,3,5 33:8
35:7
**14-CV-00722-SI**
1:3
**15** 10:12 17:21 24:3
24:9 30:20 33:11
137:23
**1500** 16:10,22
**16** 58:16 95:14
**180** 12:13 78:18,22
79:17
**1920s** 71:7,9,12
**1960s** 28:16 56:23
**1969** 28:18
**1970** 41:18 45:19
50:9

**1971** 31:21
**1980s** 20:17
**1981** 12:15
**1990s** 56:23
**1991** 29:18 70:4
**1997** 29:22

—— **2** ——

**2** 3:12 30:22 48:9
48:10 54:24 58:24
59:10 124:20
**2-day** 106:7
**2/6/14** 3:23
**2:55** 136:3
**20** 1:12 6:16 68:3
101:10 122:23
129:18
**2000** 88:15
**2001** 7:8 25:16
**2002** 11:4 25:16,18
62:3
**2003** 25:18
**2008** 62:1,5
**2012** 12:1
**2013** 76:24 77:14
117:6
**2014** 88:19 131:14
**2015** 131:15
**2016** 1:12 137:19
139:15,20
**2017** 137:23
**21** 45:1,9,9,10
**21st** 75:15,22,24,25
76:24 77:14
137:18
**212-686-1060** 2:7
**212-728-5671** 2:16
**22nd** 117:6
**23** 48:24 49:5 74:1
74:5,6
**24** 16:11 74:1 78:12
**25** 74:9,22 75:11
128:25
**25th** 74:10 79:21,25
80:4,8
**26th** 75:13 79:17

**27th** 43:3
**275** 2:5
**28** 79:24

—— **3** ——

**3** 3:15 8:17 83:12
83:13,15 84:15
**3Com** 67:11
**3:10** 114:20
**30** 75:16
**31** 80:1,2
**34th** 2:5
**365** 79:23

—— **4** ——

**4** 3:20 75:19,20
76:5 93:2,3,5
134:10
**4/135** 3:4
**40** 23:17,21
**44** 3:9 90:5
**48** 3:12
**49** 118:5

—— **5** ——

**5** 3:23 8:18 93:25
94:25 96:5 98:3
101:13 122:23
123:18,19,22
131:2
**5-year** 70:6
**50** 35:17 128:17,24
129:17
**59** 102:16

—— **6** ——

**6** 98:2
**6th** 118:10 119:1,14
119:24 124:1
127:17
**60** 35:17 129:17
**600,000** 131:2
**67** 113:19
**699** 1:16

—— **7** ——

**7** 2:14
**7th** 113:9

—— **8** ——

**8** 88:23 130:17
**80** 23:4 24:4
**80s** 104:20
**83** 3:15

—— **9** ——

**9th** 108:10,11,11
**9:45** 1:13
**90** 23:4
**91** 31:21 82:22
**93** 3:20
**95** 60:9
**97** 57:6
**98** 31:21 57:6 74:15

