1

2

3                    UNITED STATES DISTRICT COURT

4                    NORTHERN DISTRICT OF CALIFORNIA

5

6                                          Case No.  14-cv-00722-SI

7     In re MONTAGE TECHNLOGY GROUP

8     LIMITED SECURITIES LITIGATION           **ORDER ON PLAINTIFFS' MOTION
                                              FOR CLASS CERTIFICATION AND
9                                             DEFENDANTS' MOTION TO
                                              EXCLUDE AND SETTING FURTHER
10                                            CASE MANAGEMENT CONFERENCE
                                              FOR MAY 6, 2016**

11

12

13

14           Plaintiffs, on behalf of themselves and all others similarly situated, allege that Montage

15    Technology Group Ltd. ("Montage"), and certain of its officers and directors, violated federal

16    securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").  Currently before

17    the Court are (1) plaintiffs' motion for class certification, and (2) defendants' motion to exclude an

18    expert report submitted in support of plaintiffs' motion for class certification.  Dkt No. 77, Motion

19    for Class Certification ("Class Cert. Motion"); Dkt No. 83, Defendants' Motion to Exclude

20    ("Motion to Exclude").  For the reasons that follow, plaintiffs' motion for class certification is

21    GRANTED, and defendants' motion to exclude is GRANTED in part and DENIED in part.  A

22    further Case Management Conference is scheduled for May 6, 2016 at 3:00 pm.

23

24                                    **BACKGROUND**

25           Defendant Montage designs, develops, and markets fabrication-less semiconductor

26    solutions for the home entertainment and cloud computing markets.  Docket No. 38, Consolidated

27    Amended Complaint ("CAC") ¶ 4.  Montage is a Cayman Islands corporation, headquartered and

28    primarily conducting business in China.  CAC ¶ 3.  Through its subsidiaries, Montage also

United States District Court
Northern District of California

1   conducts business in Hong Kong, Taiwan, and the United States.  CAC ¶ 15.  During all relevant

2   times, its shares traded in the United States on the NASDAQ.  CAC ¶ 3.  Individual defendants

3   Howard C. Yang, Stephen Tai, and Mark Voll are, respectively, the Chief Executive Officer

4   (CEO), President, and Chief Financial Officer (CFO) of Montage.  CAC ¶¶ 16-19.

5       Plaintiffs are a class of persons and entities who purchased Montage securities from

6   September 25, 2013 to February 6, 2014, and did not sell the securities before February 6, 2014.

7   CAC ¶ 2.  Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act, focusing on

8   Montage's relationship with LQW Technology Company Limited ("LQW"), a company that

9   accounted for 50 percent of Montage's revenue for fiscal year 2012 and 67 percent of its revenue

10  for the first six months of fiscal year 2013.  CAC ¶ 23.  Plaintiffs allege Montage committed fraud

11  by failing to disclose in its SEC filings that its dealings with LQW were related party transactions;

12  in its stated financial disclosures, Montage instead referred to LQW as an "independent

13  distributor."  CAC  ¶¶ 5, 23.  Plaintiffs cite a report issued by Gravity Research ("Gravity Report")

14  as the source of the corrective disclosure.  CAC ¶6.

15      Plaintiffs filed their motion for class certification October 13, 2015, and offered the Expert

16  Report of Howard J. Mulcahey ("Mulcahey Report") to support their fraud-on-the-market theory

17  for a class-wide presumption of reliance.   Docket No. 76, Declaration of Johnathan Stern ("Stern

18  Dec. 1"), Exhibit 1.  Defendants moved to exclude the Mulcahey Report pursuant to *Daubert v.*

19  *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*") and Federal Rule of

20  Evidence 702.  The Court now considers plaintiffs' motion for class certification and defendants'

21  motion to exclude.

22

23                                    **LEGAL STANDARD**

24      Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs

25  bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at

26  least one subsection of Rule 23(b).  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th

27  Cir. 2014) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F. 3d 1180, 1186 (9th Cir. 2001)).  A

28  plaintiff "must  actually  *prove*—not  simply  plead—that  [his]  proposed  class  satisfies  each

*United States District Court*
*Northern District of California*

requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014) ("*Halliburton II*") (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1431-32 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-52 (2011)).

The Court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc.* v. *Connecticut Retirement Plans and Trust Fund*, 133 S. Ct. 1184, 1194 (2013) (quoting *Dukes*, 131 S. Ct. at 2251 (internal quotation marks omitted)). These analytical principles govern both Rule 23(a) and 23(b). *Comcast*, 133 S. Ct. at 1342. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194-95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.*

## I.     Fed. R. Civ. P. 23(a)

Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact exist that are common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). These elements are often referred to as "numerosity," "commonality," "typicality," and "adequacy." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).

## II.     Fed. R. Civ. P. 23(b)

A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b). Here, plaintiffs seek certification under Rule 23(b)(3), which requires a court to find "that common questions of law or fact predominate and the class action is superior to other available methods of adjudication." *See* Fed. R. Civ. P. 23(b)(3).

United States District Court
Northern District of California

1

2

3

**DISCUSSION**

4

Plaintiffs propose a class period from September 25, 2013 to February 6, 2014. Class Cert.

5 Motion at 1. Plaintiffs seek to certify a class on "behalf of those that purchased or otherwise

6 acquired the publicly traded common stock of Montage" during the class period (inclusive) and

7 "did not sell such securities prior to February 6, 2014." *Id*. Plaintiffs also ask the Court to appoint

8 Martin Graham ("Graham") and Shaun Shen ("Shen") as class representatives, and the Rosen Law

9 Firm, P.A. as class counsel. *Id.* at 1-2.

10

"As a threshold matter . . . the party seeking class certification must demonstrate that an

11 identifiable and ascertainable class exists." *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal.

12 2009). A class is sufficiently ascertainable if it is "administratively feasible for the court to

13 determine whether a particular individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184

14 F.R.D. 311, 319 (C.D. Cal. 1998). Here, the proposed class is ascertainable in the sense that

15 plaintiffs clearly identify who the class members are: any person or entity that purchased and

16 subsequently did not sell Montage stock during the proposed class period. *See* CAC ¶ 2.

17 Moreover, defendants do not challenge the ascertainability of the class. Accordingly, the class is

18 ascertainable, and the proposed class members identifiable.

19

Additionally, plaintiffs must satisfy the prerequisites of Federal Rule of Civil Procedure

20 23(a) and one requirement of Rule 23(b). *See* Fed. R. Civ. P. 23. The party seeking class

21 certification bears the burden of demonstrating that these requirements are met. *See United Steel*,

22 593 F.3d at 807.

23

24 **I.        Requirements of Rule 23(a)**

25

A class may be certified only if plaintiffs meet the "numerosity," "commonality,"

26 "typicality," and "adequacy" elements of Rule 23(a). *See United Steel*, 593 F.3d at 806. For the

27 reasons that follow, the Court finds that plaintiffs satisfy these requirements.

28

1

2

3          A.      Numerosity

4          The class must be so numerous that joinder of all members individually is "impracticable."

5    *See* Fed. R. Civ. P. 23(a)(1).  No exact numerical cut-off is required.  *In re Cooper Companies Inc.*

6    *Sec. Litig.*, 254 F.R.D. 628, 633 (C. D. Cal. 2009) (citing *Gen. Tel. Co. of the Nw. v. Equal Emp't*

7    *Opportunity Comm'n*, 446 U.S. 318, 324 (1980)).  In *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 621

8    (C.D. Cal. 1985), the Court certified a class in a securities fraud case in which several million

9    shares of stock were purchased during the class period, finding that the class met the numerosity

10   requirement.  Here, approximately 36.5 million shares of Montage stock were traded during the

11   class period, and an average of 26.5 million shares were outstanding.  Mulcahey Report ¶ 99.

12   Additionally, defendants do not dispute that the plaintiffs have satisfied the numerosity

13   requirement.  The Court finds that the numerosity requirement is satisfied for the proposed class.

14

15         B.      Commonality

16         Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed.

17   R. Civ. P. 23(a)(2).  "Commonality requires the plaintiffs to demonstrate that the class members

18   have suffered the same injury," not "merely that they have all suffered a violation of the same

19   provision of law."  *Dukes*, 131 S. Ct. at 255 (citation omitted) (internal quotation mark omitted).

20   Plaintiffs' claims "must depend on a common contention," and that common contention "must be

21   of such a nature that it is capable of class-wide resolution—which means that determination of its

22   truth or falsity will resolve an issue that is central to the validity of each other of the claims in one

23   stroke."  *Id.*

24         Here, plaintiffs have identified the common questions of law and fact pertinent to the

25   proposed class.  They have alleged that LQW is a related party pursuant to GAAP; that Montage

26   failed to disclose its dealings with LQW as related party transactions in SEC filings; that these

27   material failures to disclosure made the SEC filings false and misleading; and that plaintiffs in the

28   class suffered damages as a result.  Docket No. 62 at 9 (citing CAC ¶¶ 27-36).  "[S]ince the

United States District Court
Northern District of California

5

1   complaint alleges a common course of conduct over the entire period directed against all investors,

2   generally relied upon, and violating common statutory provisions, it sufficiently appears that the

3   questions common to all investors will be relatively substantial." *Blackie v. Barrack*, 524 F.2d

4   891, 902-03 (9th Cir. 1975) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909,

5   914 (9th Cir. 1964)).   Moreover, defendants do not challenge the commonality prong of Rule

6   23(a).   The Court finds that there are common questions of law and fact that can be answered on a

7   class-wide basis, thus the commonality requirement of Rule 23(a)(2) is met.

8

9       **C.       Typicality**

10       Rule 23(a)(3) requires the named plaintiffs to show that their claims are typical of those of

11   the class.   To satisfy this requirement, the named plaintiffs must be members of the class and must

12   "possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw.*

13   *v. Falcon*, 457 U.S. 147, 156 (1982) (quotation marks and citation omitted).   The Ninth Circuit has

14   adopted the following test for typicality: "whether other members have the same or similar injury,

15   whether the action is based on conduct which is not unique to the named plaintiffs, and whether

16   other class members have been injured by the same course of conduct." *Hanon v. Dataproducts*

17   *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).   "[C]lass certification is inappropriate

18   where a putative class representative is subject to unique defenses which threaten to become the

19   focus of the litigation." *Id.*  (citation omitted).

20       The typicality requirement "is satisfied when each class member's claim arises from the

21   same course of events, and each class member makes similar legal arguments to prove the

22   defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).

23   Rule 23(a)(3) is "permissive" and only requires that the named plaintiffs' claims be "reasonably

24   co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

25   1020 (9th Cir. 1998).

26

27       **1.       Lead Plaintiff Graham Satisfies The Typicality Requirement**

28

United States District Court
Northern District of California

Defendants contend that Graham does not satisfy the typicality requirement because he is "an in-and-out trader who purchased Montage stock after the alleged corrective disclosure." Docket No. 81, Defendants' Opposition to Motion for Class Certification ("Def. Opp."), at 24. Defendants reason that Graham will be unable to demonstrate that his losses were caused by the alleged fraud because he purchased Montage stock after the February 6th corrective disclosure, while also engaging in significant in-and-out trades throughout the proposed class period. *Id.* at 25. According to defendants, Graham is atypical because "there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to [him]." *Id.* (quoting *In re NJOY Consumer Class Action Litig.*, 2015 U.S. Dist. LEXIS 109133, at *99 (C.D. Cal. Aug. 14, 2015)).

The Court is not persuaded that a plaintiff is atypical simply because he buys stock after the disclosure of an alleged fraud. Numerous cases have held that a proposed class representative meets the typicality requirement even after purchasing stock subsequent to an adverse disclosure. *See, e.g.*, *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576 (N.D. Cal. 2009) (holding that trades after an adverse disclosure do not automatically render an investor atypical); *In re Providian Fin. Corp. Sec. Litig.*, 2004 WL 5684494, *4-5 (N.D. Cal. Jan. 15, 2004) (finding that the lead plaintiff, who bought stock after the adverse disclosure, had satisfied the typicality requirement); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 719 (C.D. Cal. 2002) (same).

The Court finds these authorities persuasive. Defendants have not explained why the timing of Graham's trades makes his behavior unique. Additionally, even if Graham is revealed to be the only class member who bought additional stocks after the corrective disclosure, defendants have not demonstrated that this issue "threaten[s] to become the focus of the litigation." *See Hanon*, 976 F.2d at 508. Accordingly, the Court finds that Graham's trading behavior does not defeat his ability to meet the typicality requirement.

## 2.    Lead Plaintiff Shen Also Satisfies The Typicality Requirement

Defendants also assert that Shen is atypical because he is a "net gainer" who profited from trading Montage stock within the class period, which would present unique questions that could

take over the litigation.  Def. Opp. at 22-23.  Although Shen purchased shares on December 26, 2013, and sold on January 16, 2014, for a $660 gain, he also purchased shares on January 24, 2014, which he was in possession of at the time of the corrective disclosure on February 6, 2014. *See* Docket No. 81, Declaration of Edward Moss ("Moss Dec."), Exhibit J.  Thus, the December 26 purchase and January 16 sale do not preclude Shen from meeting the definition of someone who acquired Montage stock, but also did not sell, during the class period, as is required by the proposed class definition.  Defendants' concern about atypicality is speculative, and the Court finds that Shen meets the typicality requirement.

### D.    Adequacy

Rule 23(a)(4) permits the certification of a class only if the "representative parties will fairly and adequately protect the interests of the class."  Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing, Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

### 1.    Lead Plaintiff Graham Is An Adequate Representative

Here, defendants do not offer arguments—aside from the aforementioned atypicality challenges—that suggest Graham is an inadequate representative of the proposed class. Defendants have not presented, nor does the Court find, any information suggesting that Graham will not "fairly and adequately protect the interests of the class."  Fed. R. Civ. P 23(a)(4).  The Court finds that Graham meets the adequacy requirement of Rule 23(a)(4).

### 2.    Lead Plaintiff Shen Is Also an Adequate Representative

Defendants argue that Shen is inadequate representative because: (1) he presents potential conflicts of interest with other class members, and (2) "he exercises no control over the litigation and lacks a basic understanding of the proceedings."  Def. Opp. at 24.  Defendants' arguments, relying on Shen's deposition testimony, are misplaced.  Although Shen stated that "common

United States District Court
Northern District of California

knowledge" tells him that class representatives are typically compensated more than the average class member, he also stated that he does not have any expectations regarding how much he could potentially receive. *See* Moss Dec., Exhibit A, Deposition of Shaun Shen ("Shen Deposition," at 102:12-103:22). When asked if he expected to be compensated for any sort of emotional distress, Shen remarked, "I would assume—I would hope so, *but I'm not expecting it.*" *Id.* at 105:3-4 (emphasis added). Most notably, Shen also stated the following: "I'm not here to expect a numerical value for my compensation. *I don't have any specific expectations*. I just want to represent the class action lawsuit." *Id.* at 104:11-14. When viewed in context Shen's comments do not indicate that his position as class representative presents a conflict of interest with other class members.

Additionally, the Court rejects defendants' contention that Shen is not versed in the details of the case and is merely a pawn for the Rosen Law Firm. Shen stated in his deposition that his "obligation is to represent [the] best interests [of the class members] and to recover the damages they've suffer[ed], [at] the same time monitor[ing] the work that's being done by the Rosen Law firm." Docket No. 93, Declaration of Jonathan Stern ("Stern Dec. 3"), Shaun Shen Deposition, 153:9-12. It appears to the Court that Shen is aware of the proceedings and his duties as class representative. Accordingly, the Court finds that lead plaintiff Shen has met the adequacy requirement of Rule 23(a)(4).

For the aforementioned reasons, the Court finds that plaintiffs have satisfied the requirements of Rule 23(a).

## II.       Requirements of Rule 23(b)

Along with the requirements of Rule 23(a), plaintiffs must also establish that one or more of the grounds for maintaining the suit under Rule 23(b) are met. Here, plaintiffs seek certification under Rule 23(b)(3), which provides that a case may be certified as a class action if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

United States District Court
Northern District of California

adjudicating the controversy." Fed. R. Civ. P 23(b)(3). For the reasons that follow, the Court finds that plaintiffs have met both the predominance and superiority requirements of Rule 23(b).

### A.    Predominance

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432. The predominance analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1022) (internal quotation marks omitted)).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund*, *Inc.*, v. *Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) ("*Halliburton I*"). To sustain a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must prove, *inter alia*, that he relied upon the alleged misrepresentation or omission. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Reliance is an essential requirement for Rule 10b-5 liability because it ensures that there is the indispensable nexus between plaintiffs' injury and a defendant's misrepresentation. *Id.* at 159. "[B]efore the Court can certify a class with respect to a particular security, the Court must be persuaded that plaintiffs are entitled to a presumption of class-wide reliance." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 608 (C.D. Cal. 2009).

Plaintiffs contend that they are entitled to a class-wide presumption of reliance under one of three theories: (1) pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972) ("*Affiliated Ute*"), (2) pursuant to the fraud-on-the-market theory, (3) pursuant to the fraud on the regulatory process theory. *See* Class Cert. Motion at 6, 9-10.

Defendants assert that plaintiffs have not established a class-wide presumption of reliance because none of the proposed presumptions apply to the facts in this case. For the reasons that

1    follow, the Court finds that plaintiffs have established a presumption of reliance under both

2    *Affiliated Ute* and fraud-on-the-market.

3

4

5                    **1.    The *Affiliated Ute* doctrine**

6            *Affiliated Ute* affords a presumption of reliance to a plaintiff who advances a securities

7    fraud claim based on a defendant's failure to disclose material information.  *Affiliated Ute*, 406

8    U.S. at 153-154.  A presumption of reliance pursuant to *Affiliated Ute* is "limited to cases that 'can

9    be characterized as . . . primarily alleg[ing] omissions.'"  *See Desai*, 573 F.3d at 940 (quoting

10   *Binder v. Gillepsie*, 184 F.3d 1059, 1064 (9th Cir. 1999)).  Thus, if plaintiffs' putative class action

11   is not an omissions case, they are not entitled to a presumption of reliance under *Affiliated Ute*.

12           Defendants argue that plaintiffs' primary theory of fraud is premised on an affirmative

13   misstatement; namely, that defendants represented LQW as an "independent distributor."

14   According to defendants, there is a "clear distinction" in accounting literature between an

15   "independent party" and a "related party" and thus plaintiffs cannot advance defendants'

16   affirmative statement that Montage is an "independent" distributor, yet frame their allegations as

17   "omission only."  Def. Opp. at 6-7.  Defendants assert that the allegations, at best, are a mixture of

18   misrepresentations and omissions, which would preclude a finding of an *Affiliated Ute*

19   presumption of reliance.  *Id.* at 6 (citing *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666-67 (9th

20   Cir. 2004)).

21           This Court has already examined plaintiffs' Consolidated Amended Complaint and denied

22   defendants' motion to dismiss, because plaintiffs pled "sufficient facts, taken as a whole, to

23   support an inference that Montage and LQW were related parties under GAAP, and . . . that

24   Montage's failure to so disclose made its SEC filings misleading."  *See* Dkt. 62 ("Order Denying

25   Motion to Dismiss"), at 10.

26           In its decision, the Court analyzed plaintiffs' allegations as follows:

27                   On the basis of the foregoing information, plaintiffs allege that LQW is a
                     related party to Montage, and that Montage's failure to disclose its dealings
28

                                                    11

with LQW as related party transactions made its SEC filings false and misleading.

*See* Order Denying Motion to Dismiss, at 3 (citing CAC ¶ 5).

The Court found that plaintiffs adequately pled the omission, concluding that Montage's failure to disclose its dealings with LQW as a related party would violate its disclosure obligations under GAAP. *Id.* at 11. Additionally, the Court found that the materiality of the omission was sufficiently pled. *Id.*

Defendants' current argument — not advanced in the motion to dismiss — is that the fact omitted (related party status) is the opposite of what the company affirmatively represented in its filings (independent party status), so that the entire case is effectively converted into an affirmative misrepresentation case, requiring separate proof of reliance. This wrangling about words could apply to most omission cases, and is particularly inappropriate where, as here and at defendants' urging, the Court already took up the issue and determined that the case was fairly pled as an omissions case.

The Court now finds that defendants' omission is material under current SEC regulations. The SEC relies on the Financial Accounting Standards Board ("FASB") to adopt the principles that govern accounting standards for SEC filings. *See* Thomas Lee Hazen, 2 The Law of Securities Regulations § 9.6 (6th ed. 2009). The FASB's Statement of Financial Accounting Standards ("FAS") No. 57 requires disclosure of all material related party transactions. FAS No. 57(2). To establish a presumption of reliance under *Affiliated Ute,* "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [the decision to purchase securities]." *Affiliated Ute*, 406 U.S. at 153-154. Here, plaintiffs allege that Montage failed to disclose that it "owned and controlled its largest distributor, LQW," and as a result of omitting these material facts, "the market price of Montage securities was artificially inflated during the class period." CAC ¶¶ 5, 97. Because the corrective disclosure that highlighted the omission is alleged to have caused a 25.9% stock decline in Montage stock price, the omission is material, as reasonable investors would have considered

12

the omission important in determining whether to purchase shares of Montage stock. Therefore, plaintiffs are entitled to an *Affiliated Ute* presumption of reliance.

### 2.     Fraud-on-the-market and Defendants' *Daubert* Motion

Plaintiffs also argue that they are entitled to a presumption of reliance based on a fraud-on-the-market theory.

#### a.     Fraud-on-the-market

Under this theory, plaintiffs' reliance on misleading statements about a company's financial position can be presumed if: (1) the alleged misrepresentations or omissions[1] were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded stock between when the misrepresentations or omissions were effectuated and when the truth was revealed. *Halliburton II*, 134 S. Ct. at 2407-2408. Factor three, market efficiency, is the only factor presently under dispute. "The majority of courts in this circuit agree that, for purposes of the fraud-on-the-market theory, market efficiency means that prices will reflect all relevant information, a definition of efficiency known as informational efficiency." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) (internal quotations omitted).

To determine whether a particular security traded in an efficient market, the Ninth Circuit looks "to the nonexclusive factors" set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989). *See Binder*, 184 F.3d at 1065. The *Cammer* factors require the court to analyze: (1) the trading volume of the security during the relevant period; (2) the number of analysts following the issuer of the security; (3) the ability of the issuer to file SEC Form S-3; (4) the existence of market makers and arbitrageurs; and (5) empirical evidence suggesting a causal connection between new information and stock price movements. *In re Countrywide*, 273 F.R.D.

---

[1] *See also Basic Inc. v. Levinson*, 485 U.S. 224, 241-245 (1988) (reasoning that the fraud-on-the-market theory is generally regarded as applying to both affirmative misrepresentations and omissions); 1 McLaughlin on Class Actions § 5:26 (12th ed.) (discussing how the theory is most often invoked in the context of claims based on alleged material misrepresentations and omissions); Newberg on Class Actions § 22:61 (4th ed.) (same).

United States District Court
Northern District of California

at 613-14 (citing *Cammer*, 711 F. Supp. at 1286-1287).

"The final *Cammer* factor differs from the others," because it "explores whether an important *result* of an efficient market exists," rather than "relying on circumstantial evidence that a security's market is *conducive* to efficiency." *Id.* at 614 (emphasis in original). "A causal connection between new information and price movement is 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *Id.* (quoting *Cammer*, 711 F. Supp. at 1287). "It is therefore the 'most important' *Cammer* factor." *Id.* (quoting *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 267 (D. Mass. 2006)). Nonetheless, the presence or absence of any one *Cammer* factor is not determinative of market efficiency. *Cammer*, 711 F. Supp. at 1286-1287.

While defendants assert that *Cammer* factors 1-4 are not indicative of market efficiency, defendants aggressively challenge *Cammer* factor 5, which considers the cause and effect relationship between new market information and changes in stock price. Defendants challenge *Cammer* factor 5 by targeting the report of plaintiffs' expert, Howard J. Mulcahey ("Mulcahey Report"), which provides support for the causal connection between new market information and the resulting change in the price of Montage stock. Motion to Exclude at 22. More specifically, defendants challenge the reliability of Mulcahey's methodology in reaching his conclusions. Defendants contend that without the Mulcahey Report, plaintiffs cannot establish a causal relationship, and without this causal relationship, plaintiffs will be unable to establish a class-wide presumption of reliance as required by Rule 23(b)(3). *See id.* at 2.

### b.       Expert Testimony and *Daubert*

The Court must analyze the reliability of Mulcahey's methods pursuant to *Daubert*. "If expert testimony critical to class certification is challenged, a district court must make a determination as to the admissibility and persuasiveness of that evidence before certifying a class." *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, at *6 (C.D. Cal. Feb. 18, 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)). Federal Rule of Evidence 702 permits

United States District Court
Northern District of California

expert testimony where "(a) a scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. *See also United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion."). It is plaintiffs' burden to prove the admissibility of the Mulcahey Report by a preponderance of the evidence. *See Halliburton II*, 134 S. Ct. at 2412.

Montage does not challenge Mulcahey's qualifications, and the Court finds that Mulcahey has sufficient expertise to testify in this area.[2] Dkt. No. 76-1; *see Cong. & Empire Spring Co. v. Edgar*, 99 U.S. 645, 658 (1878) ("Whether a witness is shown to be qualified or not as an expert is a preliminary question to be determined in the first place by the court; and the rule is, that if the court admits the testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony.").

Montage instead targets the reliability of the methods Mulcahey employed in his expert report. The trial court is vested with the authority to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can properly be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. *See also Ellis,* 657 F.3d at 982 ("Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable."). The Court is instructed to focus "on the principles and methodology" employed by the expert and "not the conclusions they generate." *Daubert*, 509 U.S. at 595; *see also Daubert v. Merrell Dow*

---

[2] Mr. Mulcahey has an MBA in corporate finance and several decades of experience working in various aspects of corporate finance. Since 2002, he has been vice-president and COO of Forensic Economics, Inc., a litigation support provider.

United States District Court
Northern District of California

*Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*") ("[T]he test under *Daubert* is not the correctness of the expert's conclusions, but the soundness of his methodology."). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

When assessing the reliability component of an expert's testimony, courts are encouraged to examine "(1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community." *Daubert*, 509 U.S. at 593-594. It is important to note, however, that "the test of reliability is *flexible* and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (internal quotation marks and citation omitted). "The 'list of factors [is] meant to be helpful, not definitive,' and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the 'particular circumstances of the particular case.'" *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Kumho Tire*, 526 U.S. at 150-152).

### c. Mulcahey's Expert Report

Mulcahey examined Montage stock by using the *Cammer* factors. Mulcahey concluded that the market for Montage common stock was efficient over the Proposed Class Period. Mulcahey Report ¶ 10. In analyzing Montage stock, Mulcahey conducted several quantitative analyses that focused on the potential nexus between new value-relevant information and Montage's stock price (*Cammer* factor 5). Mulcahey found that the cause and effect of new value-relevant information regarding the price reaction in Montage's stock price indicated that the stock was responsive to new information. *Id.* Mulcahey reached this conclusion by examining: (i) whether there was a statistically significant reaction by Montage's stock price to movements in the market index; (ii) whether the proportion of statistically significant excess returns for Montage common stock on days with news was significantly larger than on days without news; (iii) whether

a correspondence of statistically significant price changes to new information existed; (iv) whether Montage's stock price dropped rapidly in response to new information; (v) the statistically significant variance in excess returns on days with Montage's announcement of earnings or preliminary financial results compared to days without; (vi) the speed of the stock price response to new information on all of the largest excess return days; and (vii) the statistically significant correlation of daily returns to trading volume.  *Id.*

Defendants first contend that each of Mulcahey's tests relied on a market model that he constructed with a flawed approach.  Motion to Exclude at 6.  The Court has reviewed the relevant portions of Mulcahey's report and examined the methodology Mulcahey employed in reaching his conclusions.  Mulcahey's approach was not flawed simply because he (1) excluded only 10 days from the post-IPO period; (2) used a one-factor market model; and (3) used an F-Test in his market model.  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano*, 598 F.3d at 564 (quoting *Daubert*, 509 U.S. at 596). Defendants' arguments contesting the validity of plaintiffs' expert's conclusions based on his market model may be presented at trial.  *See* Gompers Report ¶¶ 25, 53; Docket No. 91, Declaration of Jonathan Stern ("Stern Dec. 2"), Exhibit 3 at n.3; Stern Dec. 2, Exhibit 2 ("Mulcahey Opp. Report") ¶ 22 (citing John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets* 154-156 (1997)).

### i.      The Six Direct Tests

Mulcahey conducted six direct tests to determine whether Montage stock price was affected by new information in the market: (1) the News/No News Test, (2) the Earnings Test, (3) the Speed Test, (4) a Reverse Event Study, (5) the Price-Volume Test, and (6) the Autocorrelation Test.

The Court finds that the Earnings Test, the Price-Volume Test, and the Autocorrelation Test are admissible under the requirements of Fed. R. Evid. 702 and *Daubert*.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 88 (S.D.N.Y. 2015) (finding that, in cases where there are limited earnings announcement days, the better approach is not to

place arbitrary limits on the number of sample days tested); Mulcahey Opp. Report ¶¶ 71-74 & n.111-113 (citing literature that discusses the relationship between new information, stock returns, and trading volume, which indicates that the Price-Volume Test is subject to peer review; *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 213 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 507 (S.D. Tex. 2004) (accepting autocorrelation period that corresponds to the proposed class period).

However, the News/No News Test, the Speed Test, and a Reverse Event Study, as conducted to date, are inadmissible for the reasons that follow.

### 1.  News/No News Test

To execute the News/No News Test, Mulcahey compared the proportion of statistically significant stock price reactions on non-news days to news days, with "news days" defined as days that contained a primary analyst report; or either a primary or a secondary analyst report. *Id.* ¶ 50, 56.  Mulcahey concluded that because Montage's stock reacted more often on news days than on non-news days, and because the difference was statistically significant, the market was efficient. *Id.* ¶¶ 59-61.

Defendants correctly point out that since Mulcahey admitted to *never having read* the analyst reports, he must have assumed that the 51 analyst reports he included his News/No News test met his definition of news—news that contained new and unexpected information.  Motion to Exclude at 8; *see also* Moss Dec., Exhibit M, Deposition of Howard Mulcahey ("Mulcahey Deposition") at 108:20-109:2.  If Mulcahey never read the analyst reports that he labeled as "news" for the purposes of his News/No News test, then it was impossible for him to determine whether those analyst reports actually contained new and unexpected information.  Therefore, it could be the case that statistically significant "news days" did not actually rely upon new and unexpected information, *i.e.*, that the stock price improperly reacted to old information. This would actually be evidence of market inefficiency.

The Court is unconvinced that the methodology used by Mulcahey in the News/No News test was reliably applied and will exclude the test from the jury's consideration.  *See SEC v.*

United States District Court
Northern District of California

18

1    *Razmilovic*, 822 F. Supp. 2d 234, 263 (E.D.N.Y. 2011) (excluding expert's opinion under *Daubert*

2    because the expert did not apply methodology reliably when she conducted the event study in

3    question).

4

5                                    **2.   Speed Test**

6           According to Mulcahey, "one indicia of market efficiency is prompt incorporation of the

7    effects of new information in stock prices through trading activity.  One of the most widely-cited

8    characteristics of an efficient market for a security is the prompt incorporation of the effects of

9    new information in stock prices through trading activity in the market."  Mulcahey Report ¶ 67.

10   In Mulcahey's speed test he (i) identified the 7 trading days during the class period with excess

11   returns that were significant at a 99% confidence level ("big return days"), and then (ii) examined

12   whether the excess return for the day following a big return day was statistically significant.  *Id.* ¶

13   71.  Mulcahey assumed that "unusually large excess stock returns generally reflect the reaction by

14   investors to value-relevant news being disseminated into the marketplace."  *Id.* ¶ 68.  Mulcahey

15   concluded that "the speed of price reaction to new information . . . supports a finding of the

16   efficiency of the market for Montage common stock."  *Id.* ¶ 74.

17          Defendants point out that the speed test is "logically circular" because it is "based on the

18   assumption that unusually large residual stock returns generally reflect the reaction by investors to

19   value-relevant news" even though "this assumption is exactly the question that the test is supposed

20   to examine"—*i.e.*, whether the price of Montage stock reacts to news.  Motion to Exclude at 13.

21   The Southern District of New York adopted this reasoning in *George v. China Auto. Sys., Inc.*,

22   2013 U.S. Dist. LEXIS 93698, at *30 (S.D.N.Y. July 3, 2013) ("*George*").

23          In  *George*,  the  plaintiffs'  expert  purported  to  test  the  speed  of  price  reaction

24   in the stock to new information.  *Id.* at *30.  Mirroring Mulcahey's behavior, the expert in *George*

25   first identified the days on which the stock in question had the largest excess returns.  *Id.*  He then

26   looked to see whether there was a statistically significant return on the following day.  If the

27   following day did not have a statistically significant return, he opined that it was an indication of

28   an efficient market.  *Id.*  The Court rejected this test, noting that it "suffers from a fatal logical

United States District Court
Northern District of California

19

flaw" by purporting to test whether information is efficiently impounded into the stock price without "looking at whether the days in which there was price movement had any news actually associated with them." *Id.* The court concluded that the speed test, as applied by the expert, was "based upon flawed methodology." *Id.*

Mulcahey conducted his speed test in the same manner as the expert in *George*. Mulcahey further admits that the speed test has no basis in academic literature. *See* Mulcahey Deposition at 146:20. The speed test as conducted here is unreliable and is therefore inadmissible pursuant to *Daubert*.

### 3. Reverse Event Study

Mulcahey also performed a reverse event study in his analysis of whether Montage stock traded on an efficient market. According to Mulcahey's Report, a reverse event study does not require a pre-defined news event; it merely serves to validate the News/No News test that Mulcahey previously conducted. Mulcahey Report ¶78. To conduct this test, Mulcahey selected "the 12 days that had statistically significant stock price changes for Montage during the Class Period . . . to determine what, if any, information may be responsible for the stock price movements." *Id.* ¶80. Defendants challenge Mulcahey's use of a reverse event study, arguing that it is not a sufficient test for assessing market efficiency. Motion to Exclude at 14. The Court agrees. Gompers Report ¶67; Mulcahey Deposition at 176:16-22.

Reverse event studies were relied upon by academics in two separate papers cited by Mulcahey in his expert report. Mulcahey Report ¶ 78 & n.85, 86. Courts have recognized that a reverse event study can complement the News/No News test. *See, e.g.*, *Loritz v. Exide Techs.*, 2015 U.S. Dist. LEXIS 100471, at *45-46 (C.D. Cal. July 21, 2015) (finding an expert's reverse event study proper when considered in conjunction with his news v. no-news study); *see also KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *9 (W.D. Tex. June 4, 2013). While a reverse event study can serve as a "cross check" for a previously conducted News/No News Test, here Mulcahey did not reliably perform the News/No News Test in his expert report. *See supra* p. 18. It is unreasonable to assert that a properly conducted reverse event study can supplement an

United States District Court
Northern District of California

1   unreliably performed News/No News Test.  This test as performed is unreliable and is therefore

2   inadmissible pursuant to *Daubert*.

3

4                  ii.      ***Cammer*** **Factors 1-4 and** ***Krugman*** **Factors**

5          Mulcahey also analyzed a number of "indirect" factors that plaintiffs suggest are

6   indicative of market efficiency, including (1) weekly trading volume, (2) analyst and media

7   coverage, (3) the amount of market makers, (4) Form S-3 eligibility, (5) the bid-ask spread, (6)

8   percentage of shares held by insiders, (7) the presence of institutional investors, and (8) the

9   amount of short interest.  Mulcahey Report ¶¶ 97-168.  The first four indirect factors originate in

10  *Cammer* and have been adopted by the Ninth Circuit.  *See Binder*, 184 F.3d at 1065.  The

11  remaining factors were relied upon in *Krogman v. Sterrit*, 202 F.R.D. 467, 474 (N.D. Tex. 2011),

12  and have been applied by our sister courts in similar cases.  *See e.g.*, *Petrie v. Elec. Game Card,*

13  *Inc.*, 308 F.R.D. 336, 357 (C.D. Cal. 2015); *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D.

14  563, 574 (C.D. Cal. 2012).  Mulcahey concluded that these factors, as applied to Montage stock,

15  indicate that Montage stock traded on an efficient market.

16         Defendants object to the *Cammer* and *Krogman* factors on the basis that they cannot

17  demonstrate the "cause and effect relationship central to market efficiency."  Motion to Exclude at

18  19.  However, these factors are not used to demonstrate the cause and effect relationship central to

19  market efficiency, because that is precisely what *Cammer* factor 5 is for.  Rather, these factors

20  illuminate the dimensions and characteristics of the market for Montage stock, and the Court finds

21  that Mulcahey appropriately used these factors in his analysis of market efficiency.  His analysis

22  was based on reliable principles and methods as endorsed by the Ninth Circuit.

23

24                  iii.     **Mulcahey's Testimony on Price Impact**

25         Defendants also assert that Mulcahey had no basis to conclude that the statistically

26  significant returns that he found on February 6 and 7, 2014 were due to the Gravity Report's

27  revelations of related party transactions, and not because of the allegation that Montage fabricated

28  its revenues.  Motion to Exclude at 20.  Defendants essentially argue that the effects of the alleged

United States District Court
Northern District of California

1    revenue fabrication cannot be distinguished from the effects of the alleged related party

2    transactions. *Id.*

3           But as Mulcahey explained in his opposition report, he had "no economic reason to

4    disaggregate any of the stock price effects that resulted from the Gravity Report," because

5    "Gravity's revenue fabrication claim was a *direct and foreseeable consequence* of Gravity's

6    allegations that Montage failed to disclose material related party transactions in violation of

7    GAAP, and as a result was directly related to Plaintiffs' allegation of Defendants' wrongdoing."

8    Mulcahey Opp. Report ¶ 94.  Mulcahey did not adopt or apply a flawed methodology simply

9    because he did not disaggregate the price impact of one alleged wrongdoing that directly resulted

10   from another.

11

12              d.  **Conclusion: The Mulcahey Report is Admissible in Part and**
                    **Plaintiffs are Entitled to a Fraud-on-the-Market Presumption of**
13                  **Reliance**

14          The Mulcahey Report purported to determine whether Montage stock traded on an efficient

15   market.  Mulcahey employed six direct tests to examine whether a causal relationship between

16   new market information and Montage stock price fluctuations existed, as required by *Cammer*

17   factor 5.  The Court finds three of these direct tests inadmissible, and three of these direct tests

18   admissible.  The analysis of the remaining *Cammer* and *Krugman* factors concerning whether

19   Montage stock traded on an efficient market is also admissible.   Accordingly, defendants' motion

20   to exclude the Mulcahey Report is GRANTED in part and DENIED in part, and the excluded

21   portions of the Mulcahey Report shall be barred from the fact finder's consideration.

22          In sum, plaintiffs' reliance on fraudulent statements can be presumed if (1) the alleged

23   misrepresentations or omissions were publicly known, (2) they were material, (3) *the stock traded*

24   *in an efficient market*, and (4) the plaintiff traded stock between when the misrepresentations or

25   omissions were made and when the truth was revealed.  *See Halliburton II*, 134 S. Ct. at 2407-

26   2408 (emphasis added).  As a result of the Mulcahey Report's partial admissibility, plaintiffs have

27   demonstrated, by a preponderance of the evidence, that Montage stock traded in an efficient

28

United States District Court
Northern District of California

1    market, which was the crux of defendants' challenge to the fraud-on-the-market presumption.

2    Plaintiffs are entitled to the fraud-on-the-market presumption of reliance under this theory.

3

4                  **3.    Plaintiffs Have Provided a Sufficient Damages Model**

5           Lastly, defendants contend that plaintiffs have not met the predominance requirement

6    pursuant to Rule 23(b)(3) because plaintiffs have failed to demonstrate, under *Comcast*, that

7    damages can be proven on class-wide basis.  Def. Opp. at 20 (citing *Comcast*, 133 S. Ct. at 1432).

8    In *Comcast*, the Supreme Court found that plaintiffs' proffered damage model did not measure

9    damages resulting specifically from the theory of antitrust impact that was endorsed by the district

10   court during class certification.  *Comcast*, 133 S. Ct. at 1433-1434.  In other words, the damages

11   calculation was unconnected to the theory of antitrust liability.

12          In a securities fraud matter concerning purported violations of Section 10(b) and Rule 10b-

13   5 of the Exchange Act, courts have found that a price impact analysis such as an event study can

14   serve as a method of calculating class-wide damages.  *See, e.g.*, *In re Diamond Foods*, 295 F.R.D

15   at 251-252 (accepting the event study conducted by plaintiff's expert as a sufficient measure of

16   demonstrating that damages can be proven on a class-wide basis); *In re Imperial Credit*, 252 F.

17   Supp. 2d. at 1014 (acknowledging that the event study method is an accepted method of

18   evaluating the "materiality of damages to a class of stockholders in a defendant corporation").

19   Here, Mulcahey conducted a price impact analysis that determined whether the Gravity Report had

20   an effect on Montage stock.  *See* Mulcahey Opp. Report ¶¶ 93-94.  Accordingly, plaintiffs have

21   sufficiently shown that damages can be proven on a class-wide basis, such that individual damage

22   analyses will not engulf questions common to the class as a whole.

23

24                  **4.    Conclusion: Plaintiffs Have Satisfied the Predominance Requirement of
                          Rule 23(b)(3)**

25

26          The Court finds that plaintiffs are entitled to a presumption of reliance under *Affiliated Ute*

27   and fraud-on-the-market.  It is not necessary for the Court to also analyze whether a presumption

28

                                              23

of reliance pursuant to fraud-on-the-regulatory process applies.  Plaintiffs have also shown that damages can be proven on a class-wide basis.[3]

///

### B.     Superiority

"Rule 23(b) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon*, 150 F.3d at 1023 (quoting Fed. R. Civ. P. 23(b)(3)).  The Court must determine "whether the objectives of the particular class action procedure will be achieved in the particular case."  *Id*. (citation omitted).  The four factors for the Court's examination are: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  *Zinser*, 253 F.3d at 1190-92.

A class action is the superior method of adjudication in this case.  The alternative methods of resolution are individual claims by individual plaintiffs.  Class treatment would increase the class members' access to redress by unifying what otherwise may be multiple small claims.  Further, to the Court's knowledge, there is no other pending litigation involving these claims.  *Zinser*, 253 F.3d at 1191.  Each class member will not have to litigate "numerous and substantial separate issues to establish his or her right to recover individually."  *Id*. at 1192.  Here, the complexities of class action treatment do not outweigh the benefits of considering common issues in one trial; thus, class action treatment is the superior method of adjudication.  *Id*.

Defendants do not challenge plaintiffs' arguments regarding superiority.  The Court finds that plaintiffs have satisfied the superiority requirement, and concludes that plaintiffs have met

---

[3] *See In re Diamond Foods, Inc., Sec. Litig*., 295 F.R.D. at 252 ("Whether plaintiff will ultimately prevail in proving damages is not necessary to determine at this stage.  Instead, the question for class certification is whether plaintiff has met its burden of establishing that damages can be proven on a classwide basis.  On this record, plaintiff has sufficiently shown that damages are capable of measurement on a classwide basis such that individual damage calculations do not threaten to overwhelm questions common to the class.").

United States District Court
Northern District of California

1    both elements of Rule 23(b).

8    ///

9                                        **CONCLUSION**

10           For the reasons discussed above, the Court GRANTS plaintiffs' motion for class

11   certification, and GRANTS in part and DENIES in part defendants' motion to exclude expert

12   testimony.

13           **The Court will conduct a further Case Management Conference on Friday, May 6,**

14   **2016 at 3:00 pm.**  **One week prior to that date, the parties shall file a Joint Case Management**

15   **Conference Statement, providing suggested dates for the remainder of this action.**

17           **IT IS SO ORDERED**.

20   Dated:  April 21, 2016

22                                                        SUSAN ILLSTON
                                                          United States District Judge

United States District Court
Northern District of California

25